# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

NEW YORKERS FOR RELIGIOUS LIBERTY, INC.,
GENNARO AGOVINO, CURTIS CUTLER, LIZ
DELGADO, JANINE DEMARTINI, BRENDAN
FOGARTY, SABINA KOLENOVIC, KRISTA O'DEA,
DEAN PAOLILLO, DENNIS PILLET, MATTHEW
RIVERA, LAURA SATIRA, FRANK SCHIMENTI,
JAMES SCHMITT, individually and on behalf of all
other persons similarly situated,

Case No. 1:22-cv-00752

Plaintiffs,

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
DAMAGES

- against -

THE CITY OF NEW YORK; ERIC ADAMS, in his
official capacity as Mayor of the City of New York,
DAVE CHOKSHI, in his official capacity as Health
Commissioner of the City of New York, and ROBERTA
REARDON, in her capacity as New York State
Commissioner of Labor,

JURY TRIAL DEMANDED

Defendants.

-------------------------------------------------------------------- x

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*

— James Madison, A Memorial And Remonstrance, On The Religious Rights Of Man: Written In 1784-85

       Plaintiffs, proceeding as individuals and as a proposed class, herein complain of the Defendants as follows:

## NATURE OF ACTION

1.      Named Plaintiffs and Class members are New York City employees, employee unions and

1

non-employee individuals who are required by various public health mandates issued by the Defendants to receive vaccination against the COVID-19 virus.

2.      Plaintiffs allege violations of their fundamental religious and constitutional rights. On behalf of themselves and all others similarly situated, they seek declaratory and injunctive relief, as well as reinstatement, nominal, compensatory, actual and punitive damages, attorneys' fees and other remedies, for harms arising from the vaccination mandates listed on the Appendix to this complaint (collectively, the "Mandates"), and discriminatory policies adopted by the Defendants in the implementation of the Mandates.

3.      Collectively and individually, the Mandates violate fundamental constitutional rights, both facially and as applied through general practice and to individuals, arbitrarily and capriciously discriminate against individuals with sincere religious objections to vaccination– even though the individuals pose no direct threat to others because of their religious or medical needs– and place unconstitutional conditions on employment.

4.      In implementing the Mandates, state actors working on behalf of the City of New York adopted facially unconstitutional standards and policies subjecting Plaintiffs and thousands of other individuals to per se unconstitutional heresy inquisitions and other religious harassment.

5.      The leaders of New York City sanctioned and encouraged this discrimination. In press briefings, former Mayor Bill de Blasio made statements clarifying that the City adopted a preference for the Pope's viewpoint about what "scripture" requires on the topic of vaccines, expressed hostility towards religious opposition to vaccination as largely "invalid," stated that the City would be openly preferencing Christian Scientists and Jehovah's Witnesses, and said that to get an exemption, applicants would have to be a "standing member of a faith that has a very, very specific long-standing objection" to vaccination according to the Mayor's religious viewpoint. Mayor de Blasio further

stated that the City would discriminate against anyone with beliefs that fall under the definition of heresy—that is, less widely recognized, unorthodox or personally held religious beliefs.

6.      Under the ex-Mayor's openly discriminatory standard, people with personally held religious beliefs or unorthodox religious beliefs were expressly supposed to be (and were) singled out for discriminatory treatment by the defendants even though their beliefs are sincere.

7.      In addition to being discriminatory, the Mandates are irrational.

8.      COVID-19 vaccine mandates cannot stop the spread of SARS-CoV-2. The vaccines may blunt the severity of the disease, but the evidence does not support an assumption that they stop infection with and transmission of SARS-CoV-2 to others.

9.      Moreover, there are far less invasive measures available to ensure public safety than forcing individuals to violate their deeply held religious beliefs or lose their jobs.

10.     The Mandates are an outlier. No other city in the state requires vaccination as a condition of employment for all workers.

11.     They are also overbroad. There is no option to get tested in lieu of vaccination in these Mandates. Nor is natural immunity recognized, even though the data overwhelmingly shows that natural immunity is more robust and durable than vaccine immunity. Moreover, remote employees are not allowed an exemption or accommodation, even those who can easily work outside of an office due to the nature of their work.

12.     By the same token, the Mandates are underinclusive. In limiting its scope to the covered entity, group or individuals, each Mandate fails to include all other people, groups or organizations in New York City who fall within the declared statutory purpose of resolving the Covid-19 pandemic. And, many have carve outs for various secular categories of persons.

13.     Excluding unvaccinated staff has not proven to have any impact on mitigating the spread of

COVID-19. For example, before the DOE's unvaccinated staff were excluded on October 4, 2021, the average number of infections for all staff across the New York City school district was about 40 active infections at a time for the first month of school. This, despite an outsize delta variant outbreak.

14.     After exclusion of all unvaccinated teachers, average percent of DOE staff infected remained largely the same, and followed the same curve as the outbreaks in the largely unvaccinated student population. Last month, numbers were regularly in the thousands for daily infections, rising as high as over 5,000 actively infected fully vaccinated staff in early January.

15.     Currently, there are many staff members infected among the fully vaccinated DOE staff. This is in large part due to the Omicron variant. Vaccination has proven ineffective at stopping infection with the now dominant Omicron variant.

16.     Perhaps most shocking, because such a large percentage of the fully vaccinated staff is currently infected with COVID-19, and because the exclusion of unvaccinated teachers has already caused a massive staffing crisis, the DOE adopted the recommendation that actively infected teachers should return to school without testing to mitigate the staffing crisis. *See*, e.g., Juliana Kaplan, Short-taffed NYC schools are asking teachers with mild COVID symptoms to return to the classroom, Business Insider, https://www.businessinsider.com/teacherscan-return-to-classroom-after-positive-covid-test-mild-symptoms-2022-1.

17.     DOE data supports multiple reputable studies, showing that high vaccine uptake does not slow the spread of the virus or reduce infection rates.

18.     As one of many examples, a recent Harvard study found that "there appears to be no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases." Subramanian S. V. & Akhil Kumar, Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States, European Journal of Epidemiology, 1-4, Sep. 30, 2021, doi: 10.1007/s10654-021-00808-07.

19.     There is simply no way to achieve herd immunity with these vaccines. Public health officials and experts have unanimously acknowledged that we cannot vaccinate our way out of this virus. Most people, regardless of vaccine status, will eventually get COVID-19, and we are going to have to learn to live with it as endemic to our societies.

20.     Yesterday, Dr. Fauci admitted that most pandemic restrictions will likely end soon, stating in an interview with the Times of Israel that "there is no way we are going to eradicate this virus." Countries around the world have ceased COVID zero policies like mandates and lockdowns, and are beginning to face the fact that sacrificing our liberties and important fundamental rights cannot stop the spread of virus, and has serious consequences of its own.

<u>THE PARTIES</u>

***<u>Plaintiffs</u>***

21.     Plaintiff New Yorkers for Religious Liberty, Inc. ("NYFRL") is a validly existing corporation organized under the New York State Not-For-Profit Corporation Law. Its certificate of incorporation states that among its purposes is "to educate the public and to advocate for religious freedom of all persons, regardless of belief or creed."

22.     Plaintiff Gennaro Agovino ("Agovino") is employed by the New York City Department of Corrections ("DOC"). Agovino has not received a COVID-19 vaccination or been infected with COVID-19.

23.     Plaintiff Curtis Cutler ("Cutler") has been employed by the New York City Department of Sanitation ("DSNY") since 2014.

24.     Plaintiff Liz Delgado ("Delgado") has been employed by the City for the past 30 years. She has been an employee of the New York City Department of Investigation ("DOI") since 2016.

25.     Plaintiff Janine DeMartini ("DeMartini") worked as a social worker/therapist for the Child

Study Center of New York ("CSCNY"), a private preschool program for special needs children, from October 2018 until her employment was terminated by her employer because she was not yet vaccinated.

26.     Plaintiff Brendan Fogarty ("Fogarty") has been employed by the New York City Fire Department ("FDNY") for nearly twenty years. He has held the rank of Fire Department Captain for the past two years.

27.     Plaintiff Sabina Kolenovic ("Kolenovic") has worked for the New York City Department of Education ("DOE") for eight years.

28.     Plaintiff Krista O'Dea has been employed by FDNY for the past 16 years. She currently works as a Rescue Medic.

29.     Plaintiff Dean Paolillo began to work for the New York City Police Department ("NYPD") in 2021.

30.     Plaintiff Dennis Pillet was employed by FDNY as an emergency medical technician until he was put on leave without pay in December, 2021 for failure to submit to COVID-19 vaccination.

31.     Plaintiff Matthew Rivera has been an employee of Consolidated Edison, Inc. ("ConEd"), a private employer, for the past 13 years. He works in a customer payment center in New York City.

32.     Plaintiff Laura Satira ("Satira")  worked until December 16, 2021 for St. Bernard's Catholic Academy ("St. B.") as an early childhood resource teacher.

33.     Plaintiff Frank Schimenti has worked for the City for the past 25 years, and has worked for the New York City Department of Buildings ("DOB") for 23 years, most recently as the Assistant Chief Plan Examiner and Project Advocate for the Borough of Staten Island.

34.     Plaintiff James Schmitt has worked as a plumber for the New York City Department of Parks and Recreation ("DOPR") for the past 13 years.

35.     Defendant City of New York (the "City") is a municipal corporation constituting the local municipal government of the population residing  in New York, Bronx, Queens, Kings and Richmond Counties in New York State. The Fiorst Amendment of the United States Constitution applies to this defendant by virtue of the Fourteenth Amendment.  The City operates and employs people through agencies, including the DOB, DOC, DOE, DOI, DOPR, DSNY, FDNY and NYPD, among others.

36.     Defendant Eric Adams ("Mayor Adams") is the Mayor of the City. Sued in his official capacity, Mayor Adams is responsible for setting and overseeing the policies of the City and the manner in which they are maintained, applied and enforced. Mayor Adams acted at all times under color of law in the acts attributed to him herein.

37.     Defendant David Chokshi ("Commissioner Chokshi") is the Commissioner of Health and Mental Hygiene of the City of New York ("DOHMH"). Sued in his official capacity, Commissioner Chokshi promulgated the Mandates. Commissioner Chokshi acted at all times under color of law in the acts attributed to him herein.

38.     Roberta Reardon ("Commissioner Reardon") is the Commissioner of Labor of the State of New York. Sued in her official capacity, Commission Reardon is responsible for setting and overseeing the policies of the New York State Department of Labor, including without limitation its regulations and definitions concerning unemployment insurance, and the manner in which they are maintained, applied and enforced. Commissioner Reardon acted at all times under color of law in the acts attributed to her herein.

## JURISDICTION AND VENUE

39.     This court has jurisdiction to adjudicate all federal claims raised in this matter under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the

laws and Constitution of the United States; the Supremacy Clause of the Constitution of the United States, which allows federal district courts to hear suits alleging preemption of state and local laws by the Constitution and federal laws made in pursuance thereof; and 42 U.S.C. § 1983 and 28 U.S.C. § 1343 in relation to Defendants' deprivation and infringement under color of law of the Plaintiffs' rights, privileges, and immunities secured by the United States Constitution and laws, as detailed further herein.

40. This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorney's fees and costs under 42 U.S.C. § 1988.

41. Venue is proper in the United States District Court for the Eastern District of New York for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which Defendants unlawfully deprived many of the Plaintiffs and Class members of their rights under the laws and Constitution of the United States, as further alleged herein. It is also the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred and continue to occur.

<u>CLASS ACTION ALLEGATIONS</u>

42. The Plaintiffs bring this class action pursuant to Rule 23 in their representative capacity on behalf of themselves and the Class of all others similarly situated as defined in this complaint. Plaintiffs propose a Class consisting of all persons whose employment has been harmed or threatened by the City's mandates because they have religious objections to vaccination against COVID-19 (the "Class").

