## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

NEW YORKERS FOR RELIGIOUS LIBERTY, INC.,
GENNARO AGOVINO, CURTIS CUTLER, LIZ
DELGADO, JANINE DEMARTINI, BRENDAN
FOGARTY, SABINA KOLENOVIC, KRISTA O'DEA,
DEAN PAOLILLO, DENNIS PILLET, MATTHEW
RIVERA, LAURA SATIRA, FRANK SCHIMENTI,
JAMES SCHMITT, individually and on behalf of all
other persons similarly situated,

                             Plaintiffs,

    - against -

THE CITY OF NEW YORK; ERIC ADAMS, in his
official capacity as Mayor of the City of New York,
DAVE CHOKSHI, in his official capacity as Health
Commissioner of the City of New York, and ROBERTA
REARDON, in her capacity as New York State
Commissioner of Labor,

                           Defendants.

------------------------------------------------------------------- x

Case No. 1:22-cv-00752

MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF'S
MOTION FOR A
PRELIMINARY INJUNCTION
AND TEMPORARY
RESTRAINING ORDER

## <u>ORAL ARGUMENT REQUESTED</u>

Jonathan Robert Nelson (JN-8796)
Barry Black (BB-4602)
Sarah Child (SC-1011)
NELSON MADDEN BLACK LLP
475 Park Avenue South, Suite 2800
New York, NY 10016
Telephone: (212) 382-4300
jnelson@nelsonmaddenblack.com

Sujata S. Gibson (SG-8846)
GIBSON LAW FIRM, PLLC
408 W. Martin Luther King, Jr. St.
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

*Attorneys for Plaintiffs and the Class*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS .......................................................................................1

ARGUMENT ...........................................................................................................5

    I. LEGAL STANDARD .......................................................................................5

    II. PLAINTIFFS SATISFY THE REQUIREMENTS FOR A TEMPORARY
        RESTRAINING ORDER AND A PRELIMINARY INJUNCTION ......................6

        A. There is a Strong Likelihood of Success on the Merits .................................6

            1. The Mandates are unconstitutional both facially
            and as applied to Plaintiffs ......................................................................7

            2. The Mandates violate the Religion Clauses because
            they interfere with Plaintiffs' freedom to pursue their
            sincerely held religious beliefs concerning vaccination
            and they preference certain religions over others .................................8

                a) Strict scrutiny applies because the
                Mandate is not general .....................................................................8

                b) Strict scrutiny applies because the Mandate
                is not generally applicable ...............................................................11

                    i) The Mandate provides
                    individualized exemptions ...........................................................12

                    ii) The Mandate prohibits religious conduct
                    while permitting secular conduct ...............................................14

                    iii) The Mandates are both overinclusive
                    and underinclusive .......................................................................15

**iv) The Mandate is not *generally* applicable; it is one of eighty-three *specifically* applicable mandates** .........................................................................**16**

**c) Strict scrutiny applies because the hybrid rights exception is triggered here** ...............................................................**19**

**3. The Mandates violate well-established fundamental substantive due process rights that are subject to strict scruity** .........**20**

**a) The right to refuse medicine and bodily autonomy are fundamental rights** ...................................................**20**

**b) Courts cannot deviate from strict scrutiny because the case involves public health** ...............................................**21**

**4. The Mandates Are Unlikely to Survive Strict Scrutiny** ...................**24**

**III. Plaintiffs Will Suffer Irreparable Harm if No Injunction is Granted** .................**24**

**IV. The Balance of Equities Favors Granting a Preliminary Injunction** ...................**24**

**CONCLUSION** ...........................................................................................**25**

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Clapper*,
    804 F.3d 617 (2d Cir. 2015) ............................................................................ 5

*Agudath Isr. v. Cuomo*,
    983 F.3d 620 (2d Cir. 2020) .......................................................................... 21

*Beal v. Stern*,
    184 F.3d 117 (2d Cir. 1999) ............................................................................ 8

*Braunfeld v. Brown*,
    366 U.S. 599 (1961) ...................................................................................... 17

*Buff. Forge Co. v. Ampco-Pitt. Corp.*,
    638 F.2d 568 (2d Cir. 1981) .......................................................................... 25

*Cantwell v. Conn.*,
    310 U.S. 296 (1940) ...................................................................................... 14

*Cent. Rabbinical Cong. of the U.S. v. N.Y. City Dep't of Health & Mental Hygiene*,
    763 F.3d 183 (2d Cir. 2014) .......................................................................... 16

*Church of Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993) ................................................................................. 12, 16

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ........................................................................................ 7

*Cruzan v. Dir., Dep't of Health*,
    497 U.S. 261 (1990) ...................................................................................... 21

*Davis v. Beason*,
    133 U.S. 333 (1890) ...................................................................................... 17

*Dr. A. v. Hochul*,
    595 U.S. ___ (2021) ................................................................................... 9-10

*Echo Design Grp., Inc. v. Zino Davidoff S.A.*,
    283 F. Supp. 2d 963 (S.D.N.Y. 2003) ............................................................ 5

*Elrod v. Burns*,
    427 U.S. 347 (1976) ................................................................................... 6, 24

*Emp. Div. v. Smith*,
    494 U.S. 872 (1990) ................................................................... 8, 17, 20, 20

*Fulton v. City of Phila.*,
    141 S. Ct. 1868 (2021) ........................................................................ 12, 14, 15

*Gallagher v. N.Y. State Bd. of Elections*,
    477 F. Supp. 3d 19 (S.D.N.Y. 2020) ............................................... 26

*Galvan v. Levine*,
    490 F.2d 1255 (2d Cir. 1973) ...................................................... 8

*Gillette v. United States*,
    401 U.S. 437 (1971) ............................................................. 17

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905) ......................................................... 17, 21

*Knight v. State Dep't of Pub. Health*,
    275 F.3d 156 (2d Cir. 2001) ..................................................... 20

*Larson v. Valente*,
    456 U.S. 228 (1982) ............................................................. 11

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018) ......................................................... 12

*Meek v. Pittenger*,
    421 U.S. 349 (1975) ......................................................... 17, 17

*Minersville Sch. Dist. v. Gobitis*,
    310 U.S. 586 (1940) ............................................................. 16

*N.Y. Progress & Prot. PAC v. Walsh* ,
    733 F.3d 483 (2d Cir. 2013) .................................................. 5-6, 25

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ............................................................. 17

*Ram v. Lal*,
    906 F. Supp. 2d 59 (E.D.N.Y. 2012) ............................................... 24

*Reynolds v. United States*,
    98 U.S. 145 (1878) ............................................................. 17

*Roman Catholic Diocese v. Cuomo*,
    141 S. Ct. 63 (2020) ........................................................ 6, 9, 21

*S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ......................................................... 22

*S. Bay United Pentecostal Church v. Newsom*,
    141 S. Ct. 716 (2021) .......................................................... 22

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ............................................................. 25

*Tandon v. Newsom,*
   141 S. Ct. 1294 (2021) ........................................................................................ 15, 24

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.,*
   450 U.S. 707 (1981) ................................................................................................ 25

*United States v. Lee,*
   455 U.S. 252 (1982) ................................................................................................ 17

*Vacco v. Quill,*
   521 U.S. 793 (1997) ................................................................................................ 21

*W. Va. State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ................................................................................................ 17

*Wash. v. Glucksberg,*
   521 U.S. 702 (1997) ................................................................................................ 21

**Other**

U.S. Const. amend. I ........................................................................................................ 8

**PRELIMINARY STATEMENT**

Amidst the historic pandemic of Covid-19, Mayor Bill de Blasio and Mayor Eric Adams ("Mayors") seemingly decided that the cure for COVID lies in mass vaccinations.  Toward that end, the mayors and their Health Commissioner, David Chokshi, imposed some eighty-three vaccine mandates ("Mandate(s)") separately and distinctly applicable to various New York City departments and agencies as well as various types of private employers, each uniquely tailored to that group, expressly designed to "*potentially* save lives, protect public health, and promote public safety."  But, in doing so, they adopted policies that are brazenly hostile to those who objected based upon their sincerely held religious beliefs.  Since the Mandates were by design specifically applicable to various different groups of people and organizations in a manner unrelated to the Mandates' stated objectives, and Mandates have been applied and enforced through discriminatory criteria with unbridled discretion for government employees to pass judgment on what constitutes a valid belief, the Mandates are subject to strict scrutiny, which they cannot survive.

Without this Court's intervention, thousands of employees are scheduled to be terminated starting tomorrow, February 11th. Plaintiffs seek temporary injunctive relief to preserve the status quo for themselves and all others similarly situated while this Court reviews this important case. They have been working safely on the frontlines for the last two years without vaccination. No particular emergency attaches to February 11, 2022. All they ask is that this Court enjoin the Mandates at least until a hearing can be held to ensure that the City meets its burden of proving that no less intrusive measures could be implemented short of forcing thousands of New Yorkers to choose between having a job and following their faith.

**STATEMENT OF FACTS**

A comprehensive recitation of the relevant facts is contained within the accompanying

1

Complaint, to which the Court is respectfully referred.  A relevant summary follows.

On July 21, 2021, New York City Mayor Bill DeBlasio announced what has come to be known as the "Vax-or-Test" policy, stating: "What we're doing is mandate for the folks who work in our public hospitals and clinics, they need to be safe, the people they serve need to be safe. So, we're saying, get vaccinated, or get tested once every week. It's a fair choice." *See* transcript, MSNBC Morning Joe (July 21, 2021) https://www1.nyc.gov/office-of-the-mayor/news/508-21/transcript-mayor-de-blasio-appears-live-msnbc-smorning-joe.

But Vax-or-Test did not last long. Two weeks after issuing the Vax-or-Test mandate for all municipal workers, the City began enacting new Mandates which eradicated the testing option and required vaccination only. These Mandates were not enacted all at once, but instead seemingly at random, covering only workers in some departments and agencies through a single Mandate, and then others through the next.

To date, the Mayors and their Health Commissioner have issued a whopping eighty-three Mandates through emergency powers, each covering a different organization or group of individuals, including:

- healthcare workers
- contractors
- childcare and early intervention providers
- public schools
- private schools
- teachers
- firefighters
- police officers
- corrections officers
- sanitation workers
- private employers
- indoor entertainment
- recreation, dining and fitness
- participants in high-risk extracurricular activities; and, most recently
- all New York City private-sector employees

Many of the eighty-three mandates are procedural in nature, such as renewals of earlier mandates, but various specific Mandates set forth distinct substantive provisions for disparate organizations and individuals. Each Mandate has certain often arbitrary differences. Yet, the

2

substantive Mandates all have two things in common: (1) they all purport to derive their authority and directive from the mayors' state of emergency declaration concerning Covid-19 as pertaining to *all New Yorkers* and (2) they all share a declared purpose of resolving the Covid-19 crisis by mandatory vaccination.

After the first Mandate was temporarily enjoined for failure to provide religious accommodation, the subsequent substantive Mandates included the following language: "**Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law.**"

But this language only pays lip service to religious accommodation protections. Indeed, City-wide the Mandates were uniformly designed, implemented and enforced to deny accommodation to most employees. As the City began implementing the Mandates, Mayor de Blasio admitted in a press conference that the City intended to discriminate against employees with unorthodox or personally held religious beliefs, stating in response to a question about what criteria the City would apply in deciding who received a religious exemption:

> Yeah, it's a great question. Thank you. Yes. And **very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated**. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition**. But overwhelmingly the faiths all around the world have been supportive of vaccination. **So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection.**

Protection of personally held and unorthodox religious viewpoints, or, heretics, as they used to be called, was one of the primary concerns of the drafters of the Constitution. This lack of neutrality towards unorthodox religious beliefs was shocking enough when made in a public

statement by the architect of the Mandates. But then the City went a step further, codifying these discriminatory ideas about what constitutes a "valid" religious objection to vaccines into a written policy that requires discrimination against unorthodox beliefs, and was implemented through what can only be described as heresy inquisitions, with government officials zealously advocating denial of accommodation because the Pope does not agree with the applicant's interpretation of what her faith required of her. Even after the Second Circuit held that these policies were blatantly unconstitutional, the City did not repeal them, but only added another option, thus compounding the problem by creating two different policies – one for the heretics and one for the lucky few whose religious views lined up with state approved religions and dogma.

Because they are not neutral or generally applicable, and also violate well-established fundamental rights, the Mandates must be analyzed under strict scrutiny review, which Defendants cannot survive. Science overwhelmingly shows that COVID19 cannot meaningfully stop the spread of this virus. These vaccines are primarily for personal protection from severe symptoms, and particularly with the emergence of new variants, and the recognition that the vaccines quickly wane in effectiveness, community level protection derived from widespread vaccine uptake is widely admitted to be insignificant at best. The New York City Department of Education ("DOE"), for example, which was the first to adopt the no-test requirement, has seen no reduction in daily infections among staff since excluding all unvaccinated personnel on October 4, 2021. On the contrary, the rate of infection astronomically rose over the past four months among the fully vaccinated staff, going from an average of 50 infected staff members a day (among both vaccinated and unvaccinated staff) before the unvaccinated were excluded four months ago, to rates as high as 5,000 infected fully vaccinated staff members on certain days last month. The DOE data is

4

consistent with the studies on populations around the world, and with what public health experts universally have now begun to admit – herd immunity is not possible with these vaccines. Nearly everyone will catch COVID-19 at some point, whether or not they are vaccinated, and the primary benefit of COVID-19 vaccination is personal. While there are many excellent reasons for choosing to get vaccinated, and it is entirely understandable that the City would encourage them to do so, there is no compelling reason for conditioning the right to earn a living on getting a COVID-19 vaccine. The small percentage of employees who cannot take a COVID-19 vaccine due to sincerely held religious objections can be safely accommodated through less burdensome measures.

## ARGUMENT

### I. LEGAL STANDARD

To obtain a preliminary injunction, the moving party must ordinarily show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) the balance of hardships tips in its favor; and (4) an injunction is in the public interest. *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). The standards for obtaining a temporary restraining order largely mirror those for obtaining a preliminary injunction. *See, e.g.,* E*cho Design Grp., Inc. v. Zino Davidoff S.A.,* 283 F. Supp. 2d 963, 966 (S.D.N.Y. 2003).

Where First Amendment and fundamental rights are at issue (as here), the test for obtaining preliminary injunctive relief reduces essentially to a single prong: "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh, 7*33 F.3d 483, 488 (2d Cir. 2013). This is so because "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); protection of First Amendment rights is per se "in the public interest," *Id. ;*

5

and the balance of hardships is entirely one-sided because "the Government does not have any interest in enforcing an unconstitutional law." *Id.* .

## II. PLAINTIFFS SATISFY THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

"Government is not free to disregard the First Amendment in times of crisis...Yet recently, during the COVID pandemic, certain States seem to have ignored these long-settled principles." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 69 (2020) (Gorsuch, J., concurring). Mayor Bill de Blasio, Mayor Eric Adams, Commissioner Dave Chokshi and New York City have ravaged the Constitution like a bull in a china shop. Executive orders have issued as often as daily, rashly altering and reversing course and devising arbitrarily fluctuant policies in reckless disregard for the religious liberty rights of New York City's most indispensable heroes—like those who mentor our children, save families from raging fires, collect our trash, protect us, and care for our health.

Plaintiffs can easily demonstrate a likelihood of success on the merits, as well as each of the remaining elements of a preliminary injunction. The Court should therefore grant this motion in order to prevent irreparable harm with the impending termination dates, the earliest of which is February 11, on which Plaintiffs will effectively be forced to either surrender their employment, including all their benefits, or get vaccinated in violation of their sincerely held religious beliefs.

### A. There is a Strong Likelihood of Success on the Merits

Plaintiffs have a strong likelihood of success on the merits. The widespread abuses carried out in the implementation of these Mandates across different departments of the City subject the Mandates to facial attack. The City was openly hostile to religious objection, particularly unorthodox religious objection, they adopted facially discriminatory policies, and they preferenced Christian Science and the viewpoints of the Pope over other religions, which *per se* requires strict

scrutiny under the *Larson* test. Moreover, the Mandates violate fundamental substantive due process rights, including the right to bodily integrity, and the related rights to make medical decisions in accordance with one's chosen physician absent state interference, and to decline unwanted medicine. Because these are all well-established fundamental liberty interests, they warrant strict scrutiny of the Mandate on their own. But since this case entails both fundamental liberty interests and the free exercise clause, strict scrutiny applies regardless of whether the Mandates were found generally applicable and neutral, under the hybrid rights exception to *Smith*. These Mandates cannot survive strict scrutiny. Other less invasive measures exist, and the science shows that the COVID-19 vaccines cannot protect the general public, but are primarily for personal protection. Thus, Mandates are outside the scope of the City's police power in any event.

### 1. The Mandates are unconstitutional both facially and as applied to Plaintiffs

As a preliminary matter, Plaintiffs' challenge to the Mandates is both facial and as-applied. To raise a constitutional objection to a law, a plaintiff must almost always assert that the law's application to the plaintiff violates the Constitution. The distinction between the two types of challenges, therefore, "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint" *Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (citing *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477-78 (1995)).

When a law is regularly applied in an unconstitutional manner, a facial challenge is appropriate. According to the Second Circuit's traditionally applied precedent:

> an action seeking declaratory or injunctive relief against state officials on the ground of unconstitutionality of a statute or administrative practice is the archetype of one where class action designation is largely a formality ... [W]hat is important in such a case for the plaintiffs . . . is that the *judgment* run to the benefit not only of the named plaintiffs but of all others similarly situated . . ..

*Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir. 1973). "Although facial challenges are generally disfavored, they are more readily accepted in the First Amendment context." *Beal v. Stern*, 184 F.3d 117, 125 (2d Cir. 1999).  The Mandates are subject to facial challenge because they are regularly applied in a manner that violates the Constitution.

### 2.  The Mandates violate the Religion Clauses because they interfere with Plaintiffs' freedom to pursue their sincerely held religious beliefs concerning vaccination

The U.S. Const. amend. I as applied to the States by the Fourteenth Amendment prohibits government from enacting laws, or enforcing laws in a manner, that would prohibit the free exercise of religion.  This includes the right to "the performance of (or abstention from) physical acts," as well as the right to "profess whatever religious doctrine one desires" *Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990). Plaintiffs all maintain sincerely held religious beliefs that would preclude subjecting themselves to COVID vaccination.  As such, according to the Constitution, no law can be enacted that would prohibit their freedom to object to vaccination, nor can a law be enforced in a manner that restricts this sacrosanct religious liberty.

The boundary line between the government's power and Free Exercise is often subject to the test articulated in *Smith*—namely, that a neutral, generally applicable law that incidentally burdens religion is generally not proscribed by the Constitution. "Because the challenged restrictions are not 'neutral' and of 'general applicability,' they must satisfy 'strict scrutiny,' and this means that they must be 'narrowly tailored' to serve a 'compelling' state interest." *Roman Catholic Diocese*, 141 S. Ct. at 67. Defendants cannot meet this burden here.

### a)  Strict scrutiny applies because the Mandates are not neutral

The Mandates have been biased against religious dissent since their inception. Indeed, from the beginning, former Mayor de Blasio, who promulgated them, regularly admitted that the City's

intention was to target unorthodox believers for disfavor through discriminatory implementation of the Mandates. For example, in press briefings, de Blasio made statements clarifying that the City adopted a preference for the Pope's viewpoint about what "scripture" requires on the topic of vaccines, expressed hostility towards religious opposition to vaccination as largely "invalid," stated that the City would be openly preferencing Christian Scientists and Jehovah's Witnesses, and said that to get an exemption, applicants would have to be a "standing member of a faith that has a very, very specific long-standing objection" to vaccination according to the Mayor's religious viewpoint. Mayor de Blasio further stated that the City would discriminate against anyone with beliefs that are less widely recognized, unorthodox or personally held religious beliefs.

These statements admit an intention to commit bold violations of constitutional protections for people whose religious beliefs are personally held, or not shared by well-established religious orthodoxy. *Dr. A. v. Hochul*, 595 U.S. ___ (2021) (Gorsuch, J., dissenting) (noting similar statements made by the Governor of New York during the implementation of a parallel state mandate for healthcare workers constituted admissions that the state "'intentionally' targeted for disfavor those whose religious beliefs fail to accord with the teachings of 'any organized religion' and 'everybody from the Pope on down'"). Such non-neutral sentiments subsequently pervaded and tainted Defendants' policies and have resulted in numerous First Amendment abuses.

For example, the DOE, in an astounding breach of neutrality, implemented the Mandates through an arbitration award containing facially unconstitutional standards which only allowed religious exemptions for employees who submitted clergy letters, were members of established and recognized religions "(e.g. Christian scientists)," and whose religious leaders had not spoken in favor of the vaccine. In the ensuing heresy inquisitions used to weed out religious dissent, DOE

9

representatives zealously argued for even more blatant discrimination against employees whose religious beliefs are personal in nature or out of step with popular religious leaders and official church orthodoxy. *See*, *e.g.*, Declaration of Sabina Kolenovic ¶ 37 (DOE disregarded Muslim Plaintiff Kolenovic's advice from her Imam and instead argued that her request should be denied because other Islamic institutions in the world permitted its members to get vaccinated). What's worse, after the DOE admitted to a federal judge that such standards "may" be "constitutionally suspect" in *Keil v. City of New York*, 21-2711 (2d Cir. 2021) and *Kane v. de Blasio*, 21-2678 (2d Cir. 2021), and after the Second Circuit Court of Appeals "confirmed Defendants' suspicion" in no uncertain terms, *Id. ,* the DOE never formally renounced its standards. It instead purported to give fresh consideration to DOE employees who had been denied, but continued to act in an unconstitutional manner by refusing to abide by the First Amendment in its decisions. At least six other agencies (the DOC, Parks, DSNY, FDNY, the DOI, and Parks) continue to offer Plaintiffs the opportunity to have their exemption denials re-heard through the same facially discriminatory standards, but has reacted to the Second Circuit's holding by adding an alternate process for those who refuse to submit to the unconstitutional one. This only compounds the problem. Essentially, the City set up two standards – one for the heretics and one for state-approved religions.

But in reality both options are infected with the hostility towards unorthodox religious viewpoints that the mayor admitted would be applied in implementing the Mandates. In the alternative process afforded, following the mayor's lead, numerous agencies flagrantly violated First Amendment standards, evidencing a bias against and mistrust of unfamiliar and unpopular religious beliefs in processes that could hardly be characterized as neutral. *See, e.g.*, Declaration of James Schmitt at ¶¶ 19, 27 (Defendant Parks told Plaintiff Schmitt that his clergy letter—which

was replete with references to Bible verses and religious texts—was "inadequately related to religion"); Declaration of Frank Schimenti ("Schimenti Dec.") at ¶¶ 41, 51 (Defendant Department of Buildings told him that his sincerely held religious beliefs—which he set forth in an eight-page personal statement describing his religious background including his spiritual mentors, his reliance on prayer, and his understanding of more than 25 different Bible verses—did not actually prohibit him from taking the vaccine); Declaration of Laura Satira ¶¶ 19-20 (private school employer would not engage in interactive process with Plaintiff Satira due to threat of fines under non-public school mandate); Declaration of William Toth ¶¶ 6-11 (witnessing FDNY Commissioner state that only Christian Scientists would be granted religious exemptions).

These actions show an open preference for views of orthodox religions and religious institutions who are pro-vaccination, which the Constitution clearly prevents. *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). On this basis alone, strict scrutiny must be applied to the Mandates. "[W]e are presented with a state law granting denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." *Id.* As the Supreme Court repeatedly affirms, "even [a] slight suspicion" of lack of neutrality is per se unconstitutional regardless of whether a regulation otherwise forwards a compelling interest. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018).  The Mandates are therefore  subject to strict scrutiny.

**b)  Strict scrutiny applies because the Mandates are not generally applicable.**

General applicability and neutrality are often merged, conflated and even confused with one another, but they are two distinct concepts.  Since *Smith*, the Supreme Court has held set forth

certain rules that help define general applicability, including preference for secular conduct over religious conduct, individualized exemptions, and underinclusiveness and overinclusiveness.

### i) The Mandates provide individualized exemptions

In *Fulton v. City of Philadelphia*, the United States Supreme Court held that a law is not generally applicable when it "'invite[s]' the government to consider the particular reasons for a person's conduct by providing a 'mechanism for individualized exemptions.'" *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877 (2021) (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990)). "[I]n circumstances in which individualized exemptions from a general requirement are available," like the Mandates at issue, "[a state actor] 'may not refuse to extend that system to cases of 'religious hardship' without compelling reason.'" *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 537 (1993) (quoting *Bowen v. Roy*, 476 U.S. 693, 708 (1986)).

"It is established in our strict scrutiny jurisprudence that "a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Id.* at 547. The Mandates cannot be regarded as protecting New Yorkers from the Covid-19 pandemic while Defendants recklessly and disdainfully humiliate Plaintiffs and disparage their religious beliefs.

The agencies' overwhelming discretion to evaluate these requests as noted already in Section A.3.a has resulted not only in First Amendment violations, but also arbitrary, capricious, discriminatory, and inconsistent results. *See, e.g.*, Declaration of Curtis Cutler ¶ 32 (DSNY denied Plaintiff Cutler his religious exemption but granted it to his colleague who attends Cutler's church, possesses many of Cutler's same religious beliefs, and submitted a letter from the same pastor as Cutler did); Declaration of Liz Delgado ¶¶ 20, 22 (DOI employee denied religious exemption

because "not based on a sincerely held religious, moral, or ethical belief," even though personal statement described religious background, religious practices, and religious texts conflicting with vaccination requirement); Declaration of Dean Paolillo ¶ 47 (religious exemption denied because "objection was personal, political, or philosophical" when personal statement contained religious objections); Declaration of Dennis Pillet (religious exemption denied because of "<u>potential</u> for undue hardship") ¶ 26 (emphasis added); Declaration of Krista O'Dea ¶ 41(same).

It has resulted in exceptions to the Mandates being made for non-religious reasons, but not religious ones. Schimenti Dec. ¶ 70 (Plaintiff Schimenti's vaccinated supervisee was diagnosed with Covid-19 and given the option to work remotely, while Plaintiff Schimenti was denied his religious exemption and never given that option); Declaration of Gennaro Agovino ("Agovino Dec.") ¶¶ 19-21 (DOC employee Agovino was denied a religious exemption due to harm he could pose to detainees, when Agovino's position did not involve going into the jails, and both visitors to the jails and detainees themselves had no vaccination requirement).

And even if such discretion was not exercised improperly, the mere existence of it gives rise to a strict scrutiny standard, at least for the Mandates that govern City employees, because of the potential for abuse. *See Fulton*, 141 S. Ct. at 1879 (citing *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990)) (emphasis added) ("[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude, . . . "). While the law may permit government officials to make certain religious inquiries, strict boundaries and a light touch are required. Strict scrutiny is always required of such policies, and too much discretion can lead to a law's facial invalidation. In

*Cantwell v. Connecticut*, for example, the Supreme Court held that a solicitation statute limiting solicitation from non-religious causes was facially invalid under the First and Fourteenth Amendment where, as here, it allowed local officials broad discretion to determine which causes were "religious" in nature and which were not. *Cantwell v. Conn.*, 310 U.S. 296, 310 (1940). The Court flatly rejected the states' argument that judicial review of any wrongly decided case was a sufficient remedy, noting the real risk of harm that existed from vesting such broad discretion in a government official at all and the grave risk of prior restraint on first amendment liberties. *Id.* at 904. The entire solicitation statute was struck down as a result, not just the policy regarding religious solicitation classification determinations.

### ii)  The Mandates Prefer Religious Conduct over Secular Conduct

The Supreme Court has repeatedly affirmed that government may not grant exemptions to a law for secular conduct but deny similar exemptions for religious conduct, for in doing so government simply prioritizes secular conduct over religious conduct in violation of the First Amendment.  "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877.  In examining *Lukumi*, *Fulton* explained that the City of Hialeah claimed that its ordinances prohibiting animal sacrifice

> were necessary in part to protect public health, which was 'threatened by the disposal of animal carcasses in open public places . . .. But the ordinances did not regulate hunters' disposal of their kills or improper garbage disposal by restaurants, both of which posed a similar hazard . . . The Court concluded that this and other forms of underinclusiveness meant that the ordinances were not generally applicable.

*Id.*.

14

Here, the Mandates expressly purport to have been enacted to "potentially save lives, protect public health, and promote public safety." Despite this lofty goal, they conveniently carve out exemptions.  For example, the DOE Mandate was made inapplicable to bus drivers, voters and election personnel, parents and UPS and FedEx drivers.  But, like the City of Hialeah, the NYC DOE's concerns for health and safety ends there: no religious exemptions ensue. Other Mandates among the eighty-three different mandates passed have similar carve-outs.

"Government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Mayor de Blasio and Commissioner Chokshi simply do not get to decide that voters, delivery personnel and bus drivers are more important than religious DOE employees.

### iii) The Mandates are both overinclusive and underinclusive

Laws are not generally applicable when they are overinclusive or underinclusive "in relation to the state interests they purportedly serve." *Lukumi*, 508 U.S. at 579. A law is not generally applicable when "it is underinclusive in relation to its asserted secular goals." *Cent. Rabbinical Cong. of the U.S. v. N.Y. City Dep't of Health & Mental Hygiene, 76*3 F.3d 183, 186 (2d Cir. 2014).

The Mandates are overinclusive because, for example, they were made applicable to all departmental or agency employees and staff—even those working remotely. The Mandates are underinclusive because they are expressly inapplicable to a wide assortment of individuals or groups.  For example, the DOE Mandate excepted **(1)** bus drivers, **(2)** workers at "UPK" programs not located in a NYC DOE building, **(3)** "Individuals entering a DOE school building for the

limited purpose to deliver or pickup items," **(4)** "Parents or guardians of students who are conducting student registration or for other purposes identified by DOE as essential to student education and unable to be completed remotely" and **(5)** "Individuals entering for the purposes of voting or, pursuant to law, assisting or accompanying a voter or observing the election."

Furthermore, each Mandate is significantly different from the other. For example, the Childcare and Early Intervention Program is the only Mandate that does not allow reasonable accommodations for in-person work, whereas the other mandates related to children do.

### iv) The Mandates are not *generally* applicable; each is one of eighty-three *specifically* applicable mandates

In announcing its rule in *Smith*, the Supreme Court did not specifically define general applicability. In its most basic form, and most simply put, *generally applicable* means *generally applicable*—applicable in general, to the general public. Indeed, Justice Scalia, quoting from Justice Frankfurter in *Minersville School Dist. Bd. of Ed. v. Gobitis*, 310 U.S. 586, 594-595 (1940), noted that: "Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a *general law* not aimed at the promotion or restriction of religious beliefs." *Smith*, 494 US at 879 (1990) (emphasis added).   Laws that are generally applicable are intended to address broad "socially harmful conduct" and various "aspects of public policy." *Id.* at 885. They are designed to govern "relevant concerns of a political society." *Minersville*, 310 U.S. at 603. Because of their application to the general public, they have historically been referred to as "general laws." *See, e.g.,* D*avis v. Beason,* 133 U.S. 333, 348 (1890); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 655 (1943); *Meek v. Pittenger*, 421 U.S. 349, 351 (1975).

16

In his *Lukumi* concurrence, Justice Souter noted that "general applicability is, for the most part, self-explanatory," *Lukumi* at 561 (Souter, J., concurring), and referring to generally applicable laws as "secular law[s], applicable to *all*." *Id.* (emphasis added).

*Smith* limited its holding to general laws, such as criminal or tax statutes, applicable to all and beyond the reach of *Sherbert*'s strict scrutiny standards. In doing so, it leaned upon a number of its prior rulings, each of which involved laws that were generally applicable: they applied to *everyone.*

- *Reynolds v. United States*, 98 U.S. 145 (1878) (criminal laws against polygamy)
- *Prince v. Massachusetts*, 321 U.S. 158 (1944) (child labor laws)
- *Braunfeld v. Brown*, 366 U.S. 599 (1961) (Sunday-closing laws against)
- *Gillette v. United States*, 401 U.S. 437, 461 (1971) (military Selective Service System)
- *United States v. Lee*, 455 U.S. 252, 258-61 (1982) (payment of Social Security taxes)

The one vaccine case to which the Court cited, *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), was markedly distinguishable from this case. There, the statute provided that "[t]he board of health of a city or town if, in its opinion, it is necessary for the public health or safety shall require and enforce the vaccination and revaccination of *all the inhabitants* (emphasis added)." *Id.* at 22. Indeed, the statute's applicability to the entire population is precisely why the court sanctioned "reasonable regulations, as the safety of the general public may demand." *Id.* . . In contrast with the narrow, specifically applied Mandates, the *Jacobson* statute expressly applied to "*all persons*," "*all the inhabitants of Cambridge,*" *and* "*all the inhabitants of the city.*"

Unlike the controlled-substance law in *Smith* and the cases involving criminal and tax laws upon which it relied, all of which were applicable to the public at large and excepted no person or group, each Mandate is one of eighty-three covid-related executive orders, each of which *specifically* targets a *unique* and *different* group, none of which is the sole object of that Mandate.

17

The various de Blasio, Adams and Chokshi mandates all purport to be addressing the *general* Covid-19 pandemic affecting the *general* New York City population. Yet each governs a specific subsector of this vast City; each is *specifically* applicable and patently *not* generally applicable.

For example: the DOE Mandate, like all others, expressly declares that it is issued because "Mayor Bill de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City to address the threat posed by COVID-19 to the health and welfare of City residents." The DOE Mandate does not purport to address concerns raised by a children's pandemic, a sanitation worker's pandemic, a firefighter's pandemic or any other health emergency that is uniquely connected to one agency at a time. There is nothing in the blackboards, pencils, erasers, books, backpacks, lockers, or anything else specific to schools, school children, teachers or school buildings, for example, that purports to be specifically connected to Covid-19 or heighten its effects. The same, of course, applies to the various other de Blasio and Chokshi vaccine mandates. They are all separate slices of vaccine pie, each with a different flavor, color, and expiration date—certainly not one generally applicable pie!

The Mayors and their Health Commissioner could perhaps have implemented a vaccine mandate generally applicable to all New Yorkers, requiring everyone in New York City to be vaccinated. Instead, the City decided to "divide and conquer," by picking off various segments of the electorate at one at a time, apparently based upon nothing more than pure muscle and expedience, each Mandate replete with arbitrariness and capriciousness. This was politically easier to pass – the City could test the waters, and keep the impacted workers with religious objections from organizing all at once in outrage. But that is precisely why only generally applicable laws can avoid strict scrutiny; they are less likely to have this type of encroaching intent.

18

New York City's eighty-three vaccine mandates, handcrafted and custom-tailored for the various sub-sectors of New York City's work force, are flatly outside of the ubiquitous laws that *Smith*, its predecessors, and its progeny deemed to have such broad political and societal reach that they warranted departure from strict scrutiny.

### c)  Strict scrutiny applies because the hybrid rights exception is triggered here.

The Mandates are subject to strict scrutiny, because they violate the *Larson* test by openly naming certain state-preferred religions and dogmas, and they are not neutral and generally applicable as regularly applied through official Citywide policy. However, they also deserve strict scrutiny for another reason. That is – they violate additional well-established fundamental liberty interests, which triggers the hybrid rights exception set forth in *Smith* for purposes of analyzing the burdens on religion.

The Second Circuit's holding that "the language [in *Smith*] relating to hybrid claims is dicta and not binding on this court," *Knight v. State Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001), is as inconsistent with *Smith* itself as it is unavailing. *Smith*, of course, did not overrule *Sherbert* and *Thomas*.  Strict scrutiny is still the default standard for reviewing a Free Exercise challenge.  *Smith* merely removed a certain class of cases from the sphere of traditional First Amendment scrutiny, holding that "[w]e have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Smith*, 494 US at 878-79. But *Smith* went one step further in certifying that hybrid rights cases were *not* in that category of case outside of the First Amendments traditional reach. "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise

19

Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press." *Id*. at 881.  The only logical conclusion then is that hybrid rights cases remain subject to traditional strict scrutiny.

In any event, even if the relevant language *were* "dicta," we are still left with *Smith* affirming the earlier hybrid rights decisons, including *Cantwell*, *Murdock*, *Pierce* and *Yoder*.

### 3. The Mandates violate well-established fundamental substantive due process rights that are subject to strict scrutiny.

Three major well-established fundamental liberty interests are squarely violated in this case. Each are iterations of the same basic, and sacred, natural right to control one's own body, and care for it as one best sees fit, in accordance with one's creed and religious beliefs, as well as one's best judgment. Infringement of any triggers strict scrutiny. Particularly because COVID-19 vaccines are non-sterilizing vaccines, they Mandates cannot survive this review.

#### a.  The right to refuse medicine and bodily autonomy are fundamental rights.

In *Cruzan v. Dir., Dep't of Health*, 497 U.S. 261, 278 (1990), the Supreme Court recognized that "a person has a constitutionally protected liberty interest in refusing unwanted medical treatment." This right specifically extends even to lifesaving medical treatment, and is a segment of the broader, well-established, fundamental right to bodily autonomy. *See, e.g., V*acco v. Quill*, 521 U.S. 793, 807 (1997) (referencing the fundamental right to refuse medical treatment as derived from the "well-established, traditional rights to bodily integrity and freedom from unwanted touching"); *Wash. v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997) (recognizing the fundamental right to bodily autonomy is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment").

**b.  Courts cannot deviate from strict scrutiny because the case involves public health**.

For decades, the courts misapplied *Jacobson*, 197 U.S. 11, as establishing carte blanche authority for administrative agencies to avoid judicial review in cases involving public health. A little over a year ago, in *Roman Catholic Diocese*, 141 S. Ct. 63 this Court overturned this bad precent to clarify that there is no exception to strict scrutiny in cases intersecting with public health. *Id.*

As the Second Circuit recently acknowledged, "the Jacobson Court itself specifically noted that 'even if based on the acknowledged police powers of a state,' a public-health measure 'must always yield in case of conflict with ... any right which [the Constitution] gives or secures.' *Agudath Isr. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905)).

Notions of deference do not obviate a government's burden to prove that their approach to safeguarding public health is narrowly tailored. The evolution of the *South Bay* decisions are instructive. In a non-binding concurrence at the start of the pandemic, Chief Justice Roberts stated that the "Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States' S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613 (2020) ("South Bay I"). Lower courts quickly took this up as an affirmation of a public health exception to strict scrutiny review. However, in a subsequent decision in the same case, Chief Justice Roberts clarifies that this oft-cited concurrence does not allow courts to avoid strictly scrutinizing constitutional violations: "I adhere to the view that the 'Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States.' **But the Constitution also entrusts the protection of the people's rights to the Judiciary.**

21

**Deference, though broad, has its limits**." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) (emphasis added). Chief Justice Robert's concurrence was the most deferential opinion in South Bay II. The concurrence collectively issued by Justices Gorsuch, Alito and Thomas leaves little doubt that the Supreme Court no longer tolerates deviation from strict scrutiny based on public health:

> In cases implicating this form of "strict scrutiny," courts nearly always face an individual's claim of constitutional right pitted against the government's claim of special expertise in a matter of high importance involving public health or safety. It has never been enough for the State to insist on deference or demand that individual rights give way to collective interests. Of course we are not scientists, but neither may we abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty. The whole point of strict scrutiny is to test the government's assertions, and our precedents make plain that it has always been a demanding and rarely satisfied standard. (citations omitted). Even in times of crisis— perhaps especially in times of crisis—we have a duty to hold governments to the Constitution.

*Id.* at 718.

### 4.  The Mandates are unlikely to survive strict scrutiny

The Mandates are not narrowly tailored to achieve a compelling government interest, nor are they even rationally related to that goal. COVID-19 vaccines cannot stop the spread of the virus. Vaccinated people can still catch and pass on COVID-19 at similar rates to unvaccinated people. The evidence on this point is conclusive. As one of many examples, a recent Harvard study found that "there appears to be no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases." Subramanian S. V. & Akhil Kumar, Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States, European Journal of Epidemiology, 1-4, Sep. 30, 2021, doi: 10.1007/s10654-021-00808-07. Against Omicron, vaccines are even less effective. Public health officials universally agree that

22

most of us will get infected with Omicron, regardless of vaccination status. See, e.g., Allison Aubrey et al., Public health experts say most of us will get COVID-19. What does that mean?, NPR Health, https://www.npr.org/2022/01/12/1072548446/public-health-experts-say-mostof-us-will-get-covid-19-what-does-that-mean.

The City's own publicly available data support these conclusions. The City publishes regular updates on the number of infected students and in-person staff working in New York City schools. That data shows that excluding unvaccinated staff has not decreased the percentage of staff infected with COVID-19 at all. Perhaps most shocking, because such a large percentage of the fully vaccinated staff is currently infected with COVID-19, the DOE adopted the recommendation that actively infected teachers should return to school without testing to mitigate the staffing crisis. If it is safe for infected teachers who can spread and transmit COVID-19 to the students to teach in classrooms, certainly unvaccinated teachers who test negative for COVID-19 infection should be allowed to teach.

Before allowing the City to foist the same failed Mandate policies onto other sectors, and ruin the lives of City workers needlessly, this Court should hold a hearing. If the City has strong evidence that they must impose these draconian Mandates on all employees in the various ways set forth in the 83 Mandates, then they can impose the Mandates in just a few weeks, after they meet their burden of showing it. Plaintiffs are prepared to present evidence, however, to the contrary, and ask that before they face irreparable consequences and trauma, that this Court give them a TRO and quickly schedule a hearing, where the court can impartially review the evidence under evidentiary standards, rather than the soundbites that all too frequently plague public health decisions in politics. "The government has the burden to establish that the challenged law satisfies

strict scrutiny. To do so in this context [of Covid-19], it must do more than assert that certain risk factors 'are always present…or always absent from the other secular activities' the government may allow. Instead, narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID." *Tandon,* 141 S. Ct. at 1926-97.

## III. Plaintiffs Will Suffer Irreparable Harm if No Injunction is Granted

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod,* 427 U.S. at 373. Indeed, "[t]he Second Circuit has stated that '[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" *Ram v. Lal*, 906 F. Supp. 2d 59, 69 (E.D.N.Y. 2012).

Here, Plaintiffs' First Amendment rights have been violated and are continuing to be violated every day as they face enormous pressure to either abandon their job or their God, especially as Friday's termination deadline approaches. Furthermore, Plaintiffs also face the egregiously unfair choice of giving up their legal right to sue over the City's unconstitutional actions or forfeiting their health insurance. *See Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981) (Granting or denial of benefits cannot be associated with religious cghoice. "While the compulsion may be indirect, the infringement upon Free Exercise is nonetheless substantial"); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (Government may not force employee to choose between following religious precepts and forfeiting benefits). There is no question that this prong is satisfied.

## IV. The Balance of the Equities Favors Granting a Preliminary Injunction

24

Typically, "the movant must show that the harm which he would suffer from the denial of his motion is 'decidedly' greater than the harm his opponent would suffer if the motion was granted." *Buff. Forge Co. v. Ampco-Pitt. Corp.*, 638 F.2d 568, 569 (2d Cir. 1981).  But in a First Amendment case, as noted above, the balance of hardships is entirely one-sided because "the Government does not have any interest in enforcing an unconstitutional law." *N.Y. Progress & Prot. PAC, 7*33 F.3d at 488. In any event, given the schizophrenic "scientific" COVID standards, the ever-changing executive orders, the disparate rules for different classes or groups of people, and the chaotic stab-in-the-dark enforcement "procedures," the equities weigh heavily in favor of the tried and true First Amendment, the ability for Plaintiffs and their families to have health insurance, to earn a living, to live comfortably with their faith.

Here, a preliminary injunction is in the public interest, as "securing First Amendment Rights is in the public interest." *Id.; Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 50 (S.D.N.Y. 2020) ("securing First Amendment rights is in the public interest") (internal quotation marks and alteration omitted). Given the free exercise rights at stake, this element is unmistakably satisfied.

## CONCLUSION

For the reasons set forth above, Movants respectfully request that their motion by order to show cause for the entry of (1) a temporary restraining order pending the resolution of the motion for a preliminary injunction, and, after expedited discovery and hearing, (2) a preliminary injunction pending the resolution on the merits of the present action.

Dated:  New York, New York
        February 10, 2022

**GIBSON LAW FIRM, PLLC**

*/s/ Sujata S. Gibson*
By: Sujata S. Gibson

408 W. Martin Luther King, Jr. St.
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law
*Attorneys for Plaintiffs*
*and the Class*

**NELSON MADDEN BLACK LLP**

*/s/ Jonathan R. Nelson*
By: Jonathan R. Nelson
Barry Black
Sarah E. Child
475 Park Avenue South, Suite 2800
New York, NY 10016
(212) 382-4300
jnelson@nelsonmaddenblack.com
*Attorneys for Plaintiffs and the Class*

26