## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

NEW YORKERS FOR RELIGIOUS LIBERTY, INC.,
GENNARO AGOVINO, CURTIS CUTLER, LIZ
DELGADO, JANINE DEMARTINI, BRENDAN
FOGARTY, SABINA KOLENOVIC, KRISTA O'DEA,
DEAN PAOLILLO, DENNIS PILLET, MATTHEW
RIVERA, LAURA SATIRA, FRANK SCHIMENTI,
JAMES SCHMITT, individually and on behalf of all
other persons similarly situated,

Case No. 1:22-cv-00752

       Plaintiffs,

MEMORANDUM OF LAW
IN FURTHER  SUPPORT OF
PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION

  - against -

THE CITY OF NEW YORK; ERIC ADAMS, in his
official capacity as Mayor of the City of New York,
DAVE CHOKSHI, in his official capacity as Health
Commissioner of the City of New York, and ROBERTA
REARDON, in her capacity as New York State
Commissioner of Labor,

       Defendants.

------------------------------------------------------------------- x


### ORAL ARGUMENT REQUESTED


Jonathan Robert Nelson (JN-8796)
Barry Black (BB-4602)
Sarah Child (SC-1011)
NELSON MADDEN BLACK LLP
475 Park Avenue South, Suite 2800
New York, NY 10016
Telephone: (212) 382-4300
jnelson@nelsonmaddenblack.com

Sujata S. Gibson (SG-8846)
GIBSON LAW FIRM, PLLC
408 W. Martin Luther King, Jr. St.
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law


*Attorneys for Plaintiffs and the Class*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................ii

PRELIMINARY STATEMENT .........................................................................................1

STATEMENT OF FACTS .................................................................................................2

ARGUMENT .....................................................................................................................4

    I.     LEGAL STANDARD...............................................................................................4

    II.    PLAINTIFFS SATISFY THE REQUIREMENTS FOR A TEMPORARY
          RESTRAINING ORDER AND A PRELIMINARY INJUNCTION...........................5

        A.  There is a Strong Likelihood of Success on the Merits ...........................................6

             1.  The Mandates are Unconstitutional as Applied to any Religious
                    Objector Because the City Violated the Establishment Clause in
                    Implementing Them.....................................................................................6

             2.  The Mandates Unconstitutional as Applied to any Religious
                    Objector Because the City Violated the Free Exercise Clause in
                    Implementing Them ..................................................................................11

             3.  The City's Religious Accommodation Policies are Unlikely to
                    Survive Strict Scrutiny .........................................................................14

                 a.   The Religious Accommodation Policies Place All Applicants
                      at Risk of Arbitrary Denial ...........................................................14

                 b.  Less Restrictive Measures are Available ......................................17

        B.  Plaintiffs are Suffering Ongoing Irreparable Harm .............................................19

        C.  The Balance of Equities Favors Granting Injunctive Relief.................................23

    CONCLUSION...................................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Agudath Isr. v. Cuomo,*
    983 F.3d 620 (2d Cir. 2020) ............................................................................ 5, 17

*Air Force Officer v. Austin,*
    2022 U.S. Dist. LEXIS 26660 (M.D. Ga., Feb. 15, 2022, No. 5:22-cv-00009-TES) (2022) . 22

*Bowen v. Roy,*
    476 U.S. 693 (1986) ............................................................................................ 14

*Brown v. Polk Cnty.,*
    61 F.3d 650 (8th Cir. 1995) ................................................................................ 13

*Buff. Forge Co. v. Ampco-Pitt. Corp.,*
    638 F.2d 568 (2d Cir. 1981) ................................................................................ 23

*Cantwell v. Conn.,*
    310 U.S. 296 (1940) ............................................................................................ 16

*CBOCS W., Inc. v. Humphries,*
    553 U.S. 442 (2008) ............................................................................................ 13

*Church of Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993) ............................................................................................ 14

*Elrod v. Burns,*
    427 U.S. 347 (1976) .............................................................................................. 5

*Emp. Div. v. Smith,*
    494 U.S. 872 (1990) ............................................................................................ 11

*Epperson v. Ark.,*
    393 U.S. 97 (1968) ................................................................................................ 7

*Espinoza v. Mont. Dep't of Revenue,*
    140 S. Ct. 2246 (2020) ........................................................................................ 11

*Everson v. Bd. of Educ.,*
    330 U.S. 1 (1947) .................................................................................................. 7

*Fulton v. City of Phila.,*
    141 S. Ct. 1868 (2021) .................................................................................. 12, 14

*Gallagher v. N.Y. State Bd. of Elections*,
    477 F. Supp. 3d 19 (S.D.N.Y. 2020) ............................................................. 23-24

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ...................................................................... 22

*Korematsu v. United States*,
    323 U.S. 214 (1944) ................................................................................... 15

*Larson v. Valente*,
    456 U.S. 228 (1982) ............................................................................ 7, 10

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018) .............................................................................. 10

*McCreary Cnty. v. ACLU*,
    545 U.S. 844 (2005) ................................................................................... 23

*N.Y. Progress & Prot. PAC v. Walsh* ,
    733 F.3d 483 (2d Cir. 2013) ................................................................. 5, 23

*Opulent Life Church v. City of Holly Springs Miss.*,
    697 F.3d 279 (5th Cir. 2012) ..................................................................... 22

*Putaro v. Carlynton Sch. Dist.*,
    No. 2:07-cv-817, 2007 U.S. Dist. LEXIS 107326 (W.D. Pa. Dec. 12, 2007) ...................... 13

*Roman Catholic Diocese v. Cuomo*,
    141 S. Ct. 63 (2020) ................................................................................. 5

*Sampson v. Murray*,
    415 U.S. 61, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974) ...................................... 20, 22

*Sch. Dist. of Abington Twp. v. Schempp*,
    374 U.S. 203 (1963) ............................................................................ 7, 8, 9

*Smith v. Bd. of Educ.*,
    844 F.2d 90 (2d Cir. 1988) ................................................................... 16-17

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) .............................................................................. 15

*United Black Firefighters Ass'n v. Akron*,
    976 F.2d 999 (6th Cir. 1992) ..................................................................... 13

*USN Seals 1-26 v. Biden*,
    2022 U.S. Dist. LEXIS 2268 (N.D. Tex., Jan. 3, 2022, Civil Action No. 4:21-cv-01236-O)
    (2022) ..................................................................................................... 22

*White v. Carlucci,*
    862 F.2d 1209 (5th Cir. 1989) ......................................................................... 20, 21

*Zelman v. Simmons-Harris,*
    536 U.S. 639 (2002) ........................................................................................ 23

*Zorach v. Clauson,*
    343 U.S. 306 (1952) .......................................................................................... 7

## PRELIMINARY STATEMENT

As directed by the Court, Plaintiffs hereby supplement their Memorandum of Law dated February 10, 2022 (ECF 7-1) ("Primary Brief"), which is incorporated herein by reference.

For the reasons set forth in the Primary Brief and accompanying factual submissions, Plaintiffs believe that the eighty-three vaccine mandates promulgated by New York City (the "City") since August 2021 (collectively "Mandates") should be enjoined. They are each infected by the rampant animus, religious hostility and lack of general applicability noted in the brief. They also, in any event, trigger the hybrid rights exception to rational basis review of otherwise neutral and generally applicable laws that only incidentally burden religion. Particularly with the emergence of the Omicron variant, which can easily infect vaccinated and non-vaccinated alike, theCity's mandatory vaccination policies cannot survive strict scrutiny.

However, as an alternative to enjoining the Mandates themselves, Plaintiffs seek a preliminary injunction enjoining enforcement of the Mandates against employees denied religious accommodation pending resolution of this litigation. This supplemental memorandum sets forth the additional reasons for the alternative request. Essentially, the argument is as follows: 1) religious accommodation decisions are always subject to strict scrutiny when made by government employers; 2) the denials cannot meet strict scrutiny because the City adopted religiously discriminatory policies and practices across all of its agencies and departments to judge religious accommodation requests and the City has not met their burden of proving that unvaccinated religious employees cannot be safely accommodated in a less burdensome way. Because fundamental constitutional rights are being trampled, and because mandating non-sterilizing vaccines is not within the police powers of the state, Plaintiffs respectfully pray for injunctive relief that will allow them to maintain the status quo pending resolution of this litigation.

1

**Plaintiffs respectfully request an evidentiary hearing to resolve any factual disputes relevant to the issuance of a preliminary injunction.**

## STATEMENT OF FACTS

A comprehensive recitation of the relevant facts is contained within the accompanying Complaint and Primary Brief, to which the Court is respectfully referred.  A relevant summary follows.

Plaintiffs have provided this Court with substantial evidence of widespread unconstitutional discrimination infecting its policies for religious accommodations to the Mandates. For example, when asked how the City would decide which applicants to accommodate, Mayor de Blasio admitted to the press that the City intended to preference Christian Scientists and to discriminate against employees with unorthodox religious views, and that he was persuaded by the Pope that scriptures do not conflict with vaccination. (*Gibson Decl.* Ex. 1). Protection of persons with personally held and unorthodox religious viewpoints, or heretics, as they used to be called, was one of the primary concerns of the drafters of the Constitution. This lack of neutrality towards unorthodox religious beliefs was shocking enough when made in a public statement by the architect of the Mandates. But then the City went a step further, codifying these discriminatory ideas about what constitutes a "valid" religious objection to vaccines into a written policy ("Original Accommodation Policy") that requires discrimination against unorthodox beliefs, and that was implemented through what can only be described as heresy inquisitions, with government officials zealously advocating denial of accommodation because the Pope or some random preferred religious leader disagrees with the applicant's interpretation of what her faith requires.

2

Even after the Second Circuit held that these policies were blatantly unconstitutional, the City did not repeal them, but only added another option ("Citywide Panel"), thus compounding the problem by creating two different policies – one for the heretics and one for the lucky few whose religious views lined up with state approved religions and dogma.

Whichever option the employee takes, the fact is that the City continues to offer a policy that *on its face* preferences orthodox religious believers, particularly Christian Scientists, over unorthodox believers. Rather than fix the problem, the maintenance of two tracks, one which openly preferences certain religions over others, compounds the problem and especially prejudices those who do not qualify under the discriminatory standards and so cannot take that option.

Moreover, Plaintiffs submitted substantial evidence, and are prepared to present testimony and additional evidence, demonstrating that the religious accommodation process carried out by the "Citywide Panel" has not fixed the open discrimination, but rather continues as a matter of widespread policy and practice to discriminate arbitrarily between those with "personally held" (or unorthodox) religious viewpoints and those whose beliefs are supported by clergy or orthodoxy of preferenced religions. *See* James Schmitt Decl. ¶¶ 27, 39; Frank Schimenti Decl. ¶¶ 51, 55; Liz Delgado Decl. ¶¶ 22, 31; Curtis Cutler Decl. ¶¶ 21, 29, 32.

Under strict scrutiny, Defendants bear the burden of showing that their denials of religious accommodation were warranted. The Citywide Panel decisions and the Original Accommodation Policy decisions cannot meet this burden. Rather than elucidate reasons for denials, they simply say "denied" or "does not meet criteria" with no further elucidation. Such conclusory statements do not meet the minimal standards under Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL") or the New York City Human Rights Law

("NYCHRL"), leaving aside the more rigorous requirements of strict scrutiny required of government employers engaged in individualized religious accommodation decisions. Similarly, the original blanket denials that everyone receives across the departments, stating only that it would be an undue hardship to accommodate requests, do not meet statutory or constitutional standards, particularly since some of these employees were subsequently accommodated, apparently without the undue hardship that the autogenerated forms claimed.

Plaintiffs assert that it is not an undue hardship to accommodate any of them. First, the City bears the burden of establishing why some employees can be accommodated and others cannot, which they have not met in these conclusory denials. Second, the evidence does not support any conclusions that religious employees who cannot be vaccinated pose a direct threat based on their vaccine status. Omicron infects vaccinated and unvaccinated people (*Gibson Decl*. Ex. 1-17) and recent studies suggest that vaccinated people may even be more likely to spread disease ninety days after their last dose ((*Gibson Decl*. Ex. 1, Ex. 3, Ex. 4, Ex. 5, Ex. 7). At a minimum, the City has not provided data or evidence sufficient to survive strict scrutiny on this point. To the extent that Defendants contend that employees pose a direct threat to their co-workers and the public because of their religious need to remain unvaccinated, or dispute any other material factual matter relevant to the issuance of a preliminary injunction, Plaintiffs respectfully request an evidentiary hearing.

## ARGUMENT

## I. LEGAL STANDARD

When a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) a likelihood of

success on the merits, (2) irreparable harm absent injunctive relief, and (3) public interest weighing in favor of granting the injunction." *Agudath Isr. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020).

Where First Amendment and fundamental rights are at issue (as here), the test for obtaining preliminary injunctive relief reduces essentially to a single prong: "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh,* 733 F.3d 483, 488 (2d Cir. 2013). This is so because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); protection of First Amendment rights is per se "in the public interest," *id.*, and the balance of hardships is entirely one-sided because "the Government does not have any interest in enforcing an unconstitutional law," *id*.

## II. PLAINTIFFS SATISFY THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

"Government is not free to disregard the First Amendment in times of crisis . . .. Yet recently, during the COVID pandemic, certain States seem to have ignored these long-settled principles." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 69 (2020) (Gorsuch, J., concurring). In implementing the Mandates, the City has zealously trampled the basic religious rights of its employees despite the Second Circuit's warning that their policies are blatantly unconstitutional. Whether or not the City's open animus towards unorthodox believers is sufficient to render the Mandates themselves unconstitutional, there can be little argument that the religious accommodation policies adopted by the City are.

Plaintiffs can easily demonstrate a likelihood of success on the merits, as well as each of the remaining elements of a preliminary injunction. The Court should therefore grant Plaintiffs' motion to enjoin enforcement of the Mandates against City employees denied religious

accommodation in order to prevent further irreparable harm as Plaintiffs are forced to either surrender their employment, including all their benefits, or get vaccinated in violation of their sincerely held religious beliefs.

### A.  There is a Strong Likelihood of Success on the Merits

Plaintiffs have a strong likelihood of success on the merits. The widespread abuses carried out in the implementation of these Mandates across different departments of the City subject the City's arbitrary and conclusory religious accommodation denials to facial attack. The City was openly hostile to religious objection to vaccines, particularly unorthodox religious objection, it adopted facially discriminatory policies, and it preferenced Christian Science and the viewpoints of the Pope over other religions, which *per se* requires strict scrutiny under the *Larson* test. *See infra.* Moreover, to the extent that denials are based on a theory of undue hardship, the City has not met its burden of showing that it cannot accommodate religious exemptions to the COVID-19 vaccine requirements, as other less invasive measures exist, and the science shows that the COVID-19 vaccines cannot protect the general public from the spread of disease, but are primarily therapeutic in nature, providing some measure of protection against severe disease outcome in some who take them.

### 1.  The Mandates are Unconstitutional as Applied to any Religious Objector Because the City Violated the Establishment Clause in Implementing Them.

The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another. *Larson v. Valente*, 456 U.S. 228, 244 (1982). Appellants are likely to succeed on their claim that the City's religious accommodation policies violate the Establishment Clause, because in evaluating whom to accommodate and how, the City

expressed "denominational preferences" which constitutes a square violation of the Establishment Clause under the *Larson* test. In *Larson*, the Supreme Court considered government-imposed reporting and registration requirements that applied to only a subset of religions (those that solicited more than fifty percent of their funds from nonmembers). In holding the law unconstitutional, the Court adopted a new test, and held that strict scrutiny must be applied in all cases in which a government policy suggests a "denominational preference" between religions.

This doctrine is well-supported by case law. The Supreme Court repeatedly adheres to the principle that pursuant to the Establishment Clause, no State can adopt policies "which aid one religion" or that "prefer one religion over another" *see, e.g.*, *Everson v. Bd. of Educ.*, 330 U.S. 1, 67 (1947). It is black letter law that regardless of personal preferences, "[t]he government must be neutral when it comes to competition between sects." *Zorach v. Clauson*, 343 U.S. 306 (1952). "The First Amendment mandates government neutrality" and "the State may not adopt programs or practices. . . . which 'aid or oppose' any religion. . . . This prohibition is absolute." *Epperson v. Arkansas*, 393 U.S. 97 (1968) (citing *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 225 (1963)). As Justice Goldberg articulated in *Abington School District*, "[t]he fullest realization of true religious liberty requires that government . . . effect no favoritism among sects . . . and that it work deterrence of no religious belief." *Id*. at 305.

The City's religious accommodation policies are infected with Establishment Clause violations, both textually and as applied, not only to individuals, but as a matter of well-established policies and practices. Indeed, from the beginning, former Mayor de Blasio, who controlled each City department, regularly admitted that the City's intention was to target unorthodox believers for disfavor through discriminatory implementation of the Mandates. For example, in press

briefings, de Blasio made statements clarifying that the City adopted a preference for the Pope's viewpoint about what "scripture" requires on the topic of vaccines, expressed hostility towards religious opposition to vaccination as largely "invalid," stated that the City would be openly preferencing Christian Scientists and Jehovah's Witnesses, and said that to get an exemption, applicants would have to be a "standing member of a faith that has a very, very specific long-standing objection" to vaccination.[1] Mayor de Blasio further stated that the City would discriminate against anyone with beliefs that are less widely recognized, unorthodox or personally held religious beliefs.[2]

These statements alone violate the Establishment Clause. But the City went much farther. For example, the DOE, in an astounding breach of neutrality, adopted the Old Accommodation Policy as official policy, enforcing the facially unconstitutional standards which only allowed religious exemptions for employees who submitted clergy letters, were members of established and recognized religions "(e.g. Christian scientists)," and whose religious leaders had not spoken in favor of the vaccine. In the ensuing heresy inquisitions that the government used to weed out religious dissent, DOE representatives zealously argued for even more blatant discrimination against employees whose religious beliefs are personal in nature or out of step with popular religious leaders and official church orthodoxy. *See*, *e.g.*, Sabina Kolenovic Decl. ¶ 37 (DOE disregarded Muslim Plaintiff Kolenovic's advice from her Imam and instead argued that her request should be denied because other Islamic institutions in the world permitted its members to

---

[1] *See* Transcript: Mayor de Blasio Holds Media Availability (September 23, 2021), https://www1.nyc.gov/office-of-the-mayor/news/644-21/transcript-mayor-de-blasio-holds-media-availability accessed on February 18 2022 at 11:03 p.m.

[2] *Id*.

8

get vaccinated). What's worse, after the DOE admitted to a federal judge that such standards "may" be "constitutionally suspect" in *Keil v. City of New York*, 21-2711 (2d Cir. 2021) and *Kane v. de Blasio*, 21-2678 (2d Cir. 2021), and after the Second Circuit Court of Appeals "confirmed Defendants' suspicion" in no uncertain terms, *id*., the DOE never formally renounced these standards. Instead, the DOE merely added a second allegedly "compliant" option. The City then implemented the unconstitutional policy throughout more departments. At least five other agencies (the DOC, DSNY, FDNY, the DOI, and Parks) continue to offer Plaintiffs the opportunity to have their exemption denials re-heard through the same facially discriminatory standards, but has reacted to the litigation pressure by adding an alternate process for those who refuse to submit to the unconstitutional one. This only compounds the problem. Essentially, the City set up two standards – one for the heretics and one for state-approved religions.   Just as a racially discriminatory policy cannot be cured by offering a separate "but equal" policy to non-white employees as an alternative, the two tracked system only makes the Establishment Clause violations worse.

But, in reality, both options are infected with the hostility towards unorthodox religious viewpoints that the mayor admitted would be applied in implementing the Mandates. In the alternative process afforded, following the mayor's lead, all of the City's various agencies flagrantly violated First Amendment standards, evidencing a widespread bias against and mistrust of unfamiliar and unpopular religious beliefs in processes that could hardly be characterized as neutral. *See, e.g*., James Schmitt Decl. at ¶¶ 19, 27 (Defendant Parks told Plaintiff Schmitt that his clergy letter—which was replete with references to Bible verses and religious texts—was "inadequately related to religion"); Frank Schimenti Decl. at ¶¶ 41, 51 (Defendant Department of

Buildings told him that his sincerely held religious beliefs—which he set forth in an eight-page personal statement describing his religious background including his spiritual mentors, his reliance on prayer, and his understanding of more than 25 different Bible verses—did not actually prohibit him from taking the vaccine); f Laura Satira Decl. ¶¶ 19-20 (private school employer would not engage in interactive process with Plaintiff Satira due to threat of fines under non-public school mandate); William Toth Decl. ¶¶ 6-11 (witnessing FDNY Commissioner state that only Christian Scientists would be granted religious exemptions).

These actions show an open preference for views of orthodox religions and religious institutions who are pro-vaccination, which the Constitution clearly prevents. On this basis alone, strict scrutiny must be applied to the religious accommodation policies as a whole. "In short, when we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." *Larson*, 456 U.S. at 244. As the Supreme Court repeatedly affirms, "even [a] slight suspicion" of lack of neutrality is *per se* unconstitutional regardless of whether a regulation otherwise forwards a compelling interest. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018).

In addition to failing the *Larson* test, the Vaccine Mandate at issue here fails the *Coercion* test. *See*, *e.g.*, *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2264 (2020) (Thomas, J. and Gorsuch, J., concurring) (Establishment clause forbids "coercion of religious orthodoxy and of financial support by force of law and threat of penalty.") The religious accommodation policies are blatantly coercive. The mayor admitted as much in his "Key to NYC" press briefing, and the draconian policies reflect this admission. (*Gibson Decl.* Ex. 23). The animus is bare. The City has

not even made an attempt to justify why reasonable accommodation cannot be made short of excluding unvaccinated employees from work and suspending them for months on end without pay. The City will not even allow employees to use their accrued vacation or sick time while they are excluded, or to earn any income from outside sources, or to collect unemployment insurance. Instead, employees are literally being starved out of house and home in an effort to coerce them to violate their faith.

> **2.  The Mandates are Unconstitutional as Applied to any Religious Objector Because the City Violated the Free Exercise Clause in Implementing Them.**

The City's religious accommodation process also fails under the Free Exercise Clause. The Free Exercise Clause prohibits government from enacting laws, or enforcing laws in a manner that would prohibit the free exercise of religion.  This includes the right to "the performance of (or abstention from) physical acts," as well as the right to "profess whatever religious doctrine one desires." *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990). Plaintiffs all maintain sincerely held religious beliefs that would preclude subjecting themselves to COVID vaccination.  As such, according to the Constitution, no law can be enacted that would prohibit their freedom to object to vaccination, nor can a law be enforced in a manner that restricts this sacrosanct religious liberty or preferences certain religious objections over others.

The boundary line between the government's power and Free Exercise is often subject to the test articulated in *Smith*—namely, that a neutral, generally applicable law that incidentally burdens religion is subjected to a lower standard of review. While there may be some debate about whether the Mandates themselves qualify for *Smith's* lower standard, no such argument can be made for the City's religious accommodation policies.

11

Religious exemption reviews are expressly about religion, and they are not generally applicable, but rather highly specific discretionary decisions, and therefore, they must be vigorously analyzed to prevent government overreach. "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless of whether any exceptions have been given, because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021); *see also Bear Creek Bible Church v. EEOC*, 2021 US Dist. LEXIS 210139, at *71 (N.D. Tex. 2021) ("Because Title VII is not a generally applicable statute due to the existence of individualized exemptions, the Court finds that strict scrutiny applies").

Thus, when state actors make religious accommodation determinations pursuant to Title VII or any other policy, either about the sufficiency of someone's religious objection, or about which accommodation to grant, the government bears the burden of establishing compliance with the statutory criteria but also bears the burden under constitutional analysis of showing that their religious accommodation decisions are justified because they further a compelling governmental interest in the least burdensome manner.

Lesser statutory standards cannot be applied in lieu of strict scrutiny for a government employer. "In most of the cases alleging religious discrimination under Title VII, the employer is a private entity rather than a government, and the first amendment to the Constitution is therefore not applicable to the employment relationship." *Brown v. Polk Cnty.*, 61 F.3d 650, 654 (8th Cir. 1995). But when the employer is a government actor, and a litigant has mounted a constitutional challenge, a court is "constrained to apply" a constitutional standard "and not Title VII standards." *United Black Firefighters Ass'n v. Akron*, 976 F.2d 999, 1012 (6th Cir. 1992).

"Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 455 (2008). In *Kane v. de Blasio*, the Second Circuit recently reaffirmed that the First Amendment applies both to the Old Accommodation Standards and to the Citywide Panel determinations. "It is, of course, true that the citywide panel must abide by the First Amendment. By ordering the citywide panel's proceedings to abide by other applicable law, the Motions Panel Order does not (and could not) suggest that the First Amendment is somehow inapplicable to those proceedings." *Kane v. de Blasio*, 21-2678 (Nov. 28, 2021 Order); *Keil v. The City of New York*, 21-2711, ECF. No. 118 (2d Cir.) (Nov. 28, 2021 Order); *see also Putaro v. Carlynton Sch. Dist.*, No. 2:07-cv-817, 2007 U.S. Dist. LEXIS 107326 (W.D. Pa. Dec. 12, 2007):

> Unlike the Equal Protection Clause, which limits the actions of only state actors, Title VII limits the actions of private entities falling within its coverage. When a state actor falls within the definition of the term "employer" contained in Title VII, it is limited by both the Equal Protection Clause and Title VII. It is not unusual for a federal constitutional provision and a federal anti-discrimination statute to provide overlapping protection. That does not mean that the two sources of federal law are mutually dependent upon one another. Although both the Equal Protection Clause and Title VII may prohibit the same forms of gender discrimination in certain instances, a cause of action under § 1983 for violations of the Equal Protection Clause is in no way affected by Title VII.

Thus, strict scrutiny must apply to the religious accommodation policies as well as individual determinations. "[I]n circumstances in which individualized exemptions from a general requirement are available," like the Mandates at issue, "[a state actor] 'may not refuse to extend that system to cases of 'religious hardship' without compelling reason.'" *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 537 (1993) (quoting *Bowen v. Roy*, 476 U.S. 693, 708 (1986)).

### 3.   The City's Religious Accommodation Policies are Unlikely to Survive Strict Scrutiny.

"A government policy can survive strict scrutiny under the First Amendment's Free Exercise Clause only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1888. "So long as the government can achieve its interests in a manner that does not burden religion, it must do so, in order to survive strict scrutiny under the Free Exercise Clause of the First Amendment." *Id.* A compelling interest "cannot be stated at an unduly "high level of generality," but rather must show a compelling interest "in denying an exception" to "particular religious claimants." *Id.* at 1882.

The government bears the burden, under strict scrutiny, of establishing that its religious accommodation policy and decisions meets strict scrutiny. They have not met that burden here and cannot likely meet it.

### a.   The Religious Accommodation Policies Place All Applicants at Risk of Arbitrary Denial.

The religious exemption policies as a whole cannot meet strict scrutiny because they pose an undue risk of arbitrary denial and persecution to all who apply. Nothing can justify maintaining the discriminatory policy as one of the options. Its very existence causes undue burden and harm to all who belong to unorthodox religions. Targeting religious minority groups, including those who hold personal religious objections rather than orthodox ones, in response to real or perceived threats, no matter how well-intentioned the reason, is forbidden under our laws and cannot withstand strict scrutiny review as a matter of law. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (overruling *Korematsu v. United States*, 323 U.S. 214 (1944)). On this basis alone, all denials must

14

be enjoined and the City prohibited from imposing the Mandates on any employees who applied for religious accommodation.

But additional reasons create an undue risk of arbitrary denial. First, no written decisions are required, and most applicants only receive either an autogenerated email stating "does not meet criteria" or a paper with a box checked "denied." This lack of detail, coupled with the evidence of animus, presents enormous risk of arbitrary and unjust denials and precludes effective individualized judicial review.

Second, the commentary that individual applicants did receive showed the agencies' overwhelming discretion to evaluate whether beliefs are "religious" as opposed to "philosophical" as noted already has resulted not only in First Amendment violations, but also arbitrary, capricious, discriminatory, and inconsistent results. *See, e.g.*, Curtis Cutler Decl. ¶ 32 (DSNY denied Plaintiff Cutler his religious exemption but granted it to his colleague who attends Cutler's church, possesses many of Cutler's same religious beliefs, and submitted a letter from the same pastor as Cutler did); Liz Delgado Decl. ¶¶ 20, 22 (DOI employee denied religious exemption because "not based on a sincerely held religious, moral, or ethical belief," even though personal statement described religious background, religious practices, and religious texts conflicting with vaccination requirement); Dean Paolillo Decl. ¶ 47 (religious exemption denied because "objection was personal, political, or philosophical" when personal statement contained religious objections).

While the law may permit government officials to make certain religious inquiries, strict boundaries and a light touch are required. Here, where the City engaged in widespread and reckless analysis of what constitutes a "valid religious" belief as opposed to a personal or philosophical belief, it is likely that all religious exemption denials must be overturned. In *Cantwell v.*

15

*Connecticut*, 310 U.S. 296, 310 (1940), the Supreme Court invalidated a solicitation statute that allowed a government official to determine which causes were "religious in nature" and which were deemed secular because such discretion presented an undue risk of arbitrary denials. Like in *Cantwell*, the risk is too high here that arbitrary and discriminatory criteria will be applied when unqualified government employees are tasked with such power. Indeed here, the risk is even more prominent given that the government officials already indicated animus and an intention to discriminate against unorthodox religious views and have refused to abandon their blatantly unconstitutional Old Accommodation Standards.

As detailed above, Plaintiffs' declarations show that the City's discretion was abused. *See also* Declaration of Christina Martinez, Esq. (*Gibson Decl.* Ex. 24) (documenting widespread unconstitutional policies and commentary in religious accommodation appeals Citywide). Furthermore, the City not only often misstated applicants' beliefs (and formed conclusions based on these misstatements), but they challenged the factual accuracy of them, which is a realm the government is forbidden to enter. *Smith v. Bd. of Educ.*, 844 F.2d 90, 93 (2d Cir. 1988) ("Generally it is not proper for courts to evaluate the truth or correctness of an individual's sincerely held religious beliefs").

Even EEOC guidance warns that an "employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief" and is only justified in seeking additional supporting information if it has "an objective basis for questioning" it.   Section 12: Religious Discrimination, Equal Employment Opportunity Commission,   https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination   (last visited Feb. 6, 2022) (emphasis added).  This advice is particularly important for government

16

employers, who must exercise especial care to avoid both Establishment Clause violations and Free Exercise violations.  The City's decision to abandon the recommendations of the EEOC and allow unqualified and arguably biased evaluators unchecked discretion to determine the validity of religious views, particularly after they were caught adopting widespread facially discriminatory policies, cannot survive strict scrutiny.

### b.  Less Restrictive Measures are Available.

Even without the evidence of discrimination, the City's decision to suspend and exclude most of their employees with religious objections to vaccines is unlikely to survive strict scrutiny. It is not enough to assert a compelling interest in stopping the spread of COVID-19. "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures imposing lesser burdens on religious liberty would fail to achieve the government's interests." *Agudath Isr.*, 983 F.3d at 633.

First, most of the Mandates do not require the City to exclude employees from the workplace. On the contrary, they state on their face that legal accommodations are not precluded. Thus, decisions about what accommodations can be granted are subject to strict scrutiny, since by the terms of Title VII and other governing statutes, they not only allow, but require the government to make an individualized determination about whether they can deviate from otherwise neutral and generally applicable policies in consideration of an employee's religious beliefs.

The Citywide Panel has presented no evidence that would permit the conclusion that the 1% of employees seeking a religious exemption from the Mandate pose a direct threat to others such that they must be excluded from work.  The City's decision to terminate rather than accommodate these employees after discretionary review cannot meet strict scrutiny.

It is well-established by now that vaccination cannot meaningfully mitigate infection and transmission of COVID-19 but is instead primarily effective for personal symptom management. *See, e.g.*, *Gibson Decl.* Ex. 10 (Harvard study analyzing data from 68 countries and 2947 U.S. counties and concluding "there appears to be no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases.").

The available COVID-19 vaccines are not able to stop the spread of COVID-19. Particularly now, with the dominance of the Omicron variant, vaccinated people are as likely (if not more likely) to be infected and transmit the virus as unvaccinated people are. (*Gibson Decl.* Ex. 1-17). Public health officials have reached consensus that virtually everyone will eventually get infected with COVID-19, regardless of vaccination status, rendering policies such as the Mandate useless. The City's own publicly available data support these points. The DOE publishes regular updates on the number of infected students and in-person staff working in New York City schools. That data shows that excluding unvaccinated staff has not decreased the percentage of staff infected with COVID-19 at all. On the contrary, before religious objectors were excluded in early October, case numbers among staff were typically far below 55 at any given time. (*Gibson Decl.* Ex. 11). The infection rates have followed the same curve as rates in the greater community, whether unvaccinated individuals are excluded or not. Last month, cases surged so high among the fully vaccinated staff that over 5,000 fully vaccinated staff members were infected some days in January. (*Gibson Decl.* Ex. 12).

Perhaps most shocking, because such a large percentage of the fully vaccinated staff is infected with COVID-19, the DOE adopted the policy that actively infected teachers with mild symptoms should return while still infectious to mitigate the staffing crisis. (*Gibson Decl.* Ex. 13).

18

If it is an acceptable risk to allow infected teachers who can spread and transmit COVID-19 to the students to teach in classrooms, certainly unvaccinated teachers who test negative for COVID-19 infection should be allowed to teach in classrooms as a reasonable religious accommodation.

No other school district in the state has vaccine mandates for their staff. Nor does any other City in the country require all employees and independent contractors to be vaccinated. The City can easily safely accommodate people who need religious accommodations. Plaintiffs respectfully ask that they be allowed to present expert testimony on this point if it is contested.

### B.  Plaintiffs are Suffering Ongoing Irreparable Harm

Over the course of the past week, other federal courts have issued decisions which clarify the issues at stake in challenges to vaccine mandates and provide strong support for Plaintiffs' motion.

Yesterday, on February 17, 2022, the United States Court of Appeals for the Fifth Circuit found that unvaccinated airline employees would suffer irreparable harm from their employer's threat to terminate their employment for non-vaccination. *Sambrano v. United Airlines, Inc.*, No. 21-1159 (5th Cir.), 2022 U. S. App. LEXIS 4347. The district court had denied the *Sambrano* plaintiffs' request for an injunction against United's mandatory vaccination policy, ruling that they could not demonstrate irreparable injury. The Circuit Court overruled this determination, finding that "the plaintiffs who remain on unpaid leave and have brought Title VII actions … are being subjected to ongoing coercion based on their religious beliefs. That coercion is harmful in and of itself and cannot be remedied after the fact." *Id*. at *7.

In reversing the district court, the *Sambrano* panel distinguished two types of harm recognized in employment cases. The first type of harm – consisting of or resulting "only" from

19

an adverse employment action – including significant reduction in household income, foreclosure

on a family residence, loss of medical benefits and risks of mental health impacts – "cannot support

an injunction." *Id*. at *16 - *17.

A second category of harms, however, *does* support an injunction. As the Fifth Circuit

observed:

> Plaintiffs in this case alleged precisely the sort of exogenous and irreparable harm
> that cases like *Sampson* [*v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 937, 39 L. Ed. 2d
> 166 (1974)] and *White* [*v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989)]
> envisioned. Crucially, plaintiffs are not seeking an injunction merely to prevent an
> adverse employment action or any harm stemming from such action. [ ] Their
> allegation of irreparable harm based on coercion is antecedent to, independent from,
> and exogenous to any adverse employment action. Plaintiffs specifically allege that
> United wants to coerce them into getting a vaccine that violates their sincerely held
> religious beliefs and thus avoid any adverse employment action.

*Id*. at *18-*19.

In his public statements about the mass terminations that began after Plaintiffs filed for

relief in this Court, Mayor Adams announced precisely the same motivation for the City's recent

mass firing – which the filing of the instant lawsuit sought to prevent:

> "Our goal was always to vaccinate, not terminate, and city workers stepped up and
> met the goal placed before them," Mr. Adams said in a statement on Monday.[3]

The Fifth Circuit found that the plaintiffs showed substantial likelihood of irreparable injury.

> United has presented plaintiffs with two options: violate their religious convictions
> or lose all pay and benefits indefinitely. That is an impossible choice for plaintiffs
> who want to remain faithful but must put food on the table. In other words, United
> is actively coercing employees to abandon their convictions...By threatening
> termination, United has enlisted employees and their families in the project of
> reforming employees' religious commitments. Putting employees to this coercive
> choice imposes a distinct and irreparable harm beyond lost pay, benefits, seniority,

---

[3] *See* E. G. Fitzsimmons, "N.Y.C. fires 1,430 workers, less than 1 percent of city employees,
over a vaccine mandate," New York Times, Feb. 14, 2022), accessed on Feb. 18, 2022 at 8:39
p.m. at:  https://www.nytimes.com/2022/02/14/nyregion/nyc-vaccine-mandate.html.

and other tangible and remediable losses. *Cf. Sambrano v. United Airlines, Inc.*], 19 F.4th [839] at 842 [(5th Cir. 2021)] (Ho, J., dissenting) ("To hypothesize that the earthly reward of monetary damages could compensate for these profound challenges of faith is to misunderstand the entire nature of religious conviction at its most foundational level.").

The Fifth Circuit concluded,

> Plaintiffs are not merely seeking to prevent or undo the placement on unpaid leave itself, but are also challenging the ongoing coercion of being forced to choose either to contravene their religious convictions or to lose pay indefinitely. In such cases, when an employee is subjected to ongoing coercion because of a protected characteristic, the irreparable harm factor of the preliminary injunction analysis is satisfied.

*Id*. at *22-*25 (footnotes omitted).

During the past several weeks, other federal courts have reached the same conclusion: the vaccine mandates that seek to coerce individuals into violating religious conscience constitutes irreparable harm that justified injunctive relief.  On Tuesday of this past week, for example, the United States District Court for the Middle District of Georgia found that the United States Air Force was committing irreparable harm to its officers by refusing to grant religious exemptions to them from its vaccine mandate. Finding that the mandate violated the officers' rights under the Religion Clauses of the U.S. Constitution, that court granted an injunction, stating that "[t]he crisis of conscience imposed by the mandate is itself an irreparable harm." *Air Force Officer v. Austin*, 2022 US Dist LEXIS 26660, at *31 (MD Ga Feb. 15, 2022, No. 5:22-cv-00009-TES).

The United States District court for the Northern District of Texas found that the U.S. Navy has been inflicting similar harm upon its Navy SEALs, and that the religious coercion of service members constituted irreparable harm that supported injunctive relief:

> While significant and life-altering, [adverse employment action harms] do not, by themselves, rise to the level of irreparable injury.  "In general, a harm is irreparable

where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). [ ]

But because these injuries are inextricably intertwined with Plaintiffs' loss of constitutional rights, this Court must conclude that Plaintiffs have suffered irreparable harm. Plaintiffs have suffered the more serious injury of "infringement of their religious liberty rights under RFRA and the First Amendment . . . ." Pls.' Br. 28, ECF No. 16. The crisis of conscience imposed by the mandate is itself an irreparable harm. *See BST Holdings[LLC v. Occupational Safety & Health Admin.],* 17 F.4th [604] at 618 [5th Cir. 2021]; *Sambrano v. United Airlines,* 19 F.4th 839, 842 (5th Cir. 2021) (Ho, J., dissenting) (citing *Sampson v. Murray*, 415 U.S. 61, 92 n.68, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." [*Elrod v. Burns]*, 427 U.S. [347] at 373 [(1976)] (plurality opinion). The same is true of RFRA. *Opulent Life Church v. City of Holly Springs,* 697 F.3d 279, 295 (5th Cir. 2012). Thus, any losses the Plaintiffs have suffered in connection with their religious accommodation requests sufficiently demonstrate irreparable injury.

*USN Seals 1-26 v. Biden*, 2022 US Dist LEXIS 2268, at *33 - *35 (ND Tex Jan. 3, 2022, Civil Action No. 4:21-cv-01236-O).

The Plaintiffs are suffering irreparable harm that is indistinguishable from the harm that other federal courts, ruling on identical issues, have found to be "irreparable." Whether they are on LWOP awaiting decision, terminated but subject to reinstatement if they do get vaccinated, working but in fear of termination, or otherwise under pressure to violate their religious beliefs, the Plaintiffs in this case are facing daily coercion from the City government and their specific employers to vaccinate so they can avoid the disastrous penalties to themselves and their families. Mayor Adams says that many city workers have "stepped up" in response to his push to "vaccinate, not terminate" them., *see supra*. What Mayor Adams really means is that the City has successfully forced them to "bow down" to the City's priorities. Because the harm that this program causes is irreparable, this court has discretionary power to put the City's religious coercion to a stop.

### C.  The Balance of Equities Favors Granting Injunctive Relief

Typically, "the movant must show that the harm which he would suffer from the denial of his motion is 'decidedly' greater than the harm his opponent would suffer if the motion was granted." *Buff. Forge Co. v. Ampco-Pitt. Corp.*, 638 F.2d 568, 569 (2d Cir. 1981).  But in a First Amendment case, as noted above, the balance of hardships is entirely one-sided because "the Government does not have any interest in enforcing an unconstitutional law." *N.Y. Progress & Prot. PAC,* 733 F.3d at 488. Courts repeatedly hold that the public interest specifically requires the state to avoid deciding which religious viewpoint is more valid as they have done here. "Manifesting a purpose to favor one faith over another, or adherence to religion generally, clashes with the "understanding, reached ... after decades of religious war, that liberty and social stability demand a religious tolerance that respects the religious views of all citizens...." *McCreary Cty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Zelman v. Simmons–Harris*, 536 U.S. 639, 718 (2002) (BREYER, J., dissenting)); *see, also, Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 50 (S.D.N.Y. 2020) ("securing First Amendment rights is in the public interest") (internal quotation marks and alteration omitted). Given the free exercise rights at stake, this element is unmistakably satisfied.

Additionally, given the Defendants' failure to meet their burden of showing that mass termination of the 1% of employees seeking religious accommodation is necessary to protect the community from spread, the equities weigh heavily in favor of the tried and true First Amendment, the ability for Plaintiffs and their families to have health insurance, to earn a living, to live comfortably with their faith without improper government coercion.

**CONCLUSION**

This Court's February 11 decision failed to halt this week's "Valentine's Day Mass Firing" of City workers. But the coercion has not ended. Many more face termination next week, and those who were terminated still have received the coercive instruction that they can return to work any time if they but violate their faith. The Court can still act to prevent additional irreparable harm. For the reasons set forth in these supplemental papers and the ones originally filed, Plaintiffs respectfully seek a preliminary injunction staying any denials of religious accommodation and the resulting coercive penalties imposed.  To the extent that any material factual matters remain in dispute, or that the Court would find additional detail useful, Plaintiffs respectfully ask that this Court issue a temporary restraining order and schedule a hearing and expedited limited discovery as will be more fully set forth in Plaintiffs' motion for expedited discovery if given leave of this Court to file it on Monday.

Dated: New York, New York
         February 18, 2022

**GIBSON LAW FIRM, PLLC**

*/s/ Sujata S. Gibson*

By: Sujata S. Gibson, Esq.
408 W Martin Luther King, Jr. St.
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

**NELSON MADDEN BLACK LLP**

*/s/ Jonathan R. Nelson*

By: Jonathan R. Nelson
Barry Black
Sarah E. Child
475 Park Avenue South, Suite 2800
New York, NY 10016
(212) 382-4300
jnelson@nelsonmaddenblack.com

*Attorneys for Plaintiffs and the Class*

24