43. This action meets the following prerequisites of Rule 23(a):

      a. Numerosity: The Class includes thousands of members. Due to the high number of class members, joinder of all members is impracticable and, indeed, virtually

impossible.

b. Ascertainability: The proposed Class is ascertainable. Every Plaintiff is employed directly or indirectly by the DOE. Anyone who asserts that they have religious objections to the DOE Mandates is eligible to join the class.

c. Commonality: A substantial pool of common questions of law and fact exists among the Class, including but not limited to:

  i. Whether the DOE adopted facially discriminatory policies and practices for determining religious exemptions and suspended or otherwise adversely impacted the employment conditions of thousands of employees pursuant to these policies;

  ii. Whether the Mandates are subject to strict scrutiny on its face;

  iii. Whether the Mandates are subject to strict scrutiny as applied through facially unconstitutional and discriminatory Exemption Standards;

  iv. Whether the Mandates as implemented can survive strict scrutiny, including whether there are less restrictive means of mitigating the spread of COVID-19;

  v. Whether the First Amendment applies to determinations about the validity of religious beliefs made by state actors considering religious exemption and accommodation, and what standard of review is required to assess those determinations;

  vi. The irrationality and arbitrariness of particular provisions of the Mandates;

  vii. Appropriate remedies to address the discrimination that occurred.

d. Typicality: Named Plaintiffs' claims are typical of the claims of the Class. Plaintiffs are all directly or indirectly employed by the DOE. The harm suffered by Plaintiffs and

the cause of such harm is representative of the respective Class.

     i. The claims or defenses of the Named Plaintiffs and the Class arise from the same events and actions by Defendants and are based on the same legal theory.

     ii. The Named Plaintiffs include most subgroups of the proposed Class– including inter alia those who declined to apply under the facially discriminatory Exemption Standards policy because it appeared futile or offensive, those who applied initially, were denied and then appealed, those who were denied and declined to appeal under the facially discriminatory Exemption Standards policy, those who were granted appeal hearings, those who were not given a chance for a hearing on appeal, those who were accepted in their zoom appeal, those who were denied on appeal, those who were accepted after second review by the "Citywide Panel" and those who were denied after second review by the "Citywide Panel."

     iii. Since preliminary injunctive relief was already afforded to the diverse Plaintiffs collectively by the Second Circuit without distinction among the subcategories, it follows that they and those similarly situated have enough commonality to meet the standards under Rule 23.

e. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class.

f. Plaintiffs do not have any interests that conflict with the interests of the members of the Class. Plaintiffs have engaged competent counsel who are experienced in complex litigation, including class actions.

g. Superiority: A class action is superior to alternatives, if any, for the timely, fair, and efficient adjudication of the issues alleged herein. A class action will permit numerous

similarly situated individuals to prosecute their common claims in a single forum simultaneously without duplication of evidence, expense, and resources. This action will result in uniformity of decisions and avoid risk of inconsistency and incompatible standards of conduct in the judicial system. It will also more efficiently allow adjudication of the pattern and practice claims.

h.  Maintainability: This action is properly maintainable as a class action for the above-mentioned reasons and under Rule 23(b):

    i.  The individual amount of restitution involved is often so insubstantial that the individual remedies are impracticable and individual litigation too costly;

    ii.  Individual actions would create a risk of inconsistent results and duplicative litigation;

    iii.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby rendering final injunctive relief or declaratory relief appropriate for the Class as a whole; and

    iv.  Individual actions would unnecessarily burden the courts and waste judicial resources.

i.  Predominance: The questions of law or fact common to Class Members predominate over any questions that may affect only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## FACTS COMMON TO ALL CLAIMS

44.  In March 2020, ex-Governor Cuomo declared a state of emergency due to the emergence of the COVID-19 pandemic. On March 20, 2020, he signed the "New York State on PAUSE" executive

order, which *inter alia* closed non-essential businesses throughout New York State and banned all non-essential gatherings of any kind. New York State and New York City began to pursue a policy of masking, social distancing, quarantines and shut-downs to control the pandemic.

45.     On March 12, 2020, Mayor de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City posed by COVID-19.

46.     On March 25, 2020, Commissioner Chokshi declared the existence of a public health emergency within the City to address COVID-19.

47.     Throughout New York City and elsewhere, businesses and public authorities transitioned to remote work and tele-commuting wherever possible.

48.     In March 2020, the New York City Department of Education ("DOE") closed all schools in its system, pivoting to a program of system-wide remote instruction. All school personnel and students participated in school activities through remote means.

49.     On June 8, 2020, New York City began reopening, putting in place safety protocols that included limitations on occupancy of public interior spaces.

50.     In December, 2020, the US Food & Drug Administration authorized the first vaccinations using newly-developed vaccines against COVID-19. Due to limited supplies, vaccines were available at first only to health-care workers, nursing-home residents and persons who were 75 years of age and older.

51.     In January, 2021, New York State lowered its minimum age for vaccine administration to 65. The following month, New York City made vaccines available to restaurant workers and taxi drivers, and reopened public middle schools for in-person instruction.

52.     In March 2021, public high schools reopened in New York City, restricted businesses including fitness classes resumed, and the vaccine eligibility age was lowered to 50.

53. On June 23, 2021, ex-Governor Cuomo issued a declaration that the state of emergency due to COVID-19 was officially over in New York. On July 1, 2021, ex-Mayor de Blasio re-opened New York City without restriction.

54. On July 20, 2021, despite the absence of any new emergency, Commissioner Chokshi issued an order requiring staff in public healthcare and clinical settings to demonstrate proof of COVID-19 vaccination or undergo weekly testing.

55. On July 26, 2021, Mayor de Blasio announced his plan to implement a vax-or-test mandate pursuant to which all city workers were going to be required to complete their vaccine series by September 13, 2021, or undergo a weekly virus test. Until then, unvaccinated workers would be required to wear masks at work starting on August 2, 2021. The vax-or-test element of this planned policy was superseded, with respect to most City employees, by later announcements, and never came fully into effect.

56. By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with presently available vaccines; (3) vaccine protection wanes significantly after a short period of time. Entire governments began to acknowledge that we will need to learn to live with COVID-19 as an endemic part of human life, and everyone (vaccinated and unvaccinated alike) will at some point catch and spread COVID-19.

57. Nonetheless, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the still-experimental COVID-19 vaccines. At a press conference, he described the goals of the

program as follows:

> The key to New York City – when you hear those words, I want you to imagine the notion that because someone's vaccinated, they can do all the amazing things that are available in this city. This is a miraculous place literally full of wonders. And, if you're vaccinated, all that's going to open up to you. You'll have the key. You can open the door. **But, if you're un-vaccinated, unfortunately, you will not be able to participate in many things. That's the point we're trying to get across. It's time for people to see vaccination as literally necessary to living a good and full and healthy life**. The Key to NYC Pass will be a first-in-the-nation approach. It will require vaccination for workers and customers in indoor dining, in indoor fitness facilities, indoor entertainment facilities. This is going to be a requirement. The only way to patronize these establishments indoors will be if you're vaccinated, at least one dose. The same for folks in terms of work, they'll need at least one dose. This is crucial because we know that this will encourage a lot more vaccination.[1]

58.      No religious exemptions exist under the Key to NYC program, leaving religious minorities unable to participate in fundamental aspects of life in the City, including aspects "literally necessary to living a good and full and healthy life" according to the mayor.

59.     Two days after the "Key to NYC" was announced, on August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky clarified that the data on vaccine effectiveness against the then-dominant delta variant are conclusive: though the vaccines appeared to prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."[2]

60.     Instead of pausing his mandates, Mayor de Blasio began what appears to be a crusade in earnest against the unvaccinated, intruding his ever-expanding mandates into the workplace.

61.     On August 10, 2021, Commissioner Chokshi issued an order requiring staff providing City operated or funded services in residential and congregate settings to demonstrate proof of COVID-19 vaccination or undergo weekly testing.

---

[1]https://www1.nyc.gov/office-of-the-mayor/news/539-21/transcript-mayor-de-blasio-holds-media-availability
[2]http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

1.

62.     On August 16, 2021, the City issued the first of what eventually became scores of major and minor COVID-19 vaccine mandates issued between that date and now. In his Emergency Executive Order No. 225, Mayor de Blasio promulgated rules putting his Key to New York City program into effect and incorporating the terms that he had announced in early August, including mandatory vaccination of all employees working in establishments covered by the order.

63.     No religious exemptions were offered under any of the early "Key to New York City" program Mandates. The religious exemption was purposefully left out due to the ex-Mayor's hostility towards religious objections to vaccination.

64.     In discussing his planned vax-or-test policy in mid-August 2021, Mayor de Blasio remarked that he hoped that the testing requirements would be so burdensome that people would need to get vaccinated to avoid them – demonstrating his animus toward persons who refused to get vaccinated for religious or other reasons.

65.     On August 20, 2021, Mayor de Blasio issued Emergency Executive Order No. 226, substituting new rules for the Key to NYC program for those he had issued in E.E.O. 225.

66.     Then, on August 23, 2021, once again with no justification from the data or case numbers, Mayor de Blasio and Commissioner Chokshi announced that employees of the New York City Department of Education ("DOE") would not have an option to undergo weekly testing but would now be terminated if they did not receive at least their initial COVID-19 vaccinations by September 27, 2021. As announced, the new policy did not allow exemptions for any reason.

67.     On August 24, 2021, Commissioner Chokshi promulgated a written vaccine mandate ("Original DOE Mandate"), incorporating the policy announced on August 23rd. The Original DOE Mandate included no exemptions for employees of DOE, no matter whether they were employed in

DOE school buildings or remotely (with various exceptions for certain categories of employees or reasons other than religious accommodation provided).

68.     Lawsuits and labor disputes ensued. Mass protests erupted and continue to be held.

69.     The DOE openly refused to agree to consider any religious exemptions or accommodations to the policy as the parties tried to negotiate.

*70.*     On August 25, 2021, Mayor de Blasio issued Emergency Executive Order No. 228, which revised his August 20 order (E.E.O. 226) to recognize that the law required employers covered by the Key to NYC rules to provide reasonable accommodations to employees as required by law.


*Arbitration and Initial Lawsuits Forced the City to Agree to Accommodate Religious Beliefs*

71.     On September 1, 2021, the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse. The challenge moved to arbitration.

72.     On September 10, 2021, an arbitrator, Martin F. Scheinman, issued an order in the UFT Arbitration ("UFT Award") that required DOE to permit religious exemptions to its vaccine requirements, but imposed unconstitutional restrictions on the criteria and manner in which requests for such exemptions were to be determined and draconian consequences for unvaccinated DOE employees, even those who did receive an exemption (collectively "Exemption Standards.")

73.     Arbitrator Scheinman has held public fundraisers for Mayor de Blasio and is a major donor. His neutrality is in question.

74.     On information and belief, the discriminatory religious exemption criteria provisions of the UFT Award were composed almost entirely of language and procedures proposed by the City.


*Unconstitutional Exemption Standards Formally Adopted by DOE*

75.     *Inter alia*, the UFT Award contained the following provisions:

a.   As an alternative to any statutory reasonable accommodation process, the City, the Board of Education of the City School District for the City of New York (the "DOE"), and the United Federation of Teachers, Local 2, AFT, AFL-CIO (the "UFT"), (collectively the "Parties") shall be subject to the following Expedited Review Process to be implemented immediately for full-time staff, H Bank and nonpedagogical employees who work a regular schedule of twenty (20) hours per week or more inclusive of lunch, including but not limited to Occupational Therapists and Physical Therapists, and Adult Education teachers who work a regular schedule of twenty (20) or more hours per week. This process shall only apply to (a) religious and medical exemption requests to the mandatory vaccination policy ... *Id*. At 6-7, Section I.

b.   Any requests to be considered as part of this process must be submitted via the SOLAS system no later than Monday, September 20, 2021, by 5:00 p.m. *Id*.

c.   Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an on line source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists). *Id*. at 9, Section I.C.

d.   The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a

17

reason for the denial. *Id*. at 9-10, Section I.E.

e.  If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE within one (1) school day of the DOE's issuance of the initial eligibility determination. The request for appeal shall include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within forty eight (48) hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond forty eight (48) hours and permit the use of CAR days after September 27, 2021, for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination. *Id*. at 10, Section I.F.

f.  A panel of arbitrators identified by SAMS shall hear these appeals, and may request the employee or the DOE submit additional documentation. The assigned arbitrator may also request information from City and/or DOE Doctors as part of the review of the appeal documentation. The assigned arbitrator, at his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the arbitrator requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall be held via Zoom telecommunication and shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the arbitrator's request shall be provided to the DOE at least one (1) business day before the hearing or the issuance of the written decision

18

without hearing. *Id*. at 10-11, Section I.G.

g.  Appeal decisions shall be issued to the employee and the DOE no later than Saturday September 25, 2021. Appeal decisions shall be expedited without full Opinion, and final and binding. *Id*. at 11, Section I.H.

h.  While an appeal is pending, the exemption shall be assumed granted and the individual shall remain on payroll consistent with Section K below. However, if a larger number of employees than anticipated have a pending appeal as of September 27, 2021, as determined by SAMS, SAMS may award different interim relief consistent with the parties' intent. Those employees who are vaccinated and have applied for an accommodation shall have the ability to use CAR days while their application and appeal are pending. Should the appeal be granted, these employees shall be reimbursed any CAR days used retroactive to the date of their initial application. *Id*. at 11-12, Section I.I.

i.  An employee who is granted a [ ] religious exemption [ ] under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/ or accommodation is in place. [ ] Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment. *Id*. at 12-13, Section I.K.

j.  The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested

accommodation is the employee not appear at school. The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth, herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution. *Id*. at 13, Section I. L.

k. Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the DOE and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose. *Id*. at 13, Section II.A.

l. During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from engaging in gainful employment during the leave period. *Id*. at 14, Section II.C.

m. During the period of September[ ] 28, 2021, through October 29, 2021, any employee who is on leave without pay due to vaccination status may opt to separate from the DOE. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused CAR days on a one (1) for one (1) basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and

release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the DOE, for non-disciplinary reasons. An employee who separates under this Section shall continue to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source (e.g., a spouse's coverage or another job). *Id*. at 16, Section III.A.

n.  During the period of November 1, 2021, through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned. *Id*. at 17, Section III.B.

o.  Beginning December 1, 2021, the DOE shall seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions contained, herein, all parties retain all legal rights at all times relevant, herein. *Id*. at 17, Section III.C.

76.     On September 15, 2021, Arbitrator Scheinman issued a second arbitral award in a negotiation between the DOE and the Council of Supervisors and Administrators ("CSA"), which represents DOE employees in supervisory and administrative positions. The CSA Award mirrored the UFT Award.

77.     On information and belief, through arbitration awards and union agreements with City agencies, multiple agencies of the City set up programs for adjudication of appeals from exemption denials by SAMS Appeal arbitrators, implementing the City's unconstitutional policy restricting religious exemptions from the Mandates and targeting unorthodox religious viewpoints for special disability.

78.     The DOE was the first City agency officially to adopt the religious accommodation policy set forth by Arbitrator Scheinman, including the Exemption Standards for the evaluation of religious exemption or accommodation requests, as policy.

79.     None of the collective bargaining agreements applicable to Plaintiffs contains a waiver provision waiving individual employees' right to sue in court for discrimination or constitutional violations.

80.     None of the Plaintiffs consented to permit any union to process a grievance concerning the Defendants' attempt to deprive them of their constitutional rights and, on information and belief, neither did any of the Class members.

81.     Sixteen labor unions representing employees of DOE filed a lawsuit ("Municipal Labor Committee Litigation") in the New York State Supreme Court in New York County on or about September 9, 2021 mounting a facial challenge to the constitutionality of the Original DOE Mandate.[3]

82.     Justice Laurence Love issued a Temporary Restraining Order in the Municipal Labor Committee Litigation against enforcement of the Original DOE Mandate because it failed to provide

for religious and medical exemptions.

83.     The next day, Commissioner Chokshi issued a new mandate (as amended on September 28, 2021, the "DOE Mandate"), which rescinded the Original DOE Mandate, as amended. The amendment extended the vaccination requirement to staff of charter schools and their contractors, but it still did not apply to schoolchildren. The primary change was that following language was also added as part of the DOE Mandate: "Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law."

84.     Justice Love dissolved the TRO on the City's promise that they would no longer oppose offering legally required reasonable religious and medical accommodation.

85.     The City's promise was empty, as they admitted that the process was meant to preclude most applications.

### DOE's Initial Implementation of the DOE Mandate

86.     The Exemption Standards provided the exclusive procedure pursuant to which DOE employees were able to file applications for religious exemptions from the DOE Mandate.

87.     Upon information and belief, at least five thousand DOE employees filed religious-based requests for exemption from the DOE Mandate on or before the deadline. Most of those persons were given only one or two days' notice before the submission deadline to prepare their applications.

88.     All DOE Initial Review applications were immediately denied through an autogenerated form email stating that any accommodation would be an "undue hardship" for DOE. This same email was even sent to DOE employees who already worked remotely and those who could easily be accommodated remotely (such as IT or administrative positions). Applicants were given one day to file an appeal with the SAMS arbitration firm, which provided the exclusive method of appeal, and

---

[3] *New York City Municipal Labor Committee, et al., v. The City of New York, et al.*, No. 158368/2021 (N.Y. Co.).

which required conformity with the Exemption Standards.

89.     Pursuant to the DOE's blatantly unconstitutional religious accommodation policy, thousands of DOE employees were denied religious accommodation and suspended without pay beginning October 4, 2021.[4]

90.     Pursuant to Section II.A of the Exemption Standards, they were eligible to receive health insurance for a finite period but "prohibited from engaging in gainful employment" under Section II.C thereof.

91.     Pursuant to Section III of the Exemption Standards, those unvaccinated employees of DOE whose exemption applications were denied were faced with a Hobson's Choice between two alternatives: (1) they had an option to "choose" to "separate" from DOE, lose their tenure and careers, but remain eligible for health insurance through September 5, 2022, and receive compensation for unused CAR days; or (2) they were permitted to "opt" to extend their unpaid leave status through September 5, 2022, remain eligible for health insurance, but be prohibited from gainful employment for nearly an entire year without income from any source. Both options required the "separated" employee to sign an express waiver of any right to challenge the separation. The DOE's required waiver document for election of Option (1) included the following representation: "As it relates to the DOE, I understand that I lose all entitlements to reversion, retention, and tenure." If unvaccinated employees failed to elect option (1) by October 29, 2021 or Option (2) by November 30, 2021, then the DOE had the power unilaterally to terminate their employment starting on December 1, 2021 according to Section III of the Exemption Standards.

---

[4] The original date of September 27, 2021 was pushed back to October 4, 2021 because of a temporary restraining order from the Second Circuit.

***The DOE extended its mandate to private employers under City contract***

92.     The DOE's original August 24th mandate required employees of private schools that were under contract with DOE to provide certain services to be vaccinated. These schools were under threat of losing their contracts with DOE, and funding, if they did not comply with DOE's instructions.

93.     Private contractors of this type informed their employees of the need to become vaccinated. Some such schools also made their employees aware that the law requires that accommodations be provided to workers who have religious objections to workplace rules, and they accepted religious accommodation requests even before the amendment to the DOE Mandate clarified that the DOE, also, had to accept such requests.

94.     However, on information and belief, the DOE responded to religious accommodation requests from private employers that no accommodations could be made for religious objectors, even after Commissioner Chokshi's September 15, 2021 amendment to the DOE Mandate affirming that it was subject to law requiring consideration of reasonable accommodation requests.

95.     As a result, private employers under contract with DOE terminated persons who submitted valid religious accommodation requests.

***The City Adopted Additional Mandates Applicable to Separate Groups***

96.     The City began issuing a flurry of additional vaccine mandates. Every time a new study came out showing that vaccines cannot stop the spread of the virus, and are for personal protection, not community protection, a new mandate (or several) appeared.

97.     The goal was clearly to eventually mandate COVID-19 vaccines for everyone, or make it impossible to live without having one, but instead of doing it all at once and risking widespread organized resistance, the City picked people off, group by group, each group hoping that perhaps in

their agency, reasonable religious accommodations would be granted.

98.     Each such mandate incorporated the discriminatory arbitration policy the City had established through the DOE as an element of its procedures for determining religious exemptions. However, aside from the common discriminatory policy, the procedures through which the vaccine mandates have been implemented have varied from mandate to mandate and, with respect to some mandates, from agency to agency.

### *The City Employee Mandate*

99.     On October 20, 2021, Commissioner Chokshi issued a mandate (the "City Employee Mandate") rescinding the August 10, 2021 Vax-or-Test Mandate and requiring "all City employees, except those employees described in Paragraph 5" thereof, to submit proof of vaccination no later than October 29, 2021, but delaying the deadline to submit proof of vaccination until November 30, 2021 for certain employees of the Department of Corrections not directly involved in healthcare related duties (pursuant to Paragraph 5 of the mandate). *Inter alia*, the City Employee Mandate applied (and still applies) to employees of the DOB, DOC, DOI, DOPR, FDNY, DOB, DSNY and NYPD, among others. It does not apply, however, to DOE employees.

100.    According to guidelines issued by City, and revised on October 28, 2021, "A sincerely held religious, moral or ethical belief may be a basis for a religious accommodation. A request based solely on a personal, political, or philosophical preference does not qualify for a religious accommodation."

101.    The guidelines also stated that "For reasonable accommodation requests filed on or before October 27, 2021, employees will be permitted to continue to submit weekly negative PCR test results while their accommodation request is under consideration or on appeal", and "Any employee who requests a reasonable accommodation from their agency on or before October 27, 2021 and is awaiting a reasonable accommodation determination from their agency or on any appeal must continue

to submit a negative PCR test result within every seven-day period, as previously required."

102.    Pursuant to the City Employee Mandate, each agency of the City informed its employees that they could request religious exemptions from the vaccine mandate by submitting accommodation requests within a very short time frame to committees controlled by the agencies. On information and belief, initial agency determinations of religious exemption requests were either adjudicated under the Exemption Standards or under no standards at all.

### *Implementation of the City Employee Mandate by the Department of Buildings*

103.    On or shortly after October 20, 2021, the DOB created a form for submission of administrative requests for religious exemption from COVID-19 immunization. The form instructed DOB exemption applicants to submit their applications and supporting documentation by email no later than October 27, 2021 "to avoid being placed on Leave Without Pay (LWOP) on November 1, 2021." Timely unvaccinated applicants were permitted to continue to work, but while their determination was pending "must continue to submit a negative test result within every seven-day period, as previously required." Employees who submitted exemption applications after that date "will be placed on LWOP until the reasonable accommodation is decided, including any appeals."

104.    DOB exemption applicants were instructed to comply with the following instructions:

- Provide a personal written and signed statement detailing the religious basis of your objection, explaining why you are requesting this religious exemption, the religious principle(s) that guide your objections to immunization, and the religious basis that prohibits COVID-19 vaccination.

- Attach any relevant supplemental materials, such as a detailed explanation from your religious organization supporting the basis of your faith/beliefs which are contrary to the practice of immunization or use of COVID-19 vaccines.

105.    On information and belief, DOB employees whose exemption applications mentioned the use of stem cell lines in the manufacture or testing of vaccines received a request from the DOP's EEO Office for further information informing them that the Pfizer vaccine had received FDA approval on

27

August 23, 2021 for adult use and that "[i]t does not appear that the mRNA COVID-19 vaccines produced by Pfizer and Moderna require the use of any fetal cell cultures in order to manufacture (produce) the vaccine," asking them to "provide any additional context regarding your religious exemption request," and asking whether they had ever taken or used any over-the-counter or prescription medications listed on the request, or been vaccinated against a list of diseases that included the standard measles vaccination that is routinely administered to children.

106.    Religious beliefs need not appear true to be granted, and employers (particularly government employers) violate the law by rejecting beliefs on the grounds they are wrong. However, as a factual matter, all three vaccines currently available implicate abortion in some manner during the development or production of the vaccine.

107.    Employees whose initial administrative requests were denied, and who wished to appeal, were required to submit their appeals "to the City's online request portal" at https://www.nyc.gov/vaxappeal within 3 business days, with review of all appeals to be decided by November 25, 2021 in a written determination to be provided to the employee and the Agency EEO Officer. Initially, employees were informed that "[t]here is no other appeals process" and "[t]here is no further appeals process."

108.    Initial denial determinations sometimes included individual evaluations of employees' religious beliefs, e.g., "the sincerely held religious beliefs that you identified do not prohibit you from taking the COVID vaccine." They also included the following instructions concerning appeal: "The request for review must include a reason for the appeal. Upon notification of the appeal, the agency EEO Officer will upload all records concerning the agency determination of the reasonable accommodation request within one business day. Additional supplemental materials to make a determination may be requested from the employee, including a release to permit contact with the

employee's medical provider is such release was not obtained in connecting [*sic*] with the original request."

109.    Once an application for exemption was finally denied, DOB employees were required to submit proof of a first vaccination within 3 business days, and of full vaccination within 45 days thereafter. If they still refused to do so, "they will be placed on Leave Without Pay immediately and may be subject to termination."

### *Implementation of the City Employee Mandate by the Department of Corrections*

110.    On October 27, 2021, the DOC sent an email to its staff requiring most, but not all, of its all staff to submit proof of receiving at least one shot of COVID-19 vaccine by the close of business on October 29. The requirements and procedures to be followed varied between uniformed and non-uniformed staff of the DOC, however.

111.    The DOC's October 29 vaccination deadline applied to nonuniformed staff and to uniformed staff assigned to CHS clinics, west facility, NIC infirmarv, Elmhurst and Bellevue hospital wards. Nonuniformed staff who failed to comply were put on LWOP as of 5 p.m., October 29, 2021. Uniformed staff assigned to the listed medical posts who failed to comply were *not* put on LWOP; they were reassigned to non-medical posts.

112.    Other uniformed staff of DOC were given until November 30, 2021 to submit proof of vaccination.

113.    DOC employees who were subject to the October 29 vaccination deadline who wished to submit requests for reasonable accommodation were required to submit their requests by email by 5 p.m. on October 27, 2021 – giving at least some DOC employees less than five hours' notice of their need to do so. The notice stated that "Employees who file reasonable accommodations requests on or

29

before October 27, 2021, must continue to submit weekly negative PCR test results while their accommodation request is under consideration or on appeal."

114. DOC employees who were subject to the November 30 deadline were told that they would be informed about procedures for requesting reasonable accommodation at a later date.

115. Initially, the City's procedures provided that appeals from administrative exemption denials were to be made to a city-wide appeals panel comprised of employees from several City agencies, including the Law Department, that was separate from each of the agencies involved, but controlled by the City.

116. The City negotiated an agreement with unions for City employees providing employees who belonged to those unions could use either of two procedures to appeal initial denials of their religious accommodation applications: either referral to the Citywide Appeals Panel, or an "expedited" appeal to an arbitrator employed by Scheinman Arbitration & Mediation Services ("SAMS") applying the Exemption Standards established under the Arbitration Award (the "SAMS Option"). The Exemption Standards were blatantly unconstitutional, but the SAMS option included a waiver of all rights to contest the result of arbitral appeal except through a proceeding under Article 75 of New York's Civil Procedure Law and Rules. On information and belief, representatives of the union and the City routinely encouraged applicants to choose the SAMS Option, without mentioning the constitutional violations set forth in the Exemption Standards, and many City employees, including DOC employees, chose the SAMS appeal option as a result.

117. For example, the SAMS option set forth in the City's agreement with Local 300, Service Employees International Union (/SEIU) ("Local 300 Agreement") included the following provision:

> SAMS will only grant appeals based on religious exemptions if it is in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection

is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations ( e.g., Christian Scientists).

118.    The standards set forth in the Local 300 Agreement  are unconstitutional for reasons discussed above.

### *Implementation of the City Employee Mandate by the Department of Investigations*

119.    DOI employees were informed in late October, 2021 that they had only a few days to apply for religious accommodation to the City Employee Mandate. The DOI supplied an application form for its employees to submit. The form provided two lines for applicants to respond to the instruction to "[d]escribe your religious belief/practice/observances and identify the accommodations that you request." The form also contained a section with the following instruction:"To be completed by agency staff supervising the employment application process or supervising an employee requesting a reasonable accommodation. After completing, supervisors must provide a copy of the entire form to the employee or applicant, and immediately send a copy to the EEO Officer or DRC." On information and belief, the requirement to provide a copy to the applicant was routinely disobeyed by DOI staff.

120.    Upon receipt of timely-filed exemption application forms, DOI staff sent emails to religious exemption applicants containing the following statement: " Your request has been received. Please continue to submit a negative test result within every seven day period while you await the reasonable accommodation determination."

121.    Some of the DOI religious exemption applicants were contacted by the DOI's EEO unit and conversed with DOE staff about their requests.

122.    DOI exemption applicants whose requests for exemption were denied received emails that provided very little information about the reason for the denials. Such emails included the following statements:

You may appeal this decision within **3 business days**. Your appeal deadline is **close of business on [ ]**. Please click on the link below and follow all instructions in order to proceed with your appeal. ***Appeals are handled and reviewed independently of DOI's EEO Office.***

If you do not appeal, you must **submit proof of the first dose of vaccination within 3 business days of this letter (November 24, 2021) to OICOVIDINFO@doi.nyc.gov or you will be placed on Leave Without Pay (LWOP) status.** If you receive a two-dose vaccine, you must provide documentation that that you have received the second dose of that vaccine within 45 days after receipt of the first dose.

[ ]

The request for appeal must include a reason for the appeal. Upon notification of the appeal, the agency will upload all records concerning the agency determination of the reasonable accommodation request within **one business day**. Additional supplemental material may be requested from the employee. The employee can submit supplemental material directly through the appeals portal. For those who do not have an email address or computer access, they should provide the documentation to their agency EEO office to upload to the portal.

The City appeal panel will provide a written determination to the employee and the Agency EEO Officer. **There is no further appeals process.**

If an employee's appeal is denied, they must submit proof of the first dose of the vaccination **within 3 business days of receipt of the appeal denial**, and if part of a two-dose regimen, submit proof that you have received second dose within 45 days after receipt of the first dose. If an employee refuses to be vaccinated within this timeframe after an appeal is denied, they will be placed on LWOP immediately and may be subject to termination.

You must continue to submit a weekly negative test result within every seven-day period, as previously required, until either your reasonable accommodation request is approved on appeal, you submit proof of vaccination, or you are placed on LWOP status.

Note regarding union employees: As of November 9, 2021, members of certain unions, including District Council 37 and CWA 1180, are covered by a new vaccine mandate agreement. Upon submission of an appeal, the covered employee then has option of appealing to the City panel (as under current procedure) or to Scheinman Mediation and Arbitration Services. If going through arbitration, there is a narrowly defined basis for exemptions. An employee covered by an agreement that provides for the two appeal options should select Option A (City panel) or Option B (arbitration). If an employee does not make that selection in their initial appeal submission, the agency should contact the employee to request they make a selection. Any employee selecting arbitration must be sent a waiver form.

123.     On information and belief, some DOI appellants whose appeals were denied by the Citywide Panel received no notices directly from the panel, and those who received direct denials from the Panel were not informed of any reasons for their denials. Other applicants were informed by the DOI of the denials, again, with no explanation for the denials.

124.     The Citywide Panel's emails to the DOI included the following statement:

> Employees who were able to submit their appeals directly through the portal will be notified by e-mail. If you submitted [employee]'s appeal on their behalf, we ask that you notify them promptly of this determination. If the appeal was denied, [employee] will have **three business days** from the date you inform the employee to submit proof of vaccination. If the employee does not, they will be put on LWOP. If the appeal was granted, the employee will be permitted to continue coming to work unvaccinated on the condition they continue weekly testing.

### *Implementation of the City Employee Mandate by the Department of Parks and Recreation*

125.      On or about October 26, 2021, DOP notified its personnel by email that the deadline to submit applications for reasonable accommodation from the City Mandate's vaccination requirement was 5 p.m. on October 27. The DOP notices attached application forms, which stated the following: "[r]eligious accommodation requests should be submitted with documentation from clergy, identifying religion or describing the religious belief\practice\observances and identify the accommodation required."

126.     After receiving individual accommodation applications, employees of DOP contacted applicants informing them that as part of the review process, the DOP's Equal Employment Opportunity (EEO) office typically enters into "a cooperative dialogue/interactive process" in which they "ask follow-up questions . . . in order to make a final determination." Such questions included, *inter alia*, the following: "How long have you had this belief? When did your belief develop and how do you adhere to it? Have you been vaccinated before? Flu? What about the vaccination is

inconsistent with your faith?"

127.    Upon denying an application, the DOP emailed outlines to applicants with information about their options to appeal their denials. The outlines informed DOP employees who were union members that they had two such options.

128.    The first option was to appeal through the City panel made up of representatives from the Department of Citywide Administrative Services, the Law Department, and the Department of Health and Mental Hygiene (for medical) or the City Commission on Human Rights (for religious). The outline stated that the City panel "will make decisions as required by law, based on the documents you submitted to your agency to request your accommodation." The outlines informed applicants that if the panel granted an appeal, "the Panel will provide you with a reasonable accommodation of their choosing; and if were on unpaid leave, you will retroactively be granted paid leave."  On information and belief, this was the only appeal option that was available to DOP employees who were not represented by a labor union.

129.    The second option, available only to union members, was to appeal to Scheinman Arbitration and Mediation Services ("SAMS"), in which an arbitrator would decide an employee's appeal based on documents submitted by the employee and the DOP.

130.    The notice of appeal options stated that under the second option,

> - ***SAMS will only grant your Religious Exemption*** if: 1) your exemption is in writing by a religious official (e.g., clergy); and 2) your religious organization is recognized and established.

> - ***SAMS will deny your religious exemption if***: 1) the leader of your religious organization has spoken publicly in favor of vaccines; 2) the documentation you provide appears to be copy-pasted from a readily available source (e.g., from the internet); or 3) your objection to vaccination is personal, political, or philosophical in nature.

131.    The outline also informed appellants that if the SAMS arbitrator granted the appeal, "you shall

be allowed to continue working and remain on payroll; you must submit to weekly COVID-19 testing; and if you have been placed on unpaid leave, you will retroactively be granted paid leave."

132.    DOP employees also received the following information about employment pending determination of their reasonable accommodation requests:

> II. EMPLOYMENT STATUS PENDING REVIEW OF YOUR REQUEST
>
> If you requested a reasonable accommodation, by the end of the day on 11/02/2021 - You will remain working and on payroll, subject to weekly COVID-19 testing, pending your agency's determination and your appeal.
>
> If your request was made after 11/02/2021 but by the end of the day on 11/05/2021- You will remain working and on payroll, subject to weekly COVID-19 testing, pending your agency's determination. While your appeal is pending, you may be placed on unpaid leave.
>
> If your request was made after 11/05/2021 - You will be placed on unpaid leave starting on 11/01/2021, and will remain on unpaid leave until the final determination of your request.
>
> If your request for reasonable accommodation is denied, you will be placed on unpaid leave from 11/01/2021 to 11/30/2021 (unless you can temporarily remain working based on the criteria above). If you choose to become vaccinated prior to 11/30/2021, you can return to work at the same work location within one (1) week of your notice and submission of proof of vaccination.

133.    On information and belief, the Citywide Panel denied many accommodation applications submitted by DOP employees, typically informing denied applicants by emails stating that "[t]he decision classification for your appeal is as follows: Does Not Meet Criteria." However, some DOP employees who did not submit letters from their pastors received exemption grants.

134.    Denied DOP applicants were informed that pursuant to the City's policy concerning the mandate, they had three business days to submit proof of vaccination, or be placed on leave without

pay ("LWOP").

135.     Applicants who replied to Citywide Panel denials asking which criteria they had failed to meet received no response.

136.     DOP employees who failed to submit proof of vaccination after denial of their appeals by the Citywide Panel received an email giving them a short deadline to choose either to separate voluntarily from DOP and maintain health insurance through June 30, 2022 (while waiving any right to challenge this separation), remain on LWOP through June 30 and maintain health insurance until that time (while waiving any right to challenge separation after June 30), or be terminated on the deadline.

137.     DOP employees who agreed to accept either of the LWOP or voluntary separation options were required to return a signed waiver to DOP within ten days, in violation of federal and state employee protection laws.

### *Implementation of the City Employee Mandate by the Department of Sanitation*

138.      DSNY employees were required to submit accommodation applications soon after the City Mandate was issued.

139.     DSNY officials sent emails to applicants asking for details concerning the applicants' length of religious beliefs concerning COVID-19 vaccines and how the applicants' religious beliefs have affected their use of other medications, among other questions.

140.     When the DSNY denied accommodation requests, an DSNY employee sent out an email with a short statement of the reason for denial, for example: "Because the information you provided in support of your request has not sufficiently demonstrated to DSNY that there is a basis for granting you an exemption to the above Order, DSNY is denying your request for an accommodation."

141.     DSNY supplied its denied employee applicants with information about a two-option appeal process that was similar to the outline that the DOP sent to its employees. It differed, however, in it

statement of the accommodation results of approval under the two options.

142.    DSNY employees were told:

> If your appeal is granted by the City panel, you will be permitted to report to work so long as you continue to submit a weekly negative COVID test.

> And:

> If your appeal is granted by the arbitrators, you will be permitted to report to work so long as you continue to submit a weekly negative COVID test.

143.    On information and belief, when Citywide Appeals Panel panels denied religious exemption appeals, typically the only information they provided to DSNY applicants was "Does Not Meet Criteria."

144.    While DSNY claims to have the power to terminate the employment of unvaccinated employees, as a practical matter, many unvaccinated employees remain in its workforce. They have not yet been terminated by DSNY.

### *Implementation of the City Employee Mandate by the Fire Department*

145.     The FDNY sent out forms for its employees to submit religious exemption applications.

146.    FDNY adjudicators did not, for the most part, contact applicants to conduct individual conversations with them.

147.    Most exemption applications were denied at the administrative level. Typically, denial notices stated the following: "The asserted basis for the accommodation is insufficient to grant the requested accommodation, particularly in light of the potential undue hardship to the Department."

148.    Some FDNY employees who received initial administrative denials of exemption requests were given the options to appeal either to the Citywide Panel or to a SAMS arbitrator. Those who opted for a SAMS appeal were required to sign a waiver of rights. The union that negotiated a SAMS

option also negotiated that union members who submitted their initial accommodation requests on or after November 3, 2021 would go on LWOP status pending appeal.

149.    Some FDNY employees were not offered a SAMS Appeal option, but were permitted to submit appeals only to the Citywide Panel.

150.    Following denial of appeals by the Citywide Panel, the FDNY sent out explanations to its employees purporting to elaborate on the reasons why they were denied reasonable accommodations, saying:

> **In response to requests for further information concerning the reasons for the denial, the Department is providing this supplemental letter.** Your request for a religious exemption from the vaccine mandate was denied because the asserted religious basis seeking the exemption was insufficient in light of the potential undue hardship to the Department. Given the state of the public health emergency, the nature of the Department's life-saving mission, and the impact to the safety and health of Department members and the public that Department members regularly interact with, the requested accommodation could not be granted.

*151.*    Although the FDNY claims to have the power to terminate its unvaccinated employees, as a practical matter many of its unvaccinated employees have continued to work and be paid for their services, despite having failed to submit any proof of vaccination.

### *Implementation of the City Employee Mandate by the Police Department*

152.    The NYPD supplied accommodation request forms to its employees along with notices that informed them of the City Employee Mandate and procedures to apply for religious exemption. The form informed applicants that "Supporting documentation from you and/or your religious official explaining your religious exemption from the COVID-19 vaccine is strongly suggested."

153.    The NYPD forms also contained the following advice to applicants: "Please be advised that this Reasonable Accommodation, if granted, does not preclude you from adhering to the mandates established in New York City Mayoral Vaccination Mandate for New York City Workforce, which requires the wearing of a facial covering AND mandatory testing in lieu of vaccination."

38

154.    On information and belief, administrative denial notifications from NYPD did not state reasons for the denial.

155.    Uniformed members of NYPD were informed that they could appeal to the Citywide Appeals Panel. Civilian NYPD employees who belonged to certain unions were also given an option to file a SAMS arbitral appeal, with waivers of rights.

156.    Despite the threat of termination, many unvaccinated NYPD employees have remained on the payroll, in their normal positions, performing their normal duties, after receiving notices denying their religious accommodation requests.

157.    On or about February 8, 2022, NYPD employees who had received cursory denial letters received a second, amended denial letter that contained a checklist of reasons for the denial, and were given a second opportunity to make an appeal to the Citywide Appeals Panel. Those persons who had already submitted an appeal were given an opportunity to supplement their appeals with additional information.

158.    NYPD employees were also informed as follows: "Employees with pending appeals will remain on active duty status and continue to work while providing proof of negative COVID-19 testing through CPRS while awaiting final decision of their appeal based upon the applicable agreement with their collective bargaining unit (CBU)."

### *The Nonpublic Schools Mandate*

159.    On December 2, 2021, Commissioner Chokshi issued an order (the "Nonpublic Schools Mandate") requiring all nonpublic schools operating within the City to "exclude any staff member" who was not vaccinated against COVID-19, and prohibited them from hiring any staff member who was not so vaccinated. This requirement became effective on December 20, 2021. It applied also to religious schools including schools in the Roman Catholic school system and yeshivas.

160.  On information and belief, private schools have responded in a variety of ways to the Nonpublic Schools Mandate. On information and belief, some religious schools solicited religious exemption applications from their employees and were liberal in granting them, in stark contrast to the attitudes of city agencies.

161.  Other private schools, in contrast, have interpreted the Nonpublic Schools Mandate as requiring them to follow DOE policy and absolutely to exclude from their school buildings all unvaccinated personnel, no matter the strength of a person's objection or the reasonableness of proposed accommodations.

### *The Private Sector Mandate*

162.  On December 13, 2021, after a federal court stayed Osha's private sector employee mandate, Commissioner Chokshi issued an order (the "Private Sector Mandate") requiring that all participants in the private sector of the City's economy demonstrate vaccination of all their personnel no later than December 27, 2021. The Private Sector Mandate extended to all "covered entities," which it defined as follows:

> "Covered entity" means: i. a non-governmental entity that employs more than one worker in New York City or maintains a workplace in New York City; or
>
> ii. a self-employed individual or a sole practitioner who works at a workplace or interacts with workers or the public in the course of their business.

*163.*  On information and belief, private employers are responding in a myriad of different ways to the Private Sector Mandate. Some are accepting religious accommodation requests from employees and giving them fair consideration. Others, on information and belief, are following government practices and denying most, if not all, religious accommodation requests.

### *The Religious Exemption Policy is Unconstitutional*

164.     The Defendants established their overall policy toward religious vaccine exemptions and accommodations in the context of the DOE Mandate, because it was the earliest vaccine mandate they issued or applied.

165.     The DOE adopted the discriminatory arbitration policy, including the Exemption Standards, as its sole official policy for determining religious exemptions.

166.     The DOE and other agencies who later adopted the Religious Exemption Policy knew or should have known that these standards are blatantly unconstitutional and thus impermissible for adoption by a government employer.

167.     The Exemption Standards require the state to impermissibly pass judgment on which religions are "valid" and which it will decline to acknowledge or give its blessing.

168.     Specifically, people who follow personal religious paths, or who belong to religions that are not "established" and "recognized" by the random reviewing administrator will <u>not</u> be considered.

169.     The Religious Exemption Policy further provides that religious objections based on personally held religious beliefs, and not necessarily echoed by the official doctrine of a church as relayed by "clergy", will be denied.

170.     Moreover, to be considered, the exemption "must be documented in writing by a religious official (e.g. clergy)." The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have personal religious beliefs.

171.      To the extent that people have "recognized" church leaders that write letters attesting that a person has religious beliefs against vaccination and these beliefs are the beliefs of the church, this documentation cannot be available online. If the church has placed a description of their ministry online, the person will be denied an exemption.

172.     Additionally, if a person does happen to belong to an "established" and "recognized" religious

organization that is hierarchical and provides letters from clergy (that are not available online), that person will still be denied if any "leader" of that person's "religious organization" has ever spoken publicly in favor of vaccination.

173. "Leader" is not defined and in practice, the Defendants have interpreted this very broadly (i.e., if one is Jewish, and any Jewish faith leader has ever made a statement in favor of vaccines, the City's attorneys have zealously argued that the employee's religious exemption should be denied even if the employee's particular faith did not include following that particular "religious leader").

174. The language of the policy shows that its intention is to deny a religious exemption or accommodation to everyone or virtually everyone. In fact, the policy gives only one example of a religion that will be accepted for exemption: Christian Science.

175. This intention was made plain to the employees. Multiple supervisors and agents of the Defendants advised employees that the Defendants intended to deny all religious exemptions other than Christian Science-based objections. They asserted that City officials have instructed, without authority, that "all other religions have publicly made statements in support of vaccination" and thus that anyone belonging to any other religion than Christian Science must be denied.

176. The Defendants were represented by Corporation Counsel in all of the Zoom hearings that were conducted in SAMS Appeals under the Exemption Standards procedures. In each appeal, Government representatives repeatedly and zealously presented unconstitutional reasons for denial, repeatedly arguing that employees' applications should be rejected because they conflict with the Pope's decision to get vaccinated, or sometimes the opinions of another popular faith leader (often one that had little or nothing to do with the religious beliefs of the applicant being assessed). Corporation Counsel also frequently cited a letter from Defendant Commissioner Chokshi, which questioned the validity of religious objections to the use of fetal cells in the development of COVID-

19 vaccines.

177.    In no uncertain terms, the Defendants turned the Zoom appeals of DOE employees into heresy inquisitions, and openly advocated for discrimination against its employees because they held minority religious views or religious views which Defendants believe are "wrong".

178.    This widespread, acknowledged policy reflected ex-Mayor de Blasio's guidance and admission of how the City would handle the applications for religious accommodation. In a press briefing held on September 23, 2021, ex-Mayor de Blasio was asked how the City intended to implement the religious exemption policies and what criteria would be used. He responded:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. **And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated**. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly the faiths all around the world have been supportive of vaccination. So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection**.

179.    It is long-settled that discrimination against personally held religious beliefs is unconstitutional and the Defendants were on notice that such criteria violates their employees' rights.

180.    In the 1980s, the New York State Legislature similarly limited religious exemptions, only allowing exemption from vaccination to families who were "bona fide members of a recognized religious organization" with teachings that were contrary to immunization.

181.    After parents with personally-held religious beliefs challenged the language codified into the Public Health Law, a federal court determined that the statute violated the Establishment Clause of the United States Constitution in a number of ways, one of which was to exclude those with personally held religious beliefs from protection.

182.    As a result of that holding, New York State had to change its statutory language to provide

religious exemptions to anyone who holds a religious objection, whether personally held or echoed by an established religious organization. In accordance with the court's clear instruction, the statute stated that no certification from clergy or attestation of membership could be required.

183.    To this day, the amended Section 2165 of the New York State Public Health Law, which governs immunization requirements for adults, states: "this section shall not apply to a person who holds genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such person being admitted or received into or attending an institution."

184.    Such broad and equal protection is the Constitutional floor. The City violated the rights of thousands of employees by adopting a facially unconstitutional policy to administer accommodations required by the First Amendment and Title VII.

***Defendants Implemented the Exemption Standards to Discriminate Against Plaintiffs***

185.    The religious exemption policy was intentionally set up to make it impossible to receive a meaningful chance at a religious exemption, while attempting to sidestep the expected lawsuits about the unconstitutionality of withholding such exemptions.

186.    Indeed, upon the proclamation that the City now had a mechanism for religious and medical exemption, the temporary restraining order in the Municipal Labor Committee Litigation was dissolved.

187.    However, what was not before the state court was the details of the City's religious exemption policy, which if examined, would have been readily revealed as facially unconstitutional.

188.    In addition to discrimination claims, Plaintiffs, many of whom are tenured teachers and staff, have procedural due process rights that were grossly violated by the City's policy.

189.    The Exemption Standards procedures deviated widely from the City's previously established

EEO policies that were still officially in place when the Mandates were promulgated (and they still are).

### Kane and Keil Lawsuits and Early Proceedings

190.    While all of this was happening, the teachers and educators impacted by the mandates were in a state of crisis. The labor disputes and pending lawsuits meant that the landscape was changing every day. The DOE Mandate itself was amended three or four times in the month between its announcement and original effective date. The DOE Mandate was also stayed more than once in various courts.

191.    As it became apparent that help was not coming from many of the broader suits, those with religious objections to the Mandate and the discriminatory standards began organizing to try to bring the issues with the religious exemption process before the Court.

192.    The *Kane* Plaintiffs filed for emergency relief from federal court just before the DOE Mandate's effective date of October 4, 2021. They filed seeking relief for themselves and all others similarly situated.

193.    At that time, many of the *Kane* Plaintiffs still did not know whether their applications were accepted or denied yet. They did know, however, that whatever the outcome, the process itself was boldly discriminatory and harmful.

194.    The federal court denied injunctive relief.

195.    A separate set of educators filed suit in the *Keil* matter on October 27, 2021.

196.    The *Keil* Plaintiffs were denied relief with no opportunity for a hearing.

197.    Both sets of Plaintiffs sought emergency relief through appeal.

198.    The November 28, 2021 merits panel decision of the Second Circuit Court of Appeals found that the DOE Mandate, as applied through the Exemption Standards, was likely to be unconstitutional.

Corporation Counsel admitted in open court that the policies they had adopted and used to determine religious accommodations were "constitutionally suspect."

199.    The Second Circuit held that Plaintiffs are likely to succeed, vacated and remanded the denial of injunctive relief and ordered that each of the Named Plaintiffs receive "fresh consideration of their requests for a religious accommodation by a central citywide panel consisting of representatives of the Department of Citywide Administrative Services, the City Commission on Human Rights, and the Office of the Corporation Counsel" (the "Citywide Panel") adhering to "standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law."

200.    The Citywide Panel was created by the Defendants and is entirely controlled by them, and the provision for referral of such panel set forth in the Second Circuit's order was adopted *verbatim* by the court from a proposal drafted by Defendants.

201.    The DOE promised to extend the same "fresh look" by the Citywide Panel to many of the thousands of others who were suspended under the admittedly unconstitutional Exemption Standards policy.

202.    However, because the Plaintiffs had not pled their case as a class action complaint, relief is not guaranteed to any others but the fifteen named Plaintiffs.

203.    The district court has continuously stayed the case and declined motions to lift the stay so that class action relief can be formally sought.

204.    Upon information and belief, some of the proposed Class have been given the opportunity to ask for a "fresh look" by the Citywide Panel. Others, who are no covered by the lawsuit at this stage, have not been allowed to participate, even though they were suspended and are now being terminated under an admittedly unconstitutional policy.

*The Citywide Panel*

205.    But the Citywide Panel process is just another veiled attempt to continue to discriminate against employees with sincerely held religious beliefs against COVID-19 vaccination. It does not provide adequate safeguards to meet the basic constitutional or statutory standards.

206.    First, it has not been extended to everyone. The Citywide Appeals Panel option has not been extended to DOE workers who either declined to file an administrative application pursuant to the discriminatory Exemption Standards or who declined (or were unable) to file an appeal pursuant to the discriminatory Exemption Standards.

207.    Second, the Citywide Appeals Panel is supposed to apply standards for the evaluation of religious exemptions that comply with the law, including *inter alia* the standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, the New York City Human Rights Law, and the New York State and United States Constitutions.

208.    Third, even though Defendants essentially admitted that they had openly discriminated against thousands of employees on the basis of religion, their review of these determinations was not undertaken by a neutral decision-maker.

209.    Instead, Defendants employed their own staff, and worse, the attorneys who represent them defending against Vaccine Mandate lawsuits and who had initially overseen the denials under the unconstitutional policy.

210.    Fourth, no Plaintiff was given any meaningful opportunity to be heard, or adequate notice of the reasons for their denial.

211.    Fifth, the issuance of more autogenerated denials reveals once more that individualized determinations required by law are not taking place in good faith.

212.    Accommodation applicants are routinely and summarily rejected with an autogenerated

explanation "does not meet criteria" email.

213. On information and belief, the Citywide Appeals Panel has no published rules or regulations to govern its actions, keeps no records of its decision-making process, and is not required to give any reasoned explanation of its decisions.

214. Sixth, the First Amendment's religion clauses require the Defendants to provide an accommodation to Plaintiffs that is the least restrictive alternative available to the Defendants. It is not constitutional for the Defendants, as governmental actors, to deny Plaintiffs – and thousands of other religiously motivated employees – their constitutional rights simply because the City finds it to be inconvenient to accommodate those rights.

215. Effective February 11, 2022, the City will begin termination proceedings against applicants denied the right to have a "fresh consideration" by the Citywide Panel at all, and any that have been rejected through the new process.

216. This threat puts Plaintiffs – and everyone who is similarly situated – under tremendous pressure to betray their religious beliefs in order to protect the livelihoods, income and insurance protections for themselves and their families during a winter where COVID-19 and its Delta and Omicron variants are once again predicted to wreak havoc upon the health of the general population (without any apparent regard to vaccination status as Omicron easily infects the vaccinated and unvaccinated alike).

### *None of the COVID-19 Mandates Are Generally Applicable*

217. The City has issued multiple mandates. Some apply to operators and patrons of public accommodations. Several have applied to employees of the DOE. Several have applied to staff of nonpublic schools. Several have covered non-DOE employees of the City and is contractors. Some purport to cover every type of nonpublic employment. Not one of the City's specific COVID-19

48

mandates has ever purported to cover every person whose conduct might affect the course of COVID-19 infection and transmission in New York City.

218.   Nor do all of the City's COVID-19 mandates show that they are part of a single, uniform policy that the City has adopted to prevent COVID-19 transmission and infection. To the contrary, each of the mandates is unique and incompatible with the others. Some contain exceptions that are not available in others. Some forbid employment of all unvaccinated personnel, even those who work remotely. Some only required "exclusion" of unvaccinated personnel.

219.   Nor are the City's many COVID-19 mandates enforced and applied in a uniform manner, so that everyone is treated alike. For example, in some instances, unvaccinated staff continue to be actively employed by the City, while others have been dismissed or put on leave without pay. In some instances, staff who received only the first shot of a two-shot vaccine continue in employment, with no effort to enforce the requirement to get a second shot. A few people have had their religious exemption applications granted, while people who have presented similar evidence have been denied. Private employers, acting in complete good faith, are applying widely different set of standards to religious exemption requests, reflecting in many instances the religious attitudes of the employer as well as the employee.

### The COVID-19 Mandates Are Not Neutral Toward Religion

220.   In addition, the Mandates are tainted by substantial evidence of religious animus, not only from the City of New York, but by decision makers at the State level as well.

221.   The first Mandate was promulgated on the same day that Governor Kathy Hochul was appointed interim Governor of the State of New York.

222.   Governor Hochul has strongly held religious beliefs in support of vaccination. In place of a cross, she wears a golden "Vaxed" necklace, which she describes in religious terms. Before taking

office, she met with Mayor de Blasio and coordinated a vaccine strategy.

223. Two days after Mayor de Blasio's Original DOE Mandate was promulgated without a religious exemption, Governor Hochul removed the religious exemption from the New York State Department of Health regulation governing healthcare workers.

224. Mayor de Blasio's amended mandates reference the state mandates as a justification to enact his own.

225. Both mandates were to take effect on September 27, 2021. The day before the state mandate was supposed to take effect, Governor Hochul gave a sermon at a Brooklyn church, during which she said that God made the vaccine and that she was recruiting apostles to coerce those who did not understand God's will and what God wants (that we be vaccinated). Governor Hochul then told the press that the Pope supports vaccination and that no religious objections to vaccination are valid, and this is why she removed the religious exemption from the state healthcare mandate.

226. Mayor de Blasio's statements have frequently echoed this New York government assertion that people's religious beliefs against vaccination are "invalid" because they are unorthodox. Representatives of the City repeatedly argued the same in each SAMS Appeal.

227. These statements are as ignorant as they are unlawful.

228. The history of religious opposition to vaccination is well-established and religious objectors exist in nearly every faith tradition.

229. Even within the Catholic Church, there is currently a robust debate about the religious propriety of getting a COVID-19 vaccine.

230. Similar to abortion, the topic of vaccination is so intertwined with religion that it is itself a religious issue, and any vaccine mandate is inherently enmeshed with religion.

231. Refusing to allow for reasonable religious accommodation is itself indicative of a lack of

neutrality.

232.     The State has now doubled down on its persecution of those with religious objections to vaccination.

233.     Just before the statewide medical mandate was to take effect, Governor Hochul gleefully announced that she had instructed the New York State Department of Labor to deny unemployment compensation to anyone who is unable to work due to a vaccine requirement.

234.     Several terminated City employees have applied and been denied unemployment compensation even though they are unable to get vaccinated due to their sincerely held religious beliefs.

***The Mandates Are Not Narrowly Tailored***

235.     The DOE's restrictions, prohibitions and "accommodations" on religious exemptions to the Mandates are not narrowly tailored to promote a compelling interest.

236.     There is no compelling reason to force the five percent of t whhe population who have religious objections to vaccination to violate their sincerely held religious beliefs.

237.     To date, the peer-reviewed evidence does not support the assumption that the vaccinated are substantially less infectious than unvaccinated people, particularly against the now dominant strains of SARS-CoV-2 widely circulating.

238.     On the contrary, transmission was not even studied in clinical trials, and it was expressly acknowledged from the outset that these vaccines cannot provide sterilizing immunity (meaning protection against transmission). These vaccines were not designed to stop transmission and the evidence-based science conclusively shows that they do not stop transmission of SARS-CoV-2 enough to mitigate community spread.

239.     Any initial hopes that the vaccines would somehow turn out to provide sterilizing immunity

have long-since been dashed, particularly with the dominance of the delta variant and now the omicron variant, upon which vaccination appears to have little to no impact in stopping infection.

240.    Even before the emergence of Omicron, the science established that vaccines cannot stop transmission. In July, 2021, the CDC released the findings of a study confirming the vaccinated are as infectious as the unvaccinated. The study also showed the vaccinated are as likely to contract COVID-19, and asymptomatic vaccinated people were just as infectious as asymptomatic unvaccinated people. Multiple other studies emerged at the same time showing the same findings.

*241.*    It is not surprising, then, that high vaccination rates do not translate into lower community spread.

*242.*    For example, a recent Harvard study found that "there appears to be no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases." Subramanian S V and Akhil Kumar. "Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States." *European Journal of Epidemiology*, 1-4. 30 Sep. 2021, doi: 10.1007/s10654-021-00808-07.

*243.*    Moreover, at the same time, evidence emerged that the vaccines were even waning in efficacy for symptom mitigation thus prompting many to start advocating for boosters after a few months. Studies from Israel and other highly vaccinated countries show efficacy plummeting less than eleven weeks after vaccination. Israel is already now contemplating a fourth booster, as their third has lost effectiveness.

244.    Defendants' own publicly available data support these points. The DOE publishes regular updates on the number of infected students and in-person staff working in New York City Schools. That data shows that excluding unvaccinated staff has not decreased the percentage of staff infected with COVID-19 at all (in fact, over the last month, there are many days when there were thousands of

actively infected among the fully vaccinated staff, whereas before exclusion of the unvaccinated, there were typically only a few dozen infected).

245.    Moreover, beyond the termination threat embodied by the Mandates, the City's pernicious treatment of employees seeking religious exemptions shows animus: for example, DOE employees are required to choose between resigning or suffering another long period of continued unpaid "leave" status, with a prohibition on outside employment. These loyal, longstanding employees are being told to "quit or starve," in essence. The policy is designed to be punitive and it is unconscionable, but consistent with ex-Mayor De Blasio's intent to impose requirements so burdensome that people would need to get vaccinated to avoid them.

246.    Many of these employees have children and spouses to feed, elderly parents to support, and eventually, a retirement to fund. To deny any employee both a salary and any option to earn money from other sources is not, by any understanding, a narrowly tailored provision. It does not meet even Title VII standards, much less strict scrutiny.

247.    Essentially, the Mandates are treating unvaccinated employees as if they have COVID-19, even if they are regularly testing and can establish that they do not have COVID-19. Because they are being treated as if they have a communicable disease, the appropriate standard is to assess whether they pose a direct threat to others – that is, a significant risk of substantial harm.

248.    The Defendants cannot meet this burden. Unvaccinated employees who are regularly tested do not pose a risk to anyone else and certainly not more of a risk than their largely untested vaccinated co-workers, who clearly can and are catching COVID-19 at staggering rates.

249.    These provisions, along with the skewed application procedures that appear to be engineered to deny exemptions, accomplish two purposes: to make refusal to vaccinate so onerous that religious opponents of vaccination will be forced to act against their beliefs or waive their legal rights, and to

save money through the mass "separation" of religiously motivated employees.

250.    The Mayor of New York City controls the New York City school system and other agencies. These policies were always ordered from the top down.

251.    As the new Mayor of New York City, Mayor Adams has vowed to continue to require in-person schooling for DOE schoolchildren and vaccination for all City employees.

***The Mandates do not serve the public interest***

252.    The Mandates have created a staffing crisis.

253.    The schools and hospitals are in such bad shape, that not only have they opted to send infected staff back to work while they are still able to infect others, but critical services are being withheld from vulnerable people.

254.    Special education children are not receiving federally required services, or aid.

255.    The lack of security personnel in schools has caused an increase in school stabbings and other major safety concerns.

256.    Many of the unvaccinated teachers are seasoned tenured faculty, who have been teaching children for years.

257.    They are being replaced by substitute teachers who are exempted from the basic qualifications usually required in an effort to get bodies into classrooms.

258.    The toll on the workforce of operating under such conditions is causing even fully vaccinated employees to quit or retire early to avoid the nightmare that is currently unfolding in the New York City public school system.

259.    Other sectors are already critically understaffed. Firing a percentage of the workforce needlessly will mean that garbage will accumulate, fires will go unattended, vulnerable people will not be able to receive care or services, and everyone will suffer.

***Plaintiff's Injuries and Standing to Seek Declaratory and Injunctive Relief***

260.    All Plaintiffs have sincere religious objections to vaccination and are entitled to opt out of these vaccines both because they are experimental medicine and because the vaccines conflict with their deeply held religious beliefs.

261.    They bring this suit on behalf of themselves and all similarly situated employees in New York City with sincere religious objections to taking a COVID-19 vaccine.


<u>FACTS RELATING TO INDIVIDUAL PLAINTIFFS</u>

262.    Detailed facts concerning the individual Plaintiffs are set forth in declarations, which are filed herewith and incorporated herein.

***Gennaro Agovino***

263.     Plaintiff Gennaro Agovino  has been employed by the DOC as a civilian employee for the past 26 years.

264.    Agovino has been a Christian his entire life and has sincerely held religious beliefs that prevent him from getting any of the Covid-19 vaccinations.

265.    Agovino submitted a religious exemption request on October 27, 2021, which the DOC denied on November 17, 2021.

266.    On November 22, 2021, Agovino submitted his appeal to the DOC and he is waiting to hear back.

267.    Each day, Agovino faces tremendous pressure to either abandon his faith or his job.

***Brendan Fogarty***

268.    Brendan Fogarty has employed by the FDNY for the past 19.5 years, and has been a captain in for the past two years.

269.    Fogarty possesses sincerely held religious beliefs that prevent him from receiving any of the Covid-19 vaccines.

270.    On October 23, 2021, he submitted his request for a religious exemption to the FDNY, and the FDNY denied it on December 13, 2021.

271.    He appealed the denial on December 19, 2021.

272.    He has not heard back from the FDNY.

273.    Every day he faces immense pressure to choose between his faith and his job.

*Curtis Cutler*

274.    Plaintiff Cutler has been a Sanitation Worker with the DSNY since 2014.

275.    Cutler objects to the vaccine mandate due to his longstanding sincerely held religious objections to vaccines.

276.    Cutler submitted an exemption request on August 20, 2021.

277.    On November 19, 2021, DSNY denied Cutler's request for a religious exemption.

278.    Cutler appealed on November 16, 2021, and the DSNY denied his appeal on January 6, 2022. He was placed on LWOP three days later.

279.    On January 31, 2022, Mr. Cutler received a notice from the DNSY stating his employment would be terminated if he does not show proof of vaccination by 5:00 p.m. on February 11, 2022.

280.    Cutler was also told by a union representative that he could extend his LWOP until June 30, 2022 and maintain his health insurance if he resigned from DSNY and waived his right to sue the DSNY. Cutler has a family to support and felt he had no choice but to resign.

*Liz Delgado*

281.    Liz Delgado has been an Administrative Assistant for the DOI since 2017. Prior to working at DOI, Delgado worked with the Department of Corrections, and also worked at the Department for the

Aging for 12 years. She has been a New York City employee for over 30 years.

282. Delgado possess sincerely held religious beliefs that prevent her from taking any of the Covid-19, and has not had a vaccine in over 25 years due to these religious convictions.

283. Delgado submitted a request for a religious exemption on October 22, 2021, and the DOI denied it on November 19, 2021 because they "not based on a sincerely held religious, moral, or ethical belief."

284. Delgado appealed to the Citywide Appeals Panel on November 24, 2021.

285. On December 20, 2021, the DOI denied her appeal.

*286.* Delgado is currently on LWOP and she very recently received a termination notice from her employer. Pursuant to that notice, Delgado must choose by February 22, 2022 whether to extend her LWOP through June 30, 2022, involuntarily resign, or retire. All options presented to Ms. Delgado include waiving her right to sue DOI.

### Janine DeMartini

287. DeMartini is employed by The Child Study Center of New York, which is partially funded by the New York City Department of Education. She holds a strong and sincere religious objection to the vaccine.

288. She submitted a request for a religious exemption on September 9, 2021, which was denied.

289. DeMartini was not given the opportunity to appeal the decision and was terminated from her job as of September 27, 2021.

### Sabina Kolenovic

290. Kolenovic is employed as a teacher by DOE. She has strong and sincere religious objections to vaccines.

291. Kolenovic submitted an administrative request for religious exemption to the DOE, which was

denied.

292.    Kolenovic participated in a Zoom hearing on her appeal to a SAMS Appeal arbitrator. During that hearing, the City attorney argued, "If religious leaders are publicly in support of the vaccine, this must be denied." The SAMS Appeal was denied without explanation and Kolenovic was put on LWOP.

293.    In November, Kolenovic was given an opportunity to file a new appeal before the Citywide Panel, as a result of a decision by the Second Circuit Court of Appeals in the case of *Kane v De Blasio*.

294.    In January, 2022, the DOE sent Kolenovic a series of questions concerning her religious beliefs, which she promptly answered.

295.    She has not heard back from DOE or the Citywide Panel since that time.

296.    Kolenovic feels daily pressure to renounce her religious opposition to COVID-19 vaccines and accept vaccination, in order to save her career and stop going without any income.

***Krista O'Dea***

297.    O'Dea is employed by FDNY. She holds a strong and sincere religious objection to the COVID-19 vaccine.

298.    She made an administrative request for a religious accommodation which was refused.

299.    She submitted an appeal to the Citywide Appeals Panel. While she has not received an official denial letter, she did receive an email that contained reasons for her denial.

300.    Since she submitted her initial request, O'Dea has continued to go to work and get paid.

301.    O'Dea is under great pressure to end the uncertainty of her position, get vaccinated, and forget about her religious beliefs.

***Dean Paolillo***

302.  Paolillo is employed as a police officer by NYPD.

303.  Paolillo has strongly held religious objections against the use of COVID-19 vaccines.

304.  Paolillo expressed his objections to COVID-19 vaccines in an administrative application for a religious accommodation which he submitted to NYPD.

305.  Paolillo's application which was administratively denied. Paolillo's application administratively denied.

306.  On February 8, 2022 Paolillo received a revised statement of denial for his application and was given a short time to make an appeal from it. If his appeal is denied, he expect to suffer termination of his employment unless he accepts vaccination.

307.  Paolillo feels tremendous pressure every day to abjure his faith and get vaccinated.

*Dennis Pillet*

308.   Pillet is a long-time FDNY employee. He holds sincere religious beliefs that it would be ungodly to accept vaccination with a COVID-19 vaccine.

309.  Pillet applied for a religious accommodation to the vaccination requirement, which was denied because of the "potential for undue hardship."

310.  Pillet submitted an appeal of the denial to the Citywide Appeals Panel. He never received an official denial notice from the panel, but he received a communication explaining why his appeal was denied.

311.  Pillet was put on leave without pay but continued to report for work. He submits to weekly testing.

312.  Pillet knows he could be terminated any day, and this subjects him to pressure to give in, betray his faith, and accept vaccination.

*Matthew Rivera*

313. Rivera works for Consolidated Edison in New York City. He is not vaccinated against COVID-19.

314. Rivera holds strong religious objections to the Covid-19 vaccines.

315. Rivera was informed on multiple occasions by his employer is subject to a vaccine mandate and that it requires him to get vaccinated.

316. Rivera submitted a request for exemption from the vaccination requirement with his employer.

317. A representative of the employer contacted Rivera asking for more information. Rivera asked for more time to do so.

318. Rivera has not heard from his employer but knows that is is possible that the employer will terminate him.

319. Rivera is under constant pressure to renounce his religious position and get vaccinated.

*Laura Satira*

320. Satira was formerly employed by St. Bernard's Catholic Academy.

321. When her employer became subject to the City's vaccine mandates, Satira was informed that she needed to get vaccinated.

322. Satira has strong and sincere religious beliefs that preclude her from taking the COVID-19 vaccines.

323. Satira submitted a request for religious accommodation to her employer, who informed her that no religious exemption or accommodation was available, and terminated Satira's employment.

*Frank Schimenti*

324. Plaintiff Frank Schimenti has been employed by the NYC DOB for the past 25 years, and currently serves as the Assistant Chief Plan Examiner and Project Advocate for the Borough of Staten Island.

325.     He possesses deeply held religious beliefs that prevent him from receiving any of the Covid-19 vaccines.

326.     On or about October 27, 2021, Schimenti submitted his request for a religious exemption to the DOB, which was denied on November 4, 2021.

327.     Schimenti appealed this decision on November 9, 2021, and the DOB denied his appeal on December 6, 2021, with no explanation.

328.     On December 10, 2021, he was placed on leave without pay.

329.     On January 31, 2022, Schimenti received an email from the DOB stating that he has until 5 p.m. on February 11, 2022 to submit proof of vaccination in order to maintain his employment.

330.     He is in deep distress, as the DOB is forcing him to choose between his faith and his job.

*James Schmitt*

331.     Plaintiff James Schmitt has been employed by Parks as a plumber for the past 13 years.

332.     Schmitt is a Christian and has sincerely held religious beliefs that prevent him from getting the Covid-19 vaccination.

333.     Schmitt submitted a request for a religious exemption on October 27, 2021 and Parks denied his request on November 17, 2021.

334.     He submitted his appeal on November 22, 2021, which Parks also denied on December 28, 2021. Schmitt was then placed on leave without pay.

335.     Because Schmitt felt he had no choice but to extend his leave without pay and keep his health insurance until June 30, 2022—which is an option Parks gave him—I signed a waiver which was a condition of this option.

336.     The waiver, which he signed under protest and without prejudice to the claim that the religious accommodation process was unconstitutional, violated the Older Workers Protection Act because he

did not have three weeks to review it.

*__Mass Terminations of Other Class Members__*

337.    Pursuant to a decision recently announced by Mayor Adams, the Defendants have sent mass notices of termination to members of the plaintiff Class. Mayor Adams has defended these firings, characterizing them not as "firing," but as "quitting" by the City's employees.

338.    Many of these employees face a termination date of February 11, 2022, which is tomorrow.

339.    Many of the other employees face a February 14 termination date.

340.    We are confident that there will be others who share Liz Delgado's termination date of February 22, 2022, and that more terminations are yet to be announced for other dates in the future.

341.    The mass termination of City employees who have refused to obey the various vaccine mandates because of their firmly held religious beliefs is a tremendous injustice that urgently needs to be addressed – and immediately.

## FIRST CLAIM FOR RELIEF
### (Liability under the Free Exercise Clause By All Plaintiffs Against All Defendants)

342.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

343.    The Mandates are unconstitutional, both facially, including as applied through widespread policies and practices, and as applied to the plaintiffs and others, because they violate their right to religious freedom under the First Amendment.

344.    The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that Congress (and by extension, State and City governments) shall make no law prohibiting the free exercise of religion.

345.    Laws that burden religion are subject to strict scrutiny under the Free Exercise Clause

particularly when they are not neutral or generally applicable.

346.    Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature. Indicia of animus need not appear in the text of the regulation, but must be examined in context through scrutiny of legislative history, related regulations and policies, implementing policies and commentary by decision-makers, among other sources.

347.    Mayor de Blasio, who was the architect of these Mandates, openly expressed animus towards unorthodox religions, admitting to the press that he is convinced by the Pope that scripture does not support a religious objection to vaccination, and stating that religious objections that do not comport with orthodoxy, as the mayor interprets it, will be denied an exemption from the Mandates. Official policies subsequently adopted by the various City departments and agencies mirrored the mayor's admission that the City intended to impose a special disability on employees with unorthodox religious viewpoints.

348.    A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions.

349.    All of the Mandates governing City employees (which constitute most of the Mandates) provide for highly individualized determinations by government officials about whether the employees' religious beliefs are valid and whether they seem sincere. Particularly given the City's adoption of brazenly discriminatory standards to judge these applications, and the widespread pattern of hostility and abuse, such unbridled discretion render the Mandates invalid as a facial matter.

350.    A government policy can survive strict scrutiny under the Free Exercise Clause only if it advances interests of the highest order and is narrowly tailored to achieve those interests. Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it

must do so.

351.    Here, there is no compelling reason to mandate vaccines, as the COVID-19 vaccines cannot stop the spread of disease.

352.    Moreover, to the extent that stopping the spread of COVID-19 is the interest, far more effective and less intrusive measures exist that could be adopted instead.

WHEREFORE, Plaintiffs ask the Court to declare that the Mandates aare invalid on their face and as applied as a facial matter generally to all employees subject to them, and individually to the Plaintiffs and the Class because they violate the Free Exercise Clause of the First Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order that all employees who have been adversely affected by the Mandates be reinstated with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

## SECOND CLAIM FOR RELIEF
### (Liability under the Establishment Clause By All Plaintiffs Against All Defendants)

353.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

354.    The Mandates violate the Establishment Clause because the City declared, in implementing them, that they intended to preference orthodox religious beliefs over unorthodox or personally held beliefs, and the City specifically noted that they would preference Christian Scientists. Under the Larson test, this requires strict scrutiny, which the City cannot withstand.

355.    The Mandates also violate the Establishment Clause because they fail the coercion test, and are enforced by the City to coerce everyone with minority religious views on vaccines to violate their

faith and get vaccinated, or lose the ability to earn income anywhere in New York City for the foreseeable future.

WHEREFORE, Plaintiffs ask the Court to declare that the Mandates are unconstitutional as applied facially through general policy and practice, and as applied to the Plaintiffs and the Class because they violate the Establishment Clause of the First Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order reinstatement to all who have been adversely affected by the Mandates with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

### THIRD CLAIM FOR RELIEF
**(Hybrid Rights Claim: Violation of Substantive Due Process Rights Guaranteed by
The Fourteenth Amendment to the United States Constitution
And First Amendment Rights Claims)**

356.    The Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

357.    Plaintiffs have a protected substantive due process right to be free from the forced or coerced administration of medical products, especially medical products that are experimental or could cause them harm.

358.    This right is also a fundamental human right, so widely recognized as to be defined by the world courts, the laws of nations, and by the Second Circuit Court of Appeals and the Supreme Court of the United States as a *Jus Cogens* norm.

359.    As well, or in the alternative, this right to refuse medicine is secured by the Due Process

Clause of the United States Constitution and corresponding provisions in the New York State Constitution, international protocols and treaties adopted by and entered into by the United States, and by the laws and regulations of the United States and New York, to be free from burdens on rights deemed "fundamental" in nature.

360. All of the available COVID-19 vaccines are still experimental in nature.

361. They were rushed to market in a matter of months, skipping or glossing over most steps and avoiding years of the normally required testing process.

362. The only available vaccines in this country are available under Emergency Use Authorization, which forbids compulsory mandates.

363. The FDA has approved two vaccines – Pfizer's "Comernaty" vaccine and Moderna's Spikevax - but neither is available in available in the United States yet, rendering this fact meaningless for all operative purposes.

364. Even if Comernaty and Spikevax were available, or other vaccines were licensed, these vaccines are all still undergoing clinical trials and are still blatantly experimental in nature.

365. Under international law, national law, state law and local law, experimental medical products cannot be mandated.

366. All vaccines, including these ones, can cause harm to some people. People with natural immunity face a greater risk of harm from COVID-19 vaccines as do certain demographic groups represented in this class – including men under twenty-five and people with certain pre-existing conditions.

367. Under the United States Constitution, people also have a fundamental right to refuse any medicine, whether it is experimental or not, even lifesaving medication. The Supreme Court has also recognized that making medical decisions free from state interference is a fundamental right, and that

the right to bodily autonomy is one of the most sacred and well-protected rights.

368. Considering the serious rights at stake, and the dearth of evidence to show this policy is necessary or effective in light of the fact that the vaccinated can transmit disease and have inferior immunity to those who have caught the disease, there is no rational reason to mandate vaccines for school employees. Given that the vaccines are still experimental, this mandate shocks the conscience.

369. Moreover, the City lacks the police power to intervene in medical decisions that cannot meaningfully stop the spread of disease. The police power is for protection of the greater community, not protection of the individual against himself. Making medical decisions such as this are the individual's sole and sacred right.

370. The Mandates are not narrowly tailored to impose the least restrictive burdens on fundamental rights. Rather, it is intentionally tailored to create an outsized burden in order to coerce participation in experimental medicine for no apparent reason.

371. Plaintiffs have no adequate remedy at law available against defendants for the injuries and the irreparable harm they imminently suffer as a direct result of the Mandates.

WHEREFORE, Plaintiffs ask the Court to declare that the Mandates are invalid facially and as applied because they violate the substantive due process rights of all covered employees, as well as hybrid rights under the First and Fourteenth Amendment, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order reinstatement of all employees who have been adversely affected by the Mandates with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

**FOURTH CLAIM FOR RELIEF**
**(Violation of the Equal Protection Clause of the**

**Fourteenth Amendment to the United States Constitution
and the New York State Constitution)**

372.　　　On behalf of themselves and the Class, the Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

373.　　　By their actions, as described herein, Defendants, acting under color of statute, ordinance, regulation, custom, or usage, subjected Plaintiffs to the deprivation of the rights, privileges, or immunities secured by the United States Constitution and New York Constitution.

374.　　　The Mandates violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (and the corresponding provision of the New York State and New York City analogous statutes) because they discriminate against unvaccinated people who need to exercise their fundamental rights to refuse experimental vaccines that conflict with their sincerely held religious beliefs.

375.　　　There is no rational basis for this discrimination. Plaintiffs pose no more danger to others than a person who is vaccinated. Both groups are equally able to spread COVID-19.

376.　　　The policy of discriminating based on an individual's willingness or ability to subject themselves to medical experimentation or to give up their deeply held religious beliefs shocks the conscience and cannot be justified as relating to any rational, permissible goal. It is not grounded in science, but rather in the effort to coerce people into waiving their protected rights.

377.　　　Plaintiffs face the loss of their employment, ability to practice their vocation, contractual rights and violation of civil rights and liberties as a result of the discriminatory regulation.

378.　　　Moreover, the policies adopted by the City facially discriminate against Plaintiffs and their similarly situated class members on the basis of religion by refusing to afford accommodations to people who hold minority or unorthodox religious viewpoints.

379.     The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

380.     While performing those duties, Defendants intentionally deprived Plaintiffs of securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and the State of New York by arbitrarily discriminating against them based on medical status, religious beliefs, and creed.

WHEREFORE, Plaintiffs ask the Court to find that the Mandates are invalid facially and as applied because they violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order reinstatment to all employees who have been adversely affected by the Mandates with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

## FIFTH CLAIM FOR RELIEF
### (Violation of the Supremacy Clause of the United States Constitution and Violations of Federal Statutory Provisions Governing EUA products and Consent to Participation in Clinical Investigations)

381.     On behalf of themselves and the Class, the Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

382.     Federal laws and regulations governing the approval and administration of medical products preempt all contrary or inconsistent laws of the states and/or local governments.

383.     The Mandates are patently contrary to United States law, and thus preempted and invalid.

384.     Title 21 of the United States Code, Section 360bbb-3(e)(1)(A)(ii), and regulations

and internal protocols of the United States Food and Drug Administration promulgated thereunder, provide in relevant part that all individuals to whom an investigational product is to be administered under an Emergency Use Authorization be informed "of the option to accept or refuse administration of the product."

385.    Because all available vaccines in New York are each investigational products, with some vaccines, under some circumstances, only permitted for use under an Emergency Use Authorization, the laws and regulations of the United States prohibit state and local governments from requiring them for any person who does not consent to their administration, including Plaintiffs.

386.    Plaintiffs do not consent to being vaccinated with an experimental vaccine, especially one which violates their sincerely held religious beliefs.

387.    Title 21, Part 50 of the Code of Federal Regulations governs the protection of human subjects in the conduct of all clinical investigations regulated by the U.S. Food and Drug Administration.

388.    21 C.F.R. § 50.20 provides that, "[e]xcept as provided in §§ 50.23 and 50.24, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative."

389.    EUA vaccines and the licensed Comirnaty vaccine and Spikevax vaccine are all still being subjected to clinical trials. Population-wide surveillance and data are still being gathered for all of them, whether the "test subjects" consent or not. Whether licensed or not, all available COVID-19 vaccines are classified as experimental medicine.

390.    None of the exemptions provided in sections 50.23 and 50.24 apply to

Plaintiffs.

391.	Plaintiffs are competent to make a decision concerning medical treatment and experimentation and will not consent.

392.	Accordingly, the Mandates also violate federal law and regulations governing the administration of experimental medicine and is thus preempted.

393.	Plaintiffs have no adequate remedy at law available against Defendants for the injuries and the irreparable harms they are suffering as a direct result of the Mandates.

WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that the Mandates violates and is preempted by the laws and regulations of the United States governing the administration of investigational medical products, for an injunction prohibiting enforcement of the Mandates, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## REQUEST FOR RELIEF

394.	Plaintiffs respectfully ask this Court for the following relief:

1.	Certifying the proposed Class pursuant to Rule 23;

2.	Declaring the Mandates unconstitutional;

3.	Enjoining enforcement of the Mandates;

4.	Reinstating any employees who were suspended or disciplined for failure to follow the mandate against religious convictions; and

5.	Damages, Attorney's fees and costs to Plaintiffs.

6.	On all Claims for Relief: awarding relief to the Class equivalent to the relief requested for the individual named Plaintiffs identified herein.

7.  On all Claims for Relief: awarding costs of suit; investigation costs; payment of reasonable attorneys' fees; declaratory relief, injunctive relief, and such other and further relief as the Court may deem just and proper.

<u>CONCLUSION</u>

Plaintiffs respectfully ask that the Court act immediately to enjoin the Defendants from terminating thousands of their religiously-observant employees, who have thus far received intolerant and unconstitutional mistreatment of their religious accommodation requests at the hands of City employees. In the long run, Plaintiffs also request the larger relier set forth in the final section of the instant Complaint.

<u>DEMAND FOR
JURY TRIAL</u>

Plaintiffs and the Class respectfully demand a trial by jury for all issues so triable in this action.

Dated: New York, New York
February 10, 2022

Respectfully submitted,

NELSON MADDEN BLACK LLP
*Attorneys for Plaintiffs and the Class*

*/s/ Jonathan R. Nelson*
**By: Jonathan Robert Nelson (JN8796)**
Barry Black
Sarah E. Child
475 Park Avenue South, Suite 2800
New York, NY 10016
(212) 382-4300
jnelson@nelsonmaddenblack.com

GIBSON LAW FIRM, PLLC

*/s/ Sujata S. Gibson*

**Sujata S. Gibson**
*Attorney for Plaintiffs and the Class*
Gibson Law Firm, PLLC
408 W Martin Luther King, Jr. Street
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

Mary Holland, Esq., *Of Counsel*

Michael Howard Sussman, Esq., *Of Counsel*