## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

NEW YORKERS FOR RELIGIOUS LIBERTY, INC.,
GENNARO AGOVINO, CURTIS CUTLER, LIZ
DELGADO, JANINE DEMARTINI, BRENDAN      Case No. 1:22-cv-00752
FOGARTY, SABINA KOLENOVIC, KRISTA O'DEA,
DEAN PAOLILLO, DENNIS PILLET, MATTHEW
RIVERA, LAURA SATIRA, FRANK SCHIMENTI,
JAMES SCHMITT, individually and on behalf of all      FIRST AMENDED PROPOSED
other persons similarly situated,      CLASS-ACTION COMPLAINT

Plaintiffs,

    - against -              JURY TRIAL DEMANDED

THE CITY OF NEW YORK; ERIC ADAMS, in his
official capacity as Mayor of the City of New York,
DAVE CHOKSHI, in his official capacity as Health
Commissioner of the City of New York, and ROBERTA
REARDON, in her capacity as New York State
Commissioner of Labor,
Defendants.
-------------------------------------------------------------------- x

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*

— James Madison, <u>A Memorial And Remonstrance, On The Religious Rights Of Man: Written In 1784-85</u>

Plaintiffs, proceeding as individuals and as a proposed class, herein complain of the Defendants as follows:

NATURE OF ACTION

1.    Named Plaintiffs and Class members are New York City employees, and non-employee individuals who are required by various public health mandates issued by the Defendants to receive

1

vaccination against the COVID-19 virus.

2.      Plaintiffs allege violations of their fundamental religious and constitutional rights. On behalf of themselves and all others similarly situated, they seek declaratory and injunctive relief, as well as reinstatement, nominal, compensatory, actual and punitive damages, attorneys' fees and other remedies, for harms arising from the vaccination mandates listed on the Appendix to this complaint and any other subsequent amendments or additions thereto (collectively, the "Mandates"), and discriminatory policies adopted by the Defendants in the implementation of the Mandates.

3.      Collectively and individually, the Mandates violate fundamental constitutional rights, both facially and as applied through general practice and to individuals, arbitrarily and capriciously discriminate against individuals with sincere religious objections to vaccination– even though the individuals pose no direct threat to others because of their religious or medical needs– and place unconstitutional conditions on employment.

4.      In implementing the Mandates, state actors working on behalf of the City of New York adopted facially unconstitutional standards and policies subjecting Plaintiffs and thousands of other individuals to per se unconstitutional heresy inquisitions and other religious harassment.

5.      The leaders of New York City sanctioned and encouraged this discrimination. In press briefings, former Mayor Bill de Blasio made statements clarifying that the City adopted a preference for the Pope's viewpoint about what "scripture" requires on the topic of vaccines, expressed hostility towards religious opposition to vaccination as largely "invalid," stated that the City would be openly preferencing Christian Scientists and Jehovah's Witnesses, and said that to get an exemption, applicants would have to be a "standing member of a faith that has a very, very specific long-standing objection" to vaccination according to the Mayor's religious viewpoint. Mayor de Blasio further stated that the City would discriminate against anyone with beliefs that fall under the definition of heresy—that is, less widely

recognized, unorthodox or personally held religious beliefs.

6.	Under the ex-Mayor's openly discriminatory standard, people with personally held religious beliefs or unorthodox religious beliefs were expressly supposed to be (and were) singled out for discriminatory treatment by the defendants even though their beliefs are sincere.

7.	In addition to being discriminatory, the Mandates are irrational and replete with discretion and discretionary and arbitrary carve-outs.

8.	COVID-19 vaccine mandates cannot stop the spread of SARS-CoV-2. The great weight of availableevidence does not support an assumption that they stop infection with and transmission of SARS-CoV-2 to others. The data is clear and widely accepted – vaccinated people can catch and spread COVID at substantially the same rate as unvaccinated More recent data from labs around the world establishes that vaccinated people appear consistently more likely to get infected than unvaccinated, though debate exists about the reasons for that repeated finding.

9.	Moreover, there are far less invasive measures available to ensure public safety than forcing individuals to violate their deeply held religious beliefs or lose their jobs.

10.	The Mandates are an outlier. No other city in the state requires vaccination as a condition of employment for all workers.

11.	The Mandates are also overbroad. There is no option to get tested in lieu of vaccination in these Mandates. Nor is natural immunity recognized, even though the data overwhelmingly shows that natural immunity is more robust and durable than vaccine immunity. Moreover, remote employees are not allowed an exemption or accommodation, even those who can easily work outside of an office due to the nature of their work.

12.	By the same token, the Mandates are underinclusive. In limiting its scope to the covered entity, group or individuals, each Mandate fails to include all other people, groups or organizations in New

York City who fall within the declared statutory purpose of resolving the Covid-19 pandemic. And, many have carve outs for various secular categories of persons.

13.     Most shockingly, on March 24, 2022, in response to lobbying efforts from lobbyists and large donors to the Mayor's election campaign, Mayor Adams issued Emergency Executive Order ("EEO") 62, which exempts entertainers (including strippers and other adult entertainers), athletes and their entourages, assistants and make-up artists, from the vaccine requirements imposed on all other workers.

14.     The Mayor admitted in press conferences and in the order itself that the carve out was expressly done for economic reasons, not health reasons.

15.     There is no public health justification for treating these employees differently than Plaintiffs or other similarly situated employees whose religious beliefs preclude them from getting vaccinated, but who are nevertheless being denied the same exemption afforded to the exempted workers in EEO 62. Strippers and basketball players and make-up artists pose as much or more of a threat to those around them if infected with COVID as do sanitation workers and other employees in New York City.

16.     Excluding unvaccinated staff has not proven to have any impact on mitigating the spread of COVID-19. For example, before the DOE's unvaccinated staff were excluded on October 4, 2021, the average number of infections for all staff across the New York City school district was about 40 active infections at a time for the first month of school. This, despite an outsize delta variant outbreak. When this amended complaint was filed, the number of infected staff among the 100% vaccinated workforce had recently exceeded 5,000 infections in one day, and was hovering at rates far above those seen when unvaccinated staff were allowed to work for the DOE as well.

17.     Perhaps most shocking, because such a large percentage of the fully vaccinated staff is currently infected with COVID-19, and because the exclusion of unvaccinated teachers has already caused a massive staffing crisis, the DOE adopted the recommendation that actively infected teachers should

return to school without testing to mitigate the staffing crisis. *See*, e.g., Juliana Kaplan, Short-staffed NYC schools are asking teachers with mild COVID symptoms to return to the classroom, Business Insider, https://www.businessinsider.com/teacherscan-return-to-classroom-after-positive-covid-test-mild-symptoms-2022-1.

18.     DOE data mirrors the data from multiple reputable studies, showing that high vaccine uptake does not slow the spread of the virus or reduce infection rates.

19.     As one of many examples, a recent Harvard study found that "there appears to be no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases." Subramanian S. V. & Akhil Kumar, Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States, European Journal of Epidemiology, 1-4, Sep. 30, 2021, doi: 10.1007/s10654-021-00808-07.

20.     There is simply no way to achieve herd immunity with these vaccines. Public health officials and experts have unanimously acknowledged that we cannot vaccinate our way out of this virus. Most people, regardless of vaccine status, will eventually get COVID-19, and we are going to have to learn to live with it as endemic to our societies.

21.     In January, 2022, Dr. Anthony Fauci admitted that the Omicron variant "will ultimately find just about everybody" whether they are vaccinated, boosted, or not. He further opined that most pandemic restrictions will likely end soon, stating in an interview with the Times of Israel that "there is no way we are going to eradicate this virus." Countries around the world have ceased COVID zero policies like mandates and lockdowns and are beginning to face the fact that sacrificing our liberties and important fundamental rights cannot stop the spread of virus, and has serious consequences of its own.

<u>THE PARTIES</u>

***<u>Plaintiffs</u>***

22.    Plaintiff New Yorkers for Religious Liberty, Inc. ("NYFRL") is a validly existing corporation organized under the New York State Not-For-Profit Corporation Law. Its certificate of incorporation states that among its purposes is "to educate the public and to advocate for religious freedom of all persons, regardless of belief or creed." NYFRL members include some of the plaintiffs along with other similarly situated New York City employees and impacted persons.

23.    Plaintiff Gennaro Agovino ("Agovino") is employed by the New York City Department of Corrections ("DOC"). Agovino has not received a COVID-19 vaccination or been infected with COVID-19.

24.    Plaintiff Curtis Cutler ("Cutler") has been employed by the New York City Department of Sanitation ("DSNY") since 2014.

25.    Plaintiff Liz Delgado ("Delgado") has been employed by the City for the past 30 years. She has been an employee of the New York City Department of Investigation ("DOI") since 2016.

26.    Plaintiff Janine DeMartini ("DeMartini") worked as a social worker/therapist for the Child Study Center of New York ("CSCNY"), a private preschool program for special needs children, from October 2018 until her employment was terminated by her employer because she was not yet vaccinated.

27.    Plaintiff Brendan Fogarty ("Fogarty") has been employed by the New York City Fire Department ("FDNY") for nearly twenty years. He has held the rank of Fire Department Captain for the past two years.

28.    Plaintiff Sabina Kolenovic ("Kolenovic") has worked for the New York City Department of Education ("DOE") for eight years.

29.    Plaintiff Krista O'Dea has been employed by FDNY for the past 16 years. She currently works as a Rescue Medic.

30.     Plaintiff Dean Paolillo began to work for the New York City Police Department ("NYPD") in 2021.

31.     Plaintiff Dennis Pillet was employed by FDNY as an emergency medical technician until he was put on leave without pay in December, 2021 for failure to submit to COVID-19 vaccination.

32.     Plaintiff Matthew Rivera has been an employee of Consolidated Edison, Inc. ("ConEd"), a private employer, for the past 13 years. He works in a customer payment center in New York City.

33.     Plaintiff Laura Satira ("Satira")  worked until December 16, 2021 for St. Bernard's Catholic Academy ("St. B.") as an early childhood resource teacher.

34.     Plaintiff Frank Schimenti has worked for the City for the past 25 years, and has worked for the New York City Department of Buildings ("DOB") for 23 years, most recently as the Assistant Chief Plan Examiner and Project Advocate for the Borough of Staten Island.

35.     Plaintiff James Schmitt has worked as a plumber for the New York City Department of Parks and Recreation ("DOPR" or "Parks") for the past 13 years.

### *Defendants*

36.     Defendant City of New York (the "City") is a municipal corporation constituting the local municipal government of the population residing in New York, Bronx, Queens, Kings and Richmond Counties in New York State. The First Amendment of the United States Constitution applies to this defendant by virtue of the Fourteenth Amendment.  The City operates and employs people through agencies, including the DOB, DOC, DOE, DOI, DOPR, DSNY, FDNY and NYPD, among others.

37.     Defendant Eric Adams ("Mayor Adams") is the Mayor of the City. Sued in his official capacity, Mayor Adams is responsible for setting and overseeing the policies of the City and the manner in which they are maintained, applied and enforced. Mayor Adams acted at all times under color of law in the acts attributed to him herein.

38.     Defendant David Chokshi[1] ("Commissioner Chokshi") was the the Commissioner of Health and Mental Hygiene of the City of New York ("DOHMH"). Sued in his official capacity, Commissioner Chokshi promulgated the Mandates. Commissioner Chokshi acted at all times under color of law in the acts attributed to him herein.

39.     Roberta Reardon ("Commissioner Reardon") is the Commissioner of Labor of the State of New York. Sued in her official capacity, Commission Reardon is responsible for setting and overseeing the policies of the New York State Department of Labor, including without limitation its regulations and definitions concerning unemployment insurance, and the manner in which they are maintained, applied and enforced. Commissioner Reardon acted at all times under color of law in the acts attributed to her herein.

<u>JURISDICTION AND VENUE</u>

40.     This court has jurisdiction to adjudicate all federal claims raised in this matter under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States; the Supremacy Clause of the Constitution of the United States, which allows federal district courts to hear suits alleging preemption of state and local laws by the Constitution and federal laws made in pursuance thereof; and 42 U.S.C. § 1983 and 28 U.S.C. § 1343 in relation to Defendants' deprivation and infringement under color of law of the Plaintiffs' rights, privileges, and immunities secured by the United States Constitution and laws, as detailed further herein.

41.     This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorney's fees and costs under 42 U.S.C.

---

[1] Dr. Chokshi was replaced as Commissioner of Health by Dr. Ashwin Vasan on or about March 15, 2022. Pursuant to Fed. R. Civ. Pro. 25(d), Dr. Vasan is automatically substituted for Dr. Chokshi in his official capacity for all practical purposes.

§ 1988.

42.     Venue is proper in the United States District Court for the Eastern District of New York for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which Defendants unlawfully deprived many of the Plaintiffs and Class members of their rights under the laws and Constitution of the United States, as further alleged herein. It is also the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred and continue to occur.

CLASS ACTION ALLEGATIONS

43.     The Plaintiffs bring this class action pursuant to Rule 23 in their representative capacity on behalf of themselves and the Class of all others similarly situated as defined in this complaint. Plaintiffs propose a Class consisting of all persons covered by the Mandates who have religious objections to the vaccine requirement (the "Class").

44.     This action meets the following prerequisites of Rule 23(a):

    a.  Numerosity: The Class includes thousands of members. Due to the high number of class members, joinder of all members is impracticable and, indeed, virtually impossible.

    b.  Ascertainability: The proposed class is ascertainable. Any person covered by the Mandates who asserts a religious objection to the vaccine mandates is eligible to join the class. Proposed subclasses include: (a) all municipal employees and contractors working for Defendants who assert religious objections to the Mandates; (b) all private sector employees and contractors who assert religious objections to the Mandates.

    c.  Commonality: A substantial pool of common questions of law and fact exists among the Class and subclasses, including but not limited to:

        i.  Whether the Mandates are subject to strict scrutiny because they collectively fall outside the category of a "neutral law of general applicability" but instead

9

represent specifically applicable discretionary policies replete with carve-outs and exceptions;

ii. Whether the Mandates are subject to strict scrutiny because the City violated the Establishment Clause in implementing and expanding the Mandates through adopting facially discriminatory criteria for judging religious objections, and not only failing to disavow, but expanding the discriminatory policies after acknowledging that they were unconstitutional and discriminatory;

iii. Whether the adoption and expansion of the discriminatory religious exemption policy constitutes "direct evidence" of discrimination, and whether Defendants can "rebut" this claim through any affirmative defense;

iv. Whether the Citywide Panel process triggers strict scrutiny, as it provides a mechanism for individualized discretionary exemption;

v. Whether the City's religious accommodation instructions and threat of fine to private businesses is preempted by the First Amendment and the Supremacy Clause facially or as applied;

vi. Whether the City's own religious accommodation policies are preempted by the Supremacy Clause facially or as applied;

vii. Whether the Mandates as implemented can survive strict scrutiny, including whether there are less restrictive means of mitigating the spread of COVID-19;

viii. Whether the First Amendment applies to determinations about the validity of religious beliefs made by state actors considering religious exemption and accommodation, and what standard of review is required to assess those determinations;

     ix. The irrationality and arbitrariness of particular provisions of the Mandates;

     x. Appropriate remedies to address the discrimination that occurred.

d. Typicality: Named Plaintiffs' claims are typical of the claims of the Class. Plaintiffs are all directly or indirectly employed by employers who are subject to the Mandates. The harm suffered by Plaintiffs and the cause of such harm is representative of the prospective Class.

     i. The claims or defenses of the Named Plaintiffs and the Class arise from the same events and actions by Defendants and are based on the same legal theories.

     ii. The Named Plaintiffs include most subgroups of the proposed Class– including inter alia impacted municipal and private employees.

e. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class.

f. Plaintiffs do not have any interests that conflict with the interests of the members of the Class. Plaintiffs have engaged competent counsel who are experienced in complex litigation, including class actions.

g. Superiority: A class action is superior to alternatives, if any, for the timely, fair, and efficient adjudication of the issues alleged herein. A class action will permit numerous similarly situated individuals to prosecute their common claims in a single forum simultaneously without duplication of evidence, expense, and resources. This action will result in uniformity of decisions and avoid risk of inconsistency and incompatible standards of conduct in the judicial system. It will also more efficiently allow adjudication of the pattern and practice claims.

h. Maintainability: This action is properly maintainable as a class action for the above-mentioned reasons and under Rule 23(b):

i. The individual amount of restitution involved is often so insubstantial (considering the substantial cost of federal litigation against a municipality with deep pockets) that the individual remedies are impracticable and individual litigation too costly;

ii. Individual actions would create a risk of inconsistent results and duplicative litigation;

iii. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby rendering final injunctive relief or declaratory relief appropriate for the Class as a whole; and

iv. Individual actions would unnecessarily burden the courts and waste judicial resources.

i. Predominance: The questions of law or fact common to Class Members predominate over any questions that may affect only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## FACTS COMMON TO ALL CLAIMS

45. In March 2020, ex-Governor Cuomo declared a state of emergency due to the emergence of the COVID-19 pandemic. On March 20, 2020, he signed the "New York State on PAUSE" executive order, which *inter alia* closed non-essential businesses throughout New York State and banned all non-essential gatherings of any kind. New York State and New York City began to pursue a policy of masking, social distancing, quarantines and shut-downs to control the pandemic.

46. On March 12, 2020, Mayor de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City posed by COVID-19.

47.     On March 25, 2020, Commissioner Chokshi declared the existence of a public health emergency within the City to address COVID-19.

48.     Throughout New York City and elsewhere, businesses and public authorities transitioned to remote work and tele-commuting wherever possible.

49.     In March 2020, the New York City Department of Education ("DOE") closed all schools in its system, pivoting to a program of system-wide remote instruction. All school personnel and students participated in school activities through remote means.

50.     On June 8, 2020, New York City began reopening, putting in place safety protocols that included limitations on occupancy of public interior spaces.

51.     In December 2020, the US Food & Drug Administration authorized the first vaccinations using newly-developed vaccines against COVID-19 under "Emergency Use Authorization." Due to limited supplies, vaccines were available at first only to health-care workers, nursing-home residents and persons who were 75 years of age and older.

52.     In January 2021, New York State lowered its minimum age for vaccine administration to 65. The following month, New York City made vaccines available to restaurant workers and taxi drivers, and reopened public middle schools for in-person instruction.

53.     In March 2021, public high schools reopened in New York City, restricted businesses including fitness classes resumed, and the vaccine eligibility age was lowered to 50.

54.     On June 23, 2021, ex-Governor Cuomo issued a declaration that the state of emergency due to COVID-19 was officially over in New York. On July 1, 2021, ex-Mayor de Blasio re-opened New York City without restriction.

55.     On July 20, 2021, despite the absence of any new emergency, Commissioner Chokshi issued an order requiring staff in public healthcare and clinical settings to demonstrate proof of COVID-19

vaccination or undergo weekly testing.

56.    On July 26, 2021, Mayor de Blasio announced his plan to implement a vax-or-test mandate pursuant to which all city workers were going to be required to complete their vaccine series by September 13, 2021, or undergo a weekly virus test. Until then, unvaccinated workers would be required to wear masks at work starting on August 2, 2021. The vax-or-test element of this planned policy was superseded, with respect to most City employees, by later announcements, and never came fully into effect.

57.    By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with presently available vaccines; (3) vaccine protection wanes significantly after a short period of time. Entire governments began to acknowledge that we will need to learn to live with COVID-19 as an endemic part of human life, and everyone (vaccinated and unvaccinated alike) will at some point catch and spread COVID-19.

58.    Nonetheless, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the still-experimental COVID-19 vaccines. At a press conference, he described the goals of the program as follows:

> The key to New York City – when you hear those words, I want you to imagine the notion that because someone's vaccinated, they can do all the amazing things that are available in this city. This is a miraculous place literally full of wonders. And, if you're vaccinated, all that's going to open up to you. You'll have the key. You can open the door. **But, if you're un-vaccinated, unfortunately, you will not be able to participate in many things. That's the point we're trying to get across. It's time for people to see vaccination as literally necessary to living a good and full and healthy life**. The Key to NYC Pass will be a first-in-the-nation approach. It will require vaccination for workers and customers in indoor dining, in indoor fitness facilities,

indoor entertainment facilities. This is going to be a requirement. The only way to patronize these establishments indoors will be if you're vaccinated, at least one dose. The same for folks in terms of work, they'll need at least one dose. This is crucial because we know that this will encourage a lot more vaccination.[2]

59.     No religious exemptions exist under the Key to NYC program, leaving religious minorities unable to participate in fundamental aspects of life in the City, including aspects "literally necessary to living a good and full and healthy life" according to the mayor.

60.     Two days after the "Key to NYC" was announced, on August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky clarified that the data on vaccine effectiveness against the then-dominant delta variant are conclusive: though the vaccines appeared to prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."[3]

61.     Instead of pausing his mandates, Mayor de Blasio began what appears to be a crusade in earnest against the unvaccinated, intruding his ever-expanding mandates into the workplace.

62.     On August 10, 2021, Commissioner Chokshi issued an order requiring staff providing City operated or funded services in residential and congregate settings to demonstrate proof of COVID-19 vaccination or undergo weekly testing.

63.     On August 16, 2021, the City issued the first of what eventually became scores of major and minor COVID-19 vaccine mandates issued between that date and now. In his Emergency Executive Order No. 225, Mayor de Blasio promulgated rules putting his Key to New York City program into effect and incorporating the terms that he had announced in early August, including mandatory

---

[2]https://www1.nyc.gov/office-of-the-mayor/news/539-21/transcript-mayor-de-blasio-holds-media-availability
[3]http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

1.

vaccination of all employees working in establishments covered by the order.

64.     No religious exemptions were offered under any of the early "Key to New York City" program Mandates. The religious exemption was purposefully left out due to the ex-Mayor's hostility towards religious objections to vaccination.

65.     In discussing his planned vax-or-test policy in mid-August 2021, Mayor de Blasio remarked that he hoped that the testing requirements would be so burdensome that people would need to get vaccinated to avoid them – demonstrating his animus toward persons who refused to get vaccinated for religious or other reasons.

66.     On August 20, 2021, Mayor de Blasio issued Emergency Executive Order No. 226, substituting new rules for the Key to NYC program for those he had issued in E.E.O. 225. Further amendments to the Key to NYC E.E.O's allowed fast food workers to automatically be considered to have been terminated for "just cause" if they did not get vaccinated, and carved out (without any public health justification) exceptions to the Mandate for non-resident athletes and entertainers and their entourages.

67.     Then, on August 23, 2021, once again with no justification from the data or case numbers, Mayor de Blasio and Commissioner Chokshi announced that employees of the New York City Department of Education ("DOE") would not have an option to undergo weekly testing but would now be terminated if they did not receive at least their initial COVID-19 vaccinations by September 27, 2021. As announced, the new policy did not allow exemptions for any reason. All other municipal employees could continue to meet the "Vax or Test" requirements from a previous Emergency Executive Order.

68.     On August 24, 2021, Commissioner Chokshi promulgated a written vaccine mandate ("Original DOE Mandate"), incorporating the policy announced on August 23rd. The Original DOE Mandate included no exemptions for employees of DOE, no matter whether they were employed in DOE school buildings or remotely (with various exceptions for certain categories of employees or reasons other than

religious accommodation provided).

69.     Lawsuits and labor disputes ensued. Mass protests erupted and continue to be held.

70.     The DOE openly refused to agree to consider any religious exemptions or accommodations to the policy as the parties tried to negotiate.


***Arbitration and Initial Lawsuits Forced the City to Agree to Accommodate Religious Beliefs***

71.     On September 1, 2021, the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse. The challenge moved to arbitration.

72.     Sixteen labor unions representing employees of DOE filed a lawsuit ("Municipal Labor Committee Litigation") in the New York State Supreme Court in New York County on or about September 9, 2021 mounting a facial challenge to the constitutionality of the Original DOE Mandate.

73.     Justice Laurence Love issued a Temporary Restraining Order in the Municipal Labor Committee Litigation against enforcement of the Original DOE Mandate because it failed to provide for religious and medical exemptions.

74.     On September 10, 2021, an arbitrator, Martin F. Scheinman, issued an order in the UFT Arbitration ("UFT Award") that required DOE to permit religious exemptions to its vaccine requirements, but imposed unconstitutional restrictions on the criteria and manner in which requests for such exemptions were to be determined and draconian consequences for unvaccinated DOE employees, even those who did receive an exemption (collectively "Exemption Standards.")

75.     Arbitrator Scheinman has held public fundraisers for Mayor de Blasio and is a major donor. His neutrality is in question.

76.     On information and belief, the discriminatory religious exemption criteria provisions of the UFT Award were composed almost entirely of language and procedures proposed by the City.

77.     On information and belief, Eric Eichenholtz assisted in the creation and drafting of the unconstitutional Exemption Standards.

78.     In advance of the return before Justice Love, Commissioner Chokshi issued a new mandate (as amended on September 28, 2021, the "DOE Mandate"), which rescinded the Original DOE Mandate, as amended. The amendment extended the vaccination requirement to staff of charter schools and their contractors. The primary change was that following language was also added as part of the DOE Mandate: "Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law."

79.     Justice Love dissolved the TRO on the City's promise that they would no longer oppose offering legally required reasonable religious and medical accommodation.

80.     The City's promise was empty, as the process was meant to preclude most applications.


***Unconstitutional Exemption Standards Formally Adopted by DOE***

81.     *Inter alia*, the UFT Award contained the following provisions:

   a.   As an alternative to any statutory reasonable accommodation process, the City, the Board of Education of the City School District for the City of New York (the "DOE"), and the United Federation of Teachers, Local 2, AFT, AFL-CIO (the "UFT"), (collectively the "Parties") shall be subject to the following Expedited Review Process to be implemented immediately for full-time staff, H Bank and nonpedagogical employees who work a regular schedule of twenty (20) hours per week or more inclusive of lunch, including but not limited to Occupational Therapists and Physical Therapists, and Adult Education teachers who work a regular schedule of twenty (20) or more hours per week. This process shall only apply to (a) religious and medical exemption requests to the mandatory vaccination policy ... *Id*. At 6-7, Section I.

b.  Any requests to be considered as part of this process must be submitted via the SOLAS system no later than Monday, September 20, 2021, by 5:00 p.m. *Id*.

c.  Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an on line source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists). *Id*. at 9, Section I.C.

d.  The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a reason for the denial. *Id*. at 9-10, Section I.E.

e.   If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE within one (1) school day of the DOE's issuance of the initial eligibility determination. The request for appeal shall include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within forty eight (48) hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond forty eight (48) hours and permit the use of CAR days after September 27,

2021, for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination. *Id*. at 10, Section I.F.

f.  A panel of arbitrators identified by SAMS shall hear these appeals, and may request the employee or the DOE submit additional documentation. The assigned arbitrator may also request information from City and/or DOE Doctors as part of the review of the appeal documentation. The assigned arbitrator, at his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the arbitrator requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall be held via Zoom telecommunication and shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the arbitrator's request shall be provided to the DOE at least one (1) business day before the hearing or the issuance of the written decision without hearing. *Id*. at 10-11, Section I.G.

g.  Appeal decisions shall be issued to the employee and the DOE no later than Saturday September 25, 2021. Appeal decisions shall be expedited without full Opinion, and final and binding. *Id*. at 11, Section I.H.

h.  While an appeal is pending, the exemption shall be assumed granted and the individual shall remain on payroll consistent with Section K below. However, if a larger number of employees than anticipated have a pending appeal as of September 27, 2021, as determined by SAMS, SAMS may award different interim relief consistent with the parties' intent. Those employees who are vaccinated and have applied for an accommodation shall have the ability to use CAR days while their application and appeal are pending. Should the appeal be granted, these

employees shall be reimbursed any CAR days used retroactive to the date of their initial application. *Id*. at 11-12, Section I.I.

i.   An employee who is granted a [ ] religious exemption [ ] under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/ or accommodation is in place. [ ] Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment. *Id*. at 12-13, Section I.K.

j.   The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school. The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth, herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution. *Id*. at 13, Section I. L.

k.   Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the DOE and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose. *Id*. at 13,

Section II.A.

l.  During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from engaging in gainful employment during the leave period. *Id*. at 14, Section II.C.

m.  During the period of September[ ] 28, 2021, through October 29, 2021, any employee who is on leave without pay due to vaccination status may opt to separate from the DOE. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused CAR days on a one (1) for one (1) basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the DOE, for non-disciplinary reasons. An employee who separates under this Section shall continue to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source (e.g., a spouse's coverage or another job). *Id*. at 16, Section III.A.

n.  During the period of November 1, 2021, through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including,

but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned. *Id*. at 17, Section III.B.

o. Beginning December 1, 2021, the DOE shall seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions contained, herein, all parties retain all legal rights at all times relevant, herein. *Id*. at 17, Section III.C.

82.     On September 15, 2021, Arbitrator Scheinman issued a second arbitral award in a negotiation between the DOE and the Council of Supervisors and Administrators ("CSA"), which represents DOE employees in supervisory and administrative positions. The CSA Award mirrored the UFT Award.

83.     On information and belief, through arbitration awards and union agreements with City agencies, multiple agencies of the City set up programs for adjudication of appeals from exemption denials by SAMS Appeal arbitrators, implementing the City's unconstitutional policy restricting religious exemptions from the Mandates and targeting unorthodox religious viewpoints for special disability.

84.     The DOE was the first City agency officially to adopt the religious accommodation policy set forth by Arbitrator Scheinman, including the Exemption Standards for the evaluation of religious exemption or accommodation requests, as policy.

85.     None of the collective bargaining agreements applicable to Plaintiffs contains a waiver provision waiving individual employees' right to sue in court for discrimination or constitutional violations.

86.     None of the Plaintiffs consented to permit any union to process a grievance concerning the Defendants' attempt to deprive them of their constitutional rights and, on information and belief, neither did any of the Class members.


***DOE's Initial Implementation of the DOE Mandate***

87.     The Exemption Standards provided the exclusive procedure pursuant to which DOE employees were able to file applications for religious exemptions from the DOE Mandate.

88.     Upon information and belief, at least five thousand DOE employees filed religious-based requests for exemption from the DOE Mandate on or before the deadline. Most of those persons were given only one or two days' notice before the submission deadline to prepare their applications.

89.     All DOE Initial Review applications were immediately denied through an autogenerated form email stating that any accommodation would be an "undue hardship" for DOE.

90.     This same email was even sent to DOE employees who already worked remotely and those who could easily be accommodated remotely (such as IT or administrative positions). Applicants were given one day to file an appeal with the SAMS arbitration firm, which provided the exclusive method of appeal, and which required conformity with the Exemption Standards.

91.     Pursuant to the DOE's blatantly unconstitutional religious accommodation policy, thousands of DOE employees were denied religious accommodation and suspended without pay beginning October 4, 2021.[4]

---

[4] The original date of September 27, 2021 was pushed back to October 4, 2021 because of a temporary restraining order from the Second Circuit.

92.     Pursuant to Section II.A of the Exemption Standards, they were eligible to receive health insurance for a finite period but "prohibited from engaging in gainful employment" under Section II.C thereof.

93.     Pursuant to Section III of the Exemption Standards, those unvaccinated employees of DOE whose exemption applications were denied were faced with a Hobson's Choice between two alternatives: (1) they had an option to "choose" to "separate" from DOE, lose their tenure and careers, but remain eligible for health insurance through September 5, 2022, and receive compensation for unused CAR days; or (2) they were permitted to "opt" to extend their unpaid leave status through September 5, 2022, remain eligible for health insurance, but be prohibited from gainful employment for nearly an entire year without income from any source. Both options required the "separated" employee to sign an express waiver of any right to challenge the separation. The DOE's required waiver document for election of Option (1) included the following representation: "As it relates to the DOE, I understand that I lose all entitlements to reversion, retention, and tenure." If unvaccinated employees failed to elect option (1) by October 29, 2021 or Option (2) by November 30, 2021, then the DOE had the power unilaterally to terminate their employment starting on December 1, 2021 according to Section III of the Exemption Standards.


*The Religious Exemption Policy is Unconstitutional*

94.     The Defendants established their overall policy toward religious vaccine exemptions and accommodations in the context of the DOE Mandate, because it was the earliest vaccine mandate they issued or applied.

95.     The DOE adopted the discriminatory arbitration policy, including the Exemption Standards, as its sole official policy for determining religious exemptions.

96.     The DOE and other agencies who later adopted the Religious Exemption Policy knew or should have known that these standards are blatantly unconstitutional and thus impermissible for adoption by a government employer.

97.     The Exemption Standards require the state to impermissibly pass judgment on which religions are "valid" and which it will decline to acknowledge or give its blessing.

98.     Specifically, people who follow personal religious paths, or who belong to religions that are not "established" and "recognized" by the random reviewing administrator, will not be considered.

99.     The Religious Exemption Policy further provides that religious objections based on personally held religious beliefs, and not necessarily echoed by the official doctrine of a church as relayed by "clergy", will be denied.

100.    Moreover, to be considered, the exemption "must be documented in writing by a religious official (e.g. clergy)." The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have personal religious beliefs.

101.     To the extent that people have "recognized" church leaders that write letters attesting that a person has religious beliefs against vaccination and these beliefs are the beliefs of the church, this documentation cannot be available online. If the church has placed a description of their ministry online, the person will be denied an exemption.

102.    Additionally, if a person does happen to belong to an "established" and "recognized" religious organization that is hierarchical and provides letters from clergy (that are not available online), that person will still be denied if any "leader" of that person's "religious organization" has ever spoken publicly in favor of vaccination.

103.    "Leader" is not defined and in practice, the Defendants have interpreted this very broadly (e.g., if one is Jewish, and any Jewish faith leader has ever made a statement in favor of vaccines, the City's

attorneys have zealously argued that the employee's religious exemption should be denied even if the employee's particular faith did not include following that particular "religious leader").

104.    The language of the policy shows that its intention is to deny a religious exemption or accommodation to everyone or virtually everyone. In fact, the policy gives only one example of a religion that will be accepted for exemption: Christian Science.

105.    This intention was made plain to City employees. Multiple supervisors and agents of the Defendants advised employees that the Defendants intended to deny all religious exemptions other than Christian Science-based objections. They asserted that City officials have instructed, without authority, that "all other religions have publicly made statements in support of vaccination" and thus that anyone belonging to any other religion than Christian Science must be denied.

106.    The Defendants were represented by Corporation Counsel in all of the Zoom hearings that were conducted in SAMS Appeals under the Exemption Standards procedures.

107.    In each appeal, Government representatives repeatedly and zealously presented unconstitutional reasons for denial, repeatedly arguing that employees' applications should be rejected because they conflict with the Pope's decision to get vaccinated, or sometimes the opinions of another popular faith leader (often one that had little or nothing to do with the religious beliefs of the applicant being assessed).

108.    Government representatives also frequently cited a letter from Defendant Commissioner Chokshi as a basis for denial in the appeals, which questioned the validity of religious objections to the use of fetal cells in the development of COVID-19 vaccines.

109.    In no uncertain terms, the Defendants turned the Zoom appeals of DOE employees into heresy inquisitions, and openly advocated for discrimination against its employees because they held minority religious views or religious views which Defendants believe are "wrong".

110.    This widespread, acknowledged policy reflected ex-Mayor de Blasio's guidance and admission of how the City would handle the applications for religious accommodation. In a press briefing held on September 23, 2021, ex-Mayor de Blasio was asked how the City intended to implement the religious exemption policies and what criteria would be used. He responded:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. **And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated**. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly the faiths all around the world have been supportive of vaccination. So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection**.

111.    It is long-settled that discrimination against personally held religious beliefs is unconstitutional and the Defendants were on notice that such criteria violates their employees' rights.

112.    In the 1980s, the New York State Legislature similarly limited religious exemptions, only allowing exemption from vaccination to families who were "bona fide members of a recognized religious organization" with teachings that were contrary to immunization.

113.    After parents with personally-held religious beliefs challenged the language codified into the Public Health Law, a federal court determined that the statute violated the Establishment Clause of the United States Constitution in a number of ways, one of which was to exclude those with personally held religious beliefs from protection.

114.    As a result of that holding, New York State had to change its statutory language to provide religious exemptions to anyone who holds a religious objection, whether personally held or echoed by an established religious organization. In accordance with the court's clear instruction, the statute stated that no certification from clergy or attestation of membership could be required.

115.    To this day, the amended Section 2165 of the New York State Public Health Law, which governs

immunization requirements for adults, states: "this section shall not apply to a person who holds genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such person being admitted or received into or attending an institution."

116.    Such broad and equal protection is the Constitutional floor. The City violated the rights of thousands of employees by adopting a facially unconstitutional policy to administer accommodations required by the First Amendment and Title VII.


***Defendants Implemented the Exemption Standards to Discriminate Against Plaintiffs***

117.    The religious exemption policy was intentionally set up to make it impossible to receive a meaningful chance at a religious exemption, while attempting to sidestep the expected lawsuits about the unconstitutionality of withholding such exemptions.

118.    Indeed, upon the proclamation that the City now had a mechanism for religious and medical exemption, the temporary restraining order in the Municipal Labor Committee Litigation was dissolved.

119.    However, what was not before the state court was the details of the City's religious exemption policy, which if examined, would have been readily revealed as facially unconstitutional.

120.    In addition to discrimination claims, Plaintiffs, many of whom are tenured teachers and staff, have procedural due process rights that were grossly violated by the City's policy.

121.    The Exemption Standards procedures deviated widely from the City's previously established EEO policies that were still officially in place when the Mandates were promulgated (and they still are).


***Kane and Keil Lawsuits and Early Proceedings***

122.    After the announcement of the DOE Mandate, the teachers and educators impacted by the mandates were in a state of crisis. The labor disputes and pending lawsuits meant that the landscape was

changing every day. The DOE Mandate itself was amended three or four times in the month between its announcement and original effective date. The DOE Mandate was also stayed more than once in various courts.

123.    As it became apparent that help was not coming from many of the broader suits, those with religious objections to the Mandate and the discriminatory standards began organizing to try to bring the issues with the religious exemption process before the Court.

124.    The *Kane* Plaintiffs filed for emergency relief from federal court just before the DOE Mandate's effective date of October 4, 2021. They filed seeking relief for themselves and all others similarly situated.

125.    At that time, many of the *Kane* Plaintiffs still did not know whether their applications were accepted or denied yet. They did know, however, that whatever the outcome, the process itself was boldly discriminatory and harmful.

126.    The district court denied injunctive relief.

127.    A separate set of educators filed suit in the *Keil* matter on October 27, 2021.

128.    The *Keil* Plaintiffs were denied relief with no opportunity for a hearing.

129.    Both sets of Plaintiffs sought emergency relief through appeal.

130.    A Second Circuit motions panel granted relief and referred the case to an expedited merits panel. Even Corporation Counsel admitted in open court during oral arguments before the motions panel that the policies they had adopted and used to determine religious accommodations were "constitutionally suspect."

131.    The November 28, 2021 merits panel decision of the Second Circuit Court of Appeals found that the DOE Mandate, as applied through the Exemption Standards, was likely to be unconstitutional.

132.    The Second Circuit held that Plaintiffs in *Kane* and *Keil* are likely to succeed, vacated and

remanded the denial of injunctive relief and ordered that each of the Named Plaintiffs receive "fresh consideration of their requests for a religious accommodation by a central citywide panel consisting of representatives of the Department of Citywide Administrative Services, the City Commission on Human Rights, and the Office of the Corporation Counsel" (the "Citywide Panel") adhering to "standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law."

133.    The Citywide Panel was created by the Defendants during the pendancy of the appeal and is entirely controlled by them, and the provision for referral of such panel set forth in the Second Circuit's order was adopted *verbatim* by the court from a proposal drafted by Defendants.

134.    The DOE promised to extend the same "fresh look" by the Citywide Panel to many of the thousands of others who were suspended under the admittedly unconstitutional Exemption Standards policy.

135.    However, because the Plaintiffs in *Kane* and *Keil* had not pled their case as a class action complaint, relief was not guaranteed to any others but the fifteen named Plaintiffs in those cases.


***The City Adopted Additional Mandates Applicable to Separate Groups***

136.    After the District Court initially declined to issue a preliminary injunction against the DOE Mandate, the City began issuing a flurry of additional vaccine mandates.

137.    These Mandates were not guided by the science or emerging scientific consensus. Every time a new study came out showing that vaccines cannot stop the spread of the virus, and are for personal protection, not community protection, a new mandate (or several) appeared.

138.    The goal was clearly to eventually mandate COVID-19 vaccines for everyone, or make it impossible to live without having one, but instead of doing it all at once and risking widespread

organized resistance, the City picked people off, group by group, each group hoping that perhaps in their agency, reasonable religious accommodations would be granted.

139.    Despite being on notice that the Exemption Standards were "blatantly violative of the First Amendment guarantee" (which the district court in *Kane* acknowledged on October 5th at the first appearance even though relief was initially denied), the City continued to include in each new Mandate the  discriminatory arbitration policy the City had established through the DOE as an element of its procedures for determining religious exemptions.

140.    However, aside from the common discriminatory policy, the procedures through which the vaccine mandates have been implemented have varied from mandate to mandate and, with respect to some mandates, from agency to agency.

***The DOE extended its mandate to private employers under City contract***

141.    The DOE's original August 24th mandate required employees of private schools that were under contract with DOE to provide certain services to be vaccinated. These schools were under threat of losing their contracts with DOE, and funding, if they did not comply with DOE's instructions.

142.    Private contractors of this type informed their employees of the need to become vaccinated. Some such schools also made their employees aware that the law requires that accommodations be provided to workers who have religious objections to workplace rules, and they accepted religious accommodation requests even before the amendment to the DOE Mandate clarified that the DOE, also, had to accept such requests.

143.    However, on information and belief, the DOE responded to religious accommodation requests from private employers that no accommodations could be made for religious objectors, even after Commissioner Chokshi's September 15, 2021 amendment to the DOE Mandate affirming that it was

subject to law requiring consideration of reasonable accommodation requests.

144.    As a result, private employers under contract with DOE terminated persons who submitted valid religious accommodation requests.


### *The City Employee Mandate*

145.    On October 20, 2021, Commissioner Chokshi issued a mandate (the "City Employee Mandate") rescinding the August 10, 2021 Vax-or-Test Mandate and  requiring "all City employees, except those employees described in Paragraph 5" thereof, to submit proof of vaccination no later than October 29, 2021, but delaying the deadline to submit proof of vaccination until November 30, 2021 for certain employees of the Department of Corrections not directly involved in healthcare related duties (pursuant to Paragraph 5 of the mandate). *Inter alia*, the City Employee Mandate applied (and still applies) to employees of the DOB, DOC, DOI, DOPR, FDNY, DOB, DSNY and NYPD, among others. It does not apply, however, to DOE employees.

146.    According to guidelines issued by City, and revised on October 28, 2021, "A sincerely held religious, moral or ethical belief may be a basis for a religious accommodation. A request based solely on a personal, political, or philosophical preference does not qualify for a religious accommodation."

147.    The guidelines also stated that "For reasonable accommodation requests filed on or before October 27, 2021, employees will be permitted to continue to submit weekly negative PCR test results while their accommodation request is under consideration or on appeal", and "Any employee who requests a reasonable accommodation from their agency on or before October 27, 2021 and is awaiting a reasonable accommodation determination from their agency or on any appeal must continue to submit a negative PCR test result within every seven-day period, as previously required."

148.    Pursuant to the City Employee Mandate, each agency of the City informed its employees that

they could request religious exemptions from the vaccine mandate by submitting accommodation requests within a very short time frame to committees controlled by the agencies. On information and belief, initial agency determinations of religious exemption requests were either adjudicated under the Exemption Standards or under no standards at all, and agency employees tasked with making such determinations were instructed to deny as many accommodation requests as possible.

149.    Most applicants were denied religious accommodation by their agencies and had to appeal under the unconstitutional SAMS criteria or a newly created "Citywide Panel" process.

### *The Citywide Panel*

150.    In addition to maintaining the facially discriminatory SAMS appeal option in most City departments, the City extended the Citywide Panel appeals process as an alternative across all agencies and departments.

151.    The Citywide Panel was created by Attorney Eric Eichenholtz and Georgia Pestana, who each have participated intimately in defending the City against the discrimination claims in the Kane and Keil lawsuits.

152.    Eric Eichenholtz, who has trained panel members and was chosen by the City as the lead coordinator for deposition, also on information and belief participated in crafting and defining the blatantly unconstitutional Exemption Standards in the SAMS arbitration awards.

153.    The Citywide Panel process is just another veiled attempt to continue to discriminate against employees with sincerely held religious beliefs against COVID-19 vaccination.

154.    The Citywide Panel does not provide adequate safeguards to meet the basic constitutional or statutory standards.

155.    First, it has not been extended to everyone. For example, at the DOE level, the Citywide Appeals

Panel option has not been extended to workers who either declined to file an administrative application pursuant to the discriminatory Exemption Standards or who declined (or were unable) to file an appeal pursuant to the discriminatory Exemption Standards.

156. Second, the Citywide Appeals Panel is supposed to apply standards for the evaluation of religious exemptions that comply with the law, including *inter alia* the standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, the New York City Human Rights Law, and the New York State and United States Constitutions. However, according to the testimony of Eric Eichenholtz, the Citywide Panel panels only claim to apply Title VII standards, not the more stringent standards that apply under the other laws. On information and belief, the Citywide Panel panels even fail to apply Title VII standards consistently and fairly.

157. Third, even though Defendants essentially admitted that they had openly discriminated against thousands of employees on the basis of religion, their review of these determinations was not undertaken by a neutral decision-maker.

158. Instead, Defendants employed their own staff, and worse, the attorneys who represent them defending against Vaccine Mandate lawsuits and who had initially overseen the denials under the unconstitutional policy.

159. Fourth, no Plaintiff was given any meaningful opportunity to be heard, or adequate notice of the reasons for their denial.

160. Fifth, the issuance of more autogenerated denials reveals once more that individualized determinations required by law are not taking place in good faith.

161. Accommodation applicants are routinely and summarily rejected with an autogenerated explanation "does not meet criteria" email.

162. The Citywide Appeals Panel has no published rules or regulations to govern its actions, keeps

inadequate records of its decision-making process, and is not required to give any reasoned explanation of its decisions.

163.     Sixth, the First Amendment's religion clauses require the Defendants to provide an accommodation to Plaintiffs that is the least restrictive alternative available to the Defendants, a requirement that is ignored in virtually every denial issued by the Citywide Panel. It is not constitutional for the Defendants, as governmental actors, to deny Plaintiffs – and thousands of other religiously motivated employees – their constitutional rights simply because the City finds it to be inconvenient to accommodate those rights.

***Preliminary Discovery Reveals the Citywide Panel is Not following Constitutional or Statutory Standards***

164.     The City's undue hardship determinations violate statutory and constitutional standards. The Citywide Panel has rejected applications of many of the named Plaintiffs and many others on the grounds that though their religious  belief is sincere, they cannot be safely accommodated due to "undue hardship." But:

        a.       Eichenholtz admitted in his sworn testimony that no other Department than the Department of Corrections has provided any information that they could base an "undue hardship" determination on; and

        b.       The Department of Corrections submission does not contain any individualized assessment of direct threat or undue hardship as required by law; and

        c.       Eichenholtz also admitted in his sworn testimony that the City is not engaging in any "direct threat" analsysis at all in making their determinations. Rather, they rely on the fact that Mandates were issued to assume that any unvaccinated employee must present an unacceptable risk to their peers, with no review of any scientific or other evidence to support that assumption;

d.     Eichenholtz also admitted that the Mandates state on their face that nothing in them should preclude reasonable accommodation as required by law, and this therefore means that the Mandates do not provide any justification for finding that it would be a direct threat to accommodate religious employees since they specifically contemplate religious accommodation.

e.     Nonetheless, Eichenholtz stated that the Citywide Panel believed it could reject religious accommodations on the generalized assumption that it must create at least a *de minimus* burden to accommodate employees who apply; and

f.     Eichholtz admitted that the Citywide Panel did not even attempt to consider whether accommodation could be made under the far more rigorous standards set forth under the New York State and New York City Human Rights Laws, which require accommodation unless it would present a *significant* hardship; and

g.     Eichenholtz admitted that the Citywide Panel did not consider whether accommodation was possible under constitutional standards required of government employers.

165.   The City also violated the First Amendment and statutory standards in assessing applicants' sincere religious beliefs.

166.   For example, Eichenholtz testified under oath that that applicants' religious objections were not implicated if they were based on the belief that the vaccine contained aborted fetal cells because "a misunderstanding by the employee about the vaccine's ingredients . . . doesn't constitute a religious practice or belief[.]"

a.     When questioned repeatedly on this point, Eichenholtz doubled down, asserting that incorrect facts do not constitute religious beliefs, even if someone is following the advice of her clergy, concluding: "[i]t's not a religious belief. They cannot -- an employee cannot

claim a vaccine contains something they don't claim. If the clergy says it, if -- regardless. If someone says the sky is green, that is -- you know, and we know the sky is blue, then the sky is blue."

    b. The First Amendment (as well as the EEOC's guidance) demands that government actors may not assess the veracity of a religious belief. *Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) (plaintiff's religious objections to a tuberculosis test on the basis that it contained artificial substances were entitled to First Amendment protection regardless of their factual accuracy, even when defendants submitted objective, scientific evidence that test was derived from natural substances).

167. Eichenholtz testified that the agencies were required to comply with EEOC standards and said that trained EEO professionals were making decisions at the agency level. He also stated that agencies were not using the standards struck down in *Kane v. de Blasio* and *Keil v. City of New York*. Nevertheless, the FDNY required applicants to present a clergy letter in the religious exemption application process, a requirement struck down in *Kane v. de Blasio* and *Keil v. City of New York*.

168. Eichenholtz admitted that inconsistent conduct should not be a basis of rejection for those whose religious conversions occurred after the fact, or for those who had an explanation. Yet discovery shows he denied numerous Plaintiffs and similarly situated employees because they received a vaccine before their religious conversion, or even in cases where the applicant could explain the reasons why one was allowed but the other was not.

169. For example, Eichenholtz denied Plaintiff Cutler because he had been vaccinated before even though Plaintiff Cutler was born again *after* his last vaccination.

170.     Eichenholtz also testified that no applicant was denied solely on the basis of inconsistent conduct, yet Plaintiff Schimenti was denied because he used other medications that purportedly involved aborted fetal stem cells in manufacture, development or testing.

171.     Eichenholtz admitted that the Citywide Panel had no good faith basis to even conclude that these other medications did in fact have the same connection to abortion. In fact, they do not.

172.     Eichenholtz testified that the panelists on the Citywide Appeals Panel have the discretion to review cases as they see appropriate, that the different panelists may come to different conclusions based on the facts and circumstances of the case, that the review is exceedingly discretionary and individualized, and that each panelist was entitled to his or her own judgment and opinion with no formal training. He also testified that the panelists were not provided with one or more objective criteria which would determine whether an exemption request ought to be granted or denied by itself.

173.     Internal emails reveal that the City adopted a policy of denying religious objections based on the connection between vaccines and aborted fetal cells.

174.     Multiple named Plaintiffs and others were denied because though their religious beliefs were deemed "sincere" and "religious in nature", the City did not agree with the applicant that the belief required them to abstain from vaccination.

175.     The City also improperly denied guidance from prayer as "personal beliefs" rather than religious, and denied religious beliefs that are not dictated by an official dogma for the same reasons.

176.     The internal communications and reasons show the City also continued to discriminate against personally held religious beliefs, deriding such beliefs as "Dudeism" and regularly rejecting personally held minority religious beliefs on the ground that personal religious paths allow the adherent to "pick and choose" what to believe.

*Implementation of the City Employee Mandate by the Department of Buildings*

177.     On or shortly after October 20, 2021, the DOB created a form for submission of administrative requests for religious exemption from COVID-19 immunization. The form instructed DOB exemption applicants to submit their applications and supporting documentation by email no later than October 27, 2021 "to avoid being placed on Leave Without Pay (LWOP) on November 1, 2021." Timely unvaccinated applicants were permitted to continue to work, but while their determination was pending "must continue to submit a negative test result within every seven-day period, as previously required." Employees who submitted exemption applications after that date "will be placed on LWOP until the reasonable accommodation is decided, including any appeals."

178.     DOB exemption applicants were instructed to comply with the following instructions:

- Provide a personal written and signed statement detailing the religious basis of your objection, explaining why you are requesting this religious exemption, the religious principle(s) that guide your objections to immunization, and the religious basis that prohibits COVID-19 vaccination.

- Attach any relevant supplemental materials, such as a detailed explanation from your religious organization supporting the basis of your faith/beliefs which are contrary to the practice of immunization or use of COVID-19 vaccines.

179.     DOB employees whose exemption applications mentioned the use of stem cell lines in the manufacture or testing of vaccines received a request from the DOB's EEO Office for further information informing them that the Pfizer vaccine had received FDA approval on August 23, 2021 for adult use and that "[i]t does not appear that the mRNA COVID-19 vaccines produced by Pfizer and Moderna require the use of any fetal cell cultures in order to manufacture (produce) the vaccine," asking them to "provide any additional context regarding your religious exemption request," and asking whether they had ever taken or used any over-the counter or prescription medications listed on the request, or been vaccinated against a list of diseases that included the standard measles vaccination that is routinely administered to children.

40

180. According to the law, religious beliefs need not appear true for accommodation requests based on such beliefs to be granted, and employers (particularly government employers) violate the law by rejecting beliefs on the grounds they are wrong. However, as a factual matter, all three vaccines currently available implicate abortion in some manner during the development or production of the vaccine.

181. Employees whose initial administrative requests were denied, and who wished to appeal, were required to submit their appeals "to the City's online request portal" at https://www.nyc.gov/vaxappeal within 3 business days, with review of all appeals to be decided by November 25, 2021 in a written determination to be provided to the employee and the Agency EEO Officer. Initially, employees were informed that "[t]here is no other appeals process" and "[t]here is no further appeals process."

182. Initial denial determinations sometimes included individual evaluations of employees' religious beliefs, e.g., "the sincerely held religious beliefs that you identified do not prohibit you from taking the COVID vaccine." They also included the following instructions concerning appeal: "The request for review must include a reason for the appeal. Upon notification of the appeal, the agency EEO Officer will upload all records concerning the agency determination of the reasonable accommodation request within one business day. Additional supplemental materials to make a determination may be requested from the employee, including a release to permit contact with the employee's medical provider is such release was not obtained in connecting [*sic*] with the original request."

183. Once an application for exemption was finally denied, DOB employees were required to submit proof of a first vaccination within 3 business days, and of full vaccination within 45 days thereafter. If they still refused to do so, "they will be placed on Leave Without Pay immediately and may be subject to termination."

184. As of June 7, 2022 the Department of Buildings resumed "Buildings After Hours" in which the

Department of Buildings invites homeowners, tenants, small business owners, and building managers (with no vaccine requirement) to their offices every Tuesday from 4-7 p.m. to ask questions and obtain information needed to, for example, plan for a home renovation or construction project, address an open violation on a property, or obtain more information about a property.

185.    Thus, DOB Plaintiff Schimenti can visit his Borough Office as a member of the public and sit in his former workstation on Tuesday evenings, but he cannot go there to work.


### *Implementation of the City Employee Mandate by the Department of Corrections*

186.    On October 27, 2021, the DOC sent an email to its staff requiring most, but not all, of its staff to submit proof of receiving at least one shot of COVID-19 vaccine by the close of business on October 29. The requirements and procedures to be followed varied between uniformed and non-uniformed staff of the DOC, however.

187.    The DOC's October 29 vaccination deadline applied to nonuniformed staff and to uniformed staff assigned to CHS clinics, west facility, NIC infirmary, Elmhurst and Bellevue hospital wards. Nonuniformed staff who failed to comply were put on LWOP as of 5 p.m., October 29, 2021. Uniformed staff assigned to the listed medical posts who failed to comply were *not* put on LWOP; they were reassigned to non-medical posts.

188.    Other uniformed staff of DOC were given until November 30, 2021 to submit proof of vaccination.

189.    DOC employees who were subject to the October 29 vaccination deadline who wished to submit requests for reasonable accommodation were required to submit their requests by email by 5 p.m. on October 27, 2021 – giving at least some DOC employees less than five hours' notice of their need to do so. The notice stated that "Employees who file reasonable accommodations requests on or before

42

October 27, 2021, must continue to submit weekly negative PCR test results while their accommodation request is under consideration or on appeal."

190.    DOC employees who were subject to the November 30 deadline were told that they would be informed about procedures for requesting reasonable accommodation at a later date.

191.    Initially, the City's procedures provided that appeals from administrative exemption denials were to be made to a city-wide appeals panel comprised of employees from several City agencies, including the Law Department, that was separate from each of the agencies involved, but controlled by the City.

192.    The City negotiated an agreement with unions for City employees providing employees who belonged to those unions could use either of two procedures to appeal initial denials of their religious accommodation applications: either referral to the Citywide Appeals Panel, or an "expedited" appeal to an arbitrator employed by Scheinman Arbitration & Mediation Services ("SAMS") applying the Exemption Standards established under the Arbitration Award (the "SAMS Option").

193.    The Exemption Standards were blatantly unconstitutional, but the SAMS option included a waiver of all rights to contest the result of arbitral appeal except through a proceeding under Article 75 of New York's Civil Procedure Law and Rules. On information and belief, representatives of the union and the City routinely encouraged applicants to choose the SAMS Option, without mentioning the constitutional violations set forth in the Exemption Standards, and many City employees, including DOC employees, chose the SAMS appeal option as a result.

194.    For example, the SAMS option set forth in the City's agreement with Local 300, Service Employees International Union (/SEIU) ("Local 300 Agreement") included the following provision:

> SAMS will only grant appeals based on religious exemptions if it is in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal,

political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations ( e.g., Christian Scientists).

195.    The standards set forth in the Local 300 Agreement  are unconstitutional for reasons discussed above, but not just for those who were corralled unwittingly into the SAMS appeal process.

196.    After the Second Circuit clarified, in no uncertain terms, that the government was prohibited from adopting unconstitutional and discriminatory religious exemption policies, even if they were implemented as a result of an arbitration proceeding, the City continued and continues to this day to offer the unconstitutional SAMS option to employees in this and other departments.

197.    Employees who do not fit the discriminatory Exemption Criteria set forth in the SAMS award are thus prejudiced and singled out for special disability and disparate treatment, as they have to appeal through a separate, and not necessarily equal, Citywide Panel process.


***Implementation of the City Employee Mandate by the Department of Investigations***

198.    DOI employees were informed in late October, 2021 that they had only a few days to apply for religious accommodation to the City Employee Mandate. The DOI supplied an application form for its employees to submit. The form provided two lines for applicants to respond to the instruction to "[d]escribe your religious belief/practice/observances and identify the accommodations that you request." The form also contained a section with the following instruction: "To be completed by agency staff supervising the employment application process or supervising an employee requesting a reasonable accommodation. After completing, supervisors must provide a copy of the entire form to the employee or applicant, and immediately send a copy to the EEO Officer or DRC." On information and belief, the requirement to provide a copy to the applicant was routinely disobeyed by DOI staff.

199.    Upon receipt of timely-filed exemption application forms, DOI staff sent emails to religious

exemption applicants containing the following statement: "Your request has been received. Please continue to submit a negative test result within every seven day period while you await the reasonable accommodation determination."

200.    Some of the DOI religious exemption applicants were contacted by the DOI's EEO unit and conversed with DOE staff about their requests.

201.    DOI exemption applicants whose requests for exemption were denied received emails that provided very little information about the reason for the denials. Such emails included the following statements:

> You may appeal this decision within **3 business days**. Your appeal deadline is **close of business on [ ]**. Please click on the link below and follow all instructions in order to proceed with your appeal. ***Appeals are handled and reviewed independently of DOI's EEO Office.***

> If you do not appeal, you must **submit proof of the first dose of vaccination within 3 business days of this letter (November 24, 2021) to OICOVIDINFO@doi.nyc.gov or you will be placed on Leave Without Pay (LWOP) status.** If you receive a two-dose vaccine, you must provide documentation that that you have received the second dose of that vaccine within 45 days after receipt of the first dose.

> [ ]

> The request for appeal must include a reason for the appeal. Upon notification of the appeal, the agency will upload all records concerning the agency determination of the reasonable accommodation request within **one business day**. Additional supplemental material may be requested from the employee. The employee can submit supplemental material directly through the appeals portal. For those who do not have an email address or computer access, they should provide the documentation to their agency EEO office to upload to the portal.

> The City appeal panel will provide a written determination to the employee and the Agency EEO Officer. **There is no further appeals process.**

> If an employee's appeal is denied, they must submit proof of the first dose of the vaccination **within 3 business days of receipt of the appeal denial**, and if part of a two-dose regimen, submit proof that you have received second dose within 45 days after receipt of the first dose. If an employee refuses to be vaccinated within this timeframe after an appeal is denied, they will be placed on LWOP immediately and may be subject to termination.

You must continue to submit a weekly negative test result within every seven-day period, as previously required, until either your reasonable accommodation request is approved on appeal, you submit proof of vaccination, or you are placed on LWOP status.

Note regarding union employees: As of November 9, 2021, members of certain unions, including District Council 37 and CWA 1180, are covered by a new vaccine mandate agreement. Upon submission of an appeal, the covered employee then has option of appealing to the City panel (as under current procedure) or to Scheinman Mediation and Arbitration Services. If going through arbitration, there is a narrowly defined basis for exemptions. An employee covered by an agreement that provides for the two appeal options should select Option A (City panel) or Option B (arbitration). If an employee does not make that selection in their initial appeal submission, the agency should contact the employee to request they make a selection. Any employee selecting arbitration must be sent a waiver form.

202. On information and belief, some DOI appellants whose appeals were denied by the Citywide Panel received no notices directly from the panel, and those who received direct denials from the Panel were not informed of any reasons for their denials. Other applicants were informed by the DOI of the denials, again, with no explanation for the denials.

203. The Citywide Panel's emails to the DOI included the following statement:

Employees who were able to submit their appeals directly through the portal will be notified by e-mail. If you submitted [employee]'s appeal on their behalf, we ask that you notify them promptly of this determination. If the appeal was denied, [employee] will have **three business days** from the date you inform the employee to submit proof of vaccination. If the employee does not, they will be put on LWOP. If the appeal was granted, the employee will be permitted to continue coming to work unvaccinated on the condition they continue weekly testing.

### *Implementation of the City Employee Mandate by the Department of Parks and Recreation*

204. On or about October 26, 2021, DOPR notified its personnel by email that the deadline to submit applications for reasonable accommodation from the City Mandate's vaccination requirement was 5 p.m. on October 27. The DOPR notices attached application forms, which stated the following:

"[r]eligious accommodation requests should be submitted with documentation from clergy, identifying religion or describing the religious belief\practice\observances and identify the accommodation required."

205. After receiving individual accommodation applications, employees of DOPR contacted applicants informing them that as part of the review process, the DOPR's Equal Employment Opportunity (EEO) office typically enters into "a cooperative dialogue/interactive process" in which they "ask follow-up questions . . . in order to make a final determination." Such questions included, *inter alia*, the following: "How long have you had this belief? When did your belief develop and how do you adhere to it? Have you been vaccinated before? Flu? What about the vaccination is inconsistent with your faith?"

206. Upon denying an application, the DOP emailed outlines to applicants with information about their options to appeal their denials. The outlines informed DOPR employees who were union members that they had two such options.

207. The first option was to appeal through the City panel made up of representatives from the Department of Citywide Administrative Services, the Law Department, and the Department of Health and Mental Hygiene (for medical) or the City Commission on Human Rights (for religious). The outline stated that the City panel "will make decisions as required by law, based on the documents you submitted to your agency to request your accommodation." The outlines informed applicants that if the panel granted an appeal, "the Panel will provide you with a reasonable accommodation of their choosing; and if were on unpaid leave, you will retroactively be granted paid leave." On information and belief, this was the only appeal option that was available to DOPR employees who were not represented by a labor union.

208. The second option, available only to union members, was to appeal to Scheinman Arbitration

and Mediation Services ("SAMS"), in which an arbitrator would decide an employee's appeal based on documents submitted by the employee and the DOPR.

209.    The notice of appeal options stated that under the second option,

> - ***SAMS will only grant your Religious Exemption*** if: 1) your exemption is in writing by a religious official (e.g., clergy); and 2) your religious organization is recognized and established.

> - ***SAMS will deny your religious exemption if***: 1) the leader of your religious organization has spoken publicly in favor of vaccines; 2) the documentation you provide appears to be copy-pasted from a readily available source (e.g., from the internet); or 3) your objection to vaccination is personal,  political, or philosophical in nature.

210.    The outline also informed appellants that if the SAMS arbitrator granted the appeal, "you shall be allowed to continue working and remain on payroll; you must submit to weekly COVID-19 testing; and if you have been placed on unpaid leave, you will retroactively be granted paid leave."

211.    DOPR employees also received the following information about employment pending determination of their reasonable accommodation requests:

> II. EMPLOYMENT STATUS PENDING REVIEW OF YOUR REQUEST

> If you requested a reasonable accommodation, by the end of the day on 11/02/2021 - You will remain working and on payroll, subject  to weekly COVID-19 testing, pending your agency's determination and your appeal.

> If your request was made after 11/02/2021 but by the end of the day on 11/05/2021- You will remain working and on payroll, subject to weekly COVID-19 testing, pending your agency's determination. While your appeal is pending, you may be placed on unpaid leave.

> If your request was made after 11/05/2021 - You will be placed on unpaid leave starting on 11/01/2021, and will remain on unpaid leave until the final determination of your request.

> If your request for reasonable accommodation is denied, you will be placed on unpaid leave from 11/01/2021 to 11/30/2021 (unless you

can temporarily remain working based on the criteria above). If you choose to become vaccinated prior to 11/30/2021, you can return to work at the same work location within one (1) week of your notice and submission of proof of vaccination.

212. On information and belief, the Citywide Panel denied the vast majority of the accommodation applications submitted by DOPR employees, typically informing denied applicants by emails stating that "[t]he decision classification for your appeal is as follows: Does Not Meet Criteria." However, some DOPR employees who did not submit letters from their pastors received exemption grants.

213. Denied DOPR applicants were informed that pursuant to the City's policy concerning the mandate, they had three business days to submit proof of vaccination, or be placed on leave without pay ("LWOP").

214. Applicants who replied to Citywide Panel denials asking which criteria they had failed to meet received no response.

215. DOPR employees who failed to submit proof of vaccination after denial of their appeals by the Citywide Panel received an email giving them a short deadline to choose either to separate voluntarily from DOPR and maintain health insurance through June 30, 2022 (while waiving any right to challenge this separation), remain on LWOP through June 30 and maintain health insurance until that time (while waiving any right to challenge separation after June 30), or be terminated on the deadline.

216. DOPR employees who agreed to accept either of the LWOP or voluntary separation options were required to return a signed waiver to DOPR within ten days, in violation of federal and state employee protection laws.

*Implementation of the City Employee Mandate by the Department of Sanitation*

217. DSNY employees were required to submit accommodation applications soon after the City

49

Mandate was issued.

218.   DSNY officials sent emails to applicants asking for details concerning the applicants' length of religious beliefs concerning COVID-19 vaccines and how the applicants' religious beliefs have affected their use of other medications, among other questions.

219.   When the DSNY denied accommodation requests, an DSNY employee sent out an email with a short statement of the reason for denial, for example: "Because the information you provided in support of your request has not sufficiently demonstrated to DSNY that there is a basis for granting you an exemption to the above Order, DSNY is denying your request for an accommodation."

220.   DSNY supplied its denied employee applicants with information about a two-option appeal process that was similar to the outline that the DOPR sent to its employees. It differed, however, in it statement of the accommodation results of approval under the two options.

221.   DSNY employees were told:

> If your appeal is granted by the City panel, you will be permitted to report to work so long as you continue to submit a weekly negative COVID test.

> And:

> If your appeal is granted by the arbitrators, you will be permitted to report to work so long as you continue to submit a weekly negative COVID test.

222.   On information and belief, when Citywide Appeals Panel panels denied religious exemption appeals, typically the only information they provided to DSNY applicants was "Does Not Meet Criteria."

223.   While DSNY claims the power to terminate the employment of unvaccinated employees, as a practical matter, many unvaccinated employees remain in its workforce. They have not yet been terminated by DSNY.

224.　The FDNY sent out forms for its employees to submit religious exemption applications.

225.　FDNY adjudicators did not, for the most part, contact applicants to conduct individual conversations with them.

226.　Most exemption applications were denied at the administrative level. Typically, denial notices stated the following: "The asserted basis for the accommodation is insufficient to grant the requested accommodation, particularly in light of the potential undue hardship to the Department."

227.　Some FDNY employees who received initial administrative denials of exemption requests were given the options to appeal either to the Citywide Panel or to a SAMS arbitrator. Those who opted for a SAMS appeal were required to sign a waiver of rights. The union that negotiated a SAMS option also negotiated that union members who submitted their initial accommodation requests on or after November 3, 2021 would go on LWOP status pending appeal.

228.　Some FDNY employees were not offered a SAMS Appeal option, but were permitted to submit appeals only to the Citywide Panel.

229.　Following denial of appeals by the Citywide Panel, the FDNY sent out explanations to its employees purporting to elaborate on the reasons why they were denied reasonable accommodations, saying:

> **In response to requests for further information concerning the reasons for the denial, the Department is providing this supplemental letter.** Your request for a religious exemption from the vaccine mandate was denied because the asserted religious basis seeking the exemption was insufficient in light of the potential undue hardship to the Department. Given the state of the public health emergency, the nature of the Department's life-saving mission, and the impact to the safety and health of Department members and the public that Department members regularly interact with, the requested accommodation could not be granted.

230.　Although the FDNY claims the power to terminate its unvaccinated employees, as a practical matter many of its unvaccinated employees have continued to work and be paid for their services,

despite having failed to submit any proof of vaccination.

### *Implementation of the City Employee Mandate by the Police Department*

231.    The NYPD supplied accommodation request forms to its employees along with notices that informed them of the City Employee Mandate and procedures to apply for religious exemption. The form informed applicants that "Supporting documentation from you and/or your religious official explaining your religious exemption from the COVID-19 vaccine is strongly suggested."

232.    The NYPD forms also contained the following advice to applicants: "Please be advised that this Reasonable Accommodation, if granted, does not preclude you from adhering to the mandates established in New York City Mayoral Vaccination Mandate for New York City Workforce, which requires the wearing of a facial covering AND mandatory testing in lieu of vaccination."

233.    On information and belief, administrative denial notifications from NYPD did not state reasons for the denial.

234.    Uniformed members of NYPD were informed that they could appeal to the Citywide Appeals Panel. Civilian NYPD employees who belonged to certain unions were also given an option to file a SAMS arbitral appeal, with waivers of rights.

235.    Despite the threat of termination, many unvaccinated NYPD employees have remained on the payroll, in their normal positions, performing their normal duties, after receiving notices denying their religious accommodation requests.

236.    On or about February 8, 2022, NYPD employees who had received cursory denial letters received a second, amended denial letter that contained a checklist of reasons for the denial, and were given a second opportunity to make an appeal to the Citywide Appeals Panel. Those persons who had already submitted an appeal were given an opportunity to supplement their appeals with additional

information.

237.    NYPD employees were also informed as follows: "Employees with pending appeals will remain on active duty status and continue to work while providing proof of negative COVID-19 testing through CPRS while awaiting final decision of their appeal based upon the applicable agreement with their collective bargaining unit (CBU)."

238.    Eric Eichenholtz testified under oath that all agencies were required to engage in a cooperative dialogue with applicants.

239.    Nevertheless, an EEO director told trainees at the NYPD who were to evaluate religious exemption requests at the agency level that they could deny people's applications without making any contact with them.

240.    The EEO director also told trainees at the NYPD that if an applicant objects to the vaccine based on its connection to aborted fetal cells but does not mention that the applicant also avoids Tylenol and Pepto Bismol on this basis, then the request should be rejected.

241.    Emails betweeen Eichenholtz and Citywide Panel members reveal that the Citywide Panel members were also advised to deny applicants from any department whose religious beliefs were based on an objection to the connection between vaccination and aborted fetal cells, seemingly even for those employees who also avoided Tylenol and Pepto Bismal.

242.    The EEO director also told trainees at the NYPD that the question of whether to grant a religious exemption request was "subjective."

243.    The City intentially slowed the review process down for NYPD religious exemption applications so that thousands of NYPD employees remain in "pending" status and are able to continue to work.

244.    This policy of pausing the reviews was an intentional policy that was communicated to management and officers, as documented in a recent press article. https://nypost.com/2022/05/21/nypd-

puts-4650-vaccine-firings-on-hold-insiders/

245. Much of this pause appears to be political as Mayor Adams comes under fire for the staffing crisis his vaccine mandates have caused on the force, and the simultaneous unchecked horrific crime wave that the City is experiencing.

246. Yet, hundreds of other NYPD officers were terminated or forced to resign who pose no greater danger than those allowed to continue working while their application indefinitely pends.

247. There is no explanation for why employees are not a direct threat to others while their application pends for months on end but somehow cannot be safely accommodated once the agency reviews an application.

248. The NYPD's decision to pause the reviews highlights that in the NYPD, just as in all of the other departments, there is no public health necessity to refuse to accommodate religious objectors.


*Continued pressure through reinstatement offers*

249. Notwithstanding that thousands of religious objectors are temporarily saved from termination through arbitrary carve outs and pauses, thousands of other employees have now been terminated because they cannot get vaccinated due to their sincerely held religious beliefs.

250. But the daily coercion to violate their faith has not ended for these employees who are terminated.

251. Because the Mandates extend to nearly every possible job in NYC, employees are not just deprived of a particular job unless they violate their faith – they are deprived of the opportunity to earn money *anywhere* in New York City.

252. Nor can they receive unemployment compensation, because at Governor Hochul's instruction, Commissioner Reardon adopted discriminatory policies to deny compensation to many categories of

employees who applied for religious accommodation.

253. For example, the Department of Labor's written policy requires blanket denial of many categories of municipal employee who are denied religious accommodation on the ground that their employer has asserted they have a "compelling interest" in denying them accommodation despite sincerely held religious objection, and thus they should also be prohibited from receiving unemployment compensation.

254. Additionally, the DOE has adopted a policy of creating a problem code in their unvaccinated employees' files, and many DOE employees have reported that even employers *outside of New York City* are unable to hire them because of the problem code in their files.

255. The problem code is a code that typically means the employee abused a child or committed a robbery or engaged in some other action that makes them unemployable.

256. Thus deprived of any means of earning money to feed themselves and their families, or keep a roof over their heads, Plaintiffs and all others similarly situated are under daily coercion to get vaccinated even after termination so that they can become eligible for employment somewhere again.

257. Defendants are now specifically offering employees who were previously terminated under the vaccine mandate the opportunity to be reinstated if they show proof that they have received at least one dose of the vaccine by June 30, 2022.

258. Toward that end, on June 15, 2022, City agencies were sent a sample notification letter template which said

> As of {insert date} you were terminated from your employment with {insert agency name}. {insert agency name} would like to offer you the opportunity to return to employment if you become fully vaccinated, provided that you share a copy of your vaccination record to {agency contact information} indicating that you have received or will receive at least the first dose by close of business on Thursday, June 30th, and that you intend to receive the second dose by August 15th. Compliance with this requirement is a condition of your return to employment with the City. Once you provide proof of full vaccination (both doses), you will be reinstated to your civil service title at your most recent salary within two weeks of submission of proof of full vaccination, with no change to benefits or break in service.

If you wish to resume employment with the City of New York, you must provide proof of receipt of at least one dose of the vaccine by close of business on June 30th, 2022.

For information regarding where to get vaccinated, please click here: NYC COVID-19 and Flu Vaccine Finder.

### *The Nonpublic Schools Mandate*

259.    On December 2, 2021, Commissioner Chokshi issued an order (the "Nonpublic Schools Mandate") requiring all nonpublic schools operating within the City to "exclude any staff member" who was not vaccinated against COVID-19, and prohibited them from hiring any staff member who was not so vaccinated. This requirement became effective on December 20, 2021. It applied also to religious schools including schools in the Roman Catholic school system and yeshivas.

260.    On information and belief, private schools have responded in a variety of ways to the Nonpublic Schools Mandate. On information and belief, some religious schools solicited religious exemption applications from their employees and were liberal in granting them, in stark contrast to the attitudes of city agencies.

261.    Other private schools, in contrast, have interpreted the Nonpublic Schools Mandate as requiring them to follow DOE policy and absolutely to exclude from their school buildings all unvaccinated personnel, no matter the strength of a person's objection or the reasonableness of proposed accommodations.

### *The Private Sector Mandate*

262.    On December 13, 2021, after a federal court stayed OSHA's private sector employee mandate, Commissioner Chokshi issued an order (the "Private Sector Mandate") requiring that all participants in the private sector of the City's economy demonstrate vaccination of all their personnel no later than

December 27, 2021. The Private Sector Mandate extended to all "covered entities," which it defined as follows:

> "Covered entity" means: i. a non-governmental entity that employs more than one worker in New York City or maintains a workplace in New York City; or
>
> ii. a self-employed individual or a sole practitioner who works at a workplace or interacts with workers or the public in the course of their business.

263.     Defendants issued guidance along with the Private Sector Mandate that impermissibly narrows the protections of Title VII and misstates the procedures and standards that employers should take when deciding religious accommodations.

264.     Pursuant to the guidance and mutliple governing E.E.O.'s, private sector employers to maintain a written record of their reasons for accepting a religious exemption, which written reasons can be demanded at any time by the City for "review" and fines issued to employers who the City finds out of compliance.

265.     Private sector employers are encouraged to follow the "checklist" in the City's guidance, even though it conflicts with EEOC guidance and statutory protections for religious accommodation, so that they can adequately demostrate that they had valid reasons for accepting a religious exemption request.

266.     According to the Guidance Documents, employers were instructed that inspectors from various City agencies would begin enforcing the Order on December 27, 2021, and all inspectors, no matter which agency they are from, will be inspecting for compliance with the same requirements.

267.     Although the Guidance Documents provide that the goal is to educate and work with businesses to help them achieve compliance, if a business refuses to comply, it would be subject to a fine of $1,000 and escalating penalties thereafter if violations persist.

268.     On information and belief, private employers are responding in a myriad of different ways to

the Private Sector Mandate. Some are accepting religious accommodation requests from employees and giving them fair consideration. Others, on information and belief, are following government practices and denying most, if not all, religious accommodation requests.

269.    Defendants' guidance coerces employers into violating statutory rights to religious accommodation.


*None of the COVID-19 Mandates Are Generally Applicable*

270.    The City has issued multiple mandates. Some apply to operators and patrons of public accommodations. Several apply to employees of the DOE. Several have applied to staff of nonpublic schools. Several have covered non-DOE employees of the City and its contractors. Some purport to cover every type of nonpublic employment. Not one of the City's specific COVID-19 mandates has ever purported to cover every person whose conduct might affect the course of COVID-19 infection and transmission in New York City.

271.    Nor do all of the City's COVID-19 mandates show that they are part of a single, uniform policy that the City has adopted to prevent COVID-19 transmission and infection. To the contrary, each of the mandates is unique and incompatible with the others. Some contain exceptions that are not available in others. Some forbid employment of all unvaccinated personnel, even those who work remotely. Some only require "exclusion" of unvaccinated personnel.

272.    Many discretionary carve-outs have occurred. For example, the City first made an exception to the Key to NYC private employer mandates by exempting certain non-resident employees. Then, on March 7, 2022, Mayor Adams repealed the Key to NYC Mandates for patrons but kept the Mandates in place for employees. Then later the same month, Mayor Adams carved out athletes, entertainers, assistants of athletes and entertainers, and other arbitrary categories of employee in an effort to improve

economic conditions for his large donors and lobbyists.

273.     Nor are the City's many COVID-19 mandates enforced and applied in a uniform manner, so that everyone is treated alike. For example, in some instances, unvaccinated staff continue to be actively employed by the City, while others have been dismissed or put on leave without pay. In some instances, staff who received only the first shot of a two-shot vaccine continue in employment, with no effort to enforce the requirement to get a second shot. A few people have had their religious exemption applications granted, while people who have presented similar evidence have been denied.

274.     Similarly, a different standard is employed for those who go through the discriminatory SAMS appeal process. For example, according to Eichenholtz, the DOE has accommodated teachers accepted under the SAMS process under a more generous "undue hardship" standard than they apply to those who are found to have sincere religious beliefs under the Citywide Panel process. Pursuant to this double standard, nearly every teacher found to have sincere religious beliefs against vaccination has been denied religious accommodation based on "undue hardship" by the Citywide Panel, even though many teachers are accommodated under the SAMS appeal. Eichenholtz admitted that there were no public health factors that set the two groups of teachers apart, only a more generous standard applied to those who were accepted under the facially discriminatory policy.

275.     Similarly, private employers are applying widely different set of standards to religious exemption requests, reflecting in many instances the religious attitudes of the employer as well as the employee, but primarily because of the City's discriminatory and threatening guidance, reporting requirements, and penalty and investigation policy.

### The COVID-19 Mandates Are Not Neutral Toward Religion

276.     In addition, the Mandates are tainted by substantial evidence of religious animus, not only from

the City of New York, but by decision makers at the State level as well.

277.    The first Mandate was promulgated on the same day that Governor Kathy Hochul was appointed interim Governor of the State of New York.

278.    Governor Hochul has strongly held religious beliefs in support of vaccination. In place of a cross, she wears a golden "Vaxed" necklace, which she describes in religious terms. Before taking office, she met with Mayor de Blasio and coordinated a vaccine strategy.

279.    Two days after Mayor de Blasio's Original DOE Mandate was promulgated without a religious exemption, Governor Hochul removed the religious exemption from the New York State Department of Health regulation governing healthcare workers.

280.    Mayor de Blasio's amended mandates reference the state mandates as a justification to enact his own.

281.    Both mandates were to take effect on September 27, 2021. The day before the state mandate was supposed to take effect, Governor Hochul gave a sermon at a Brooklyn church, during which she said that God made the vaccine and that she was recruiting apostles to coerce those who did not understand God's will and what God wants (that we be vaccinated). Governor Hochul then told the press that the Pope supports vaccination and that no religious objections to vaccination are valid, and this is why she removed the religious exemption from the state healthcare mandate.

282.    Mayor de Blasio's statements have frequently echoed this New York government assertion that people's religious beliefs against vaccination are "invalid" because they are unorthodox. Representatives of the City repeatedly argued the same in each SAMS Appeal.

283.    These statements are as ignorant as they are unlawful.

284.    The history of religious opposition to vaccination is well-established and religious objectors exist in nearly every faith tradition.

285.     Even within the Catholic Church, there is currently a robust debate about the religious propriety of getting a COVID-19 vaccine.

286.     Similar to abortion, the topic of vaccination is so intertwined with religion that it is itself a religious issue, and any vaccine mandate is inherently enmeshed with religion.

287.     Refusing to allow for reasonable religious accommodation is itself indicative of a lack of neutrality.

288.     The State has now doubled down on its persecution of those with religious objections to vaccination.

289.     Just before the statewide medical mandate was to take effect, Governor Hochul gleefully announced that she had instructed the New York State Department of Labor to deny unemployment compensation to anyone who is unable to work due to a vaccine requirement.

290.     Numerous terminated  and others+ have applied and been denied unemployment compensation pursuant to the Governor's pro-vaccination policy even though they were terminated because of their sincerely held religious beliefs against COVID-19 vaccination.

*The Mandates Are Not Narrowly Tailored*

291.     The DOE's restrictions, prohibitions and "accommodations" on religious exemptions to the Mandates are not narrowly tailored to promote a compelling interest.

292.     There is no compelling reason to force the small percent of the population who have religious objections to vaccination to violate their sincerely held religious beliefs.

293.     It is well-established fact at this point that the available COVID vaccines do not stop infection or transmission.

294.     Public Health officials repeatedly stress that regardless of vaccination status, everyone will get

COVID-19, and infected people are equally as infectious whether vaccinated or not.

295. Indeed, most vaccinated people have caught COVID, many multiple times.

296. For example, Dr. Fauci currently has COVID, despite being vaccinated four times. HHS Secretary Xavier Becerra also has COVID again, for the second time in less than a month and a half, despite being vaccinated four times.

297. Any initial hopes that the vaccines would somehow turn out to provide sterilizing immunity have long-since been dashed, particularly with the dominance of recent variants, upon which vaccination appears to have little to no impact in stopping infection. This was known before these Mandates were imposed.

298. Even before the emergence of Omicron, the science established that vaccines cannot stop transmission. In July, 2021, the CDC released the findings of a study confirming the vaccinated are as infectious as the unvaccinated. The study also showed the vaccinated are as likely to contract COVID-19, and asymptomatic vaccinated people were just as infectious as asymptomatic unvaccinated people. Multiple other studies emerged at the same time showing the same findings.

299. It is not surprising, then, that high vaccination rates do not translate into lower community spread.

300. For example, a recent Harvard study found that "there appears to be no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases." Subramanian S V and Akhil Kumar. "Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States." *European Journal of Epidemiology*, 1-4. 30 Sep. 2021, doi: 10.1007/s10654-021-00808-07.

301. Moreover, at the same time, evidence emerged that the vaccines were even waning in efficacy for symptom mitigation thus prompting many to start advocating for boosters after a few months.

Studies from Israel and other highly vaccinated countries show efficacy plummeting less than a few weeks after vaccination. The Fourth booster proved to be even less effective.

302.     Defendants' own publicly available data support these points. The DOE publishes regular updates on the number of infected students and in-person staff working in New York City Schools. That data shows that excluding unvaccinated staff has not decreased the percentage of staff infected with COVID-19 at all.

303.     Essentially, the Mandates require employers to treat unvaccinated employees as if they have COVID-19, even if they are regularly testing and can establish that they do not have COVID-19. Because they are being treated as if they have a communicable disease, the appropriate standard is to assess whether they pose a direct threat to others – that is, a significant risk of substantial harm.

304.     The Defendants cannot meet this burden.

305.     Scientific consensus shows that unvaccinated employees pose no greater risk to others based on their vaccine status than vaccinated employees.

306.     In fact, recent data from around the world consistently has started to show a higher infection rate in the vaccinated study populations than in the unvaccinated.

307.     Scientists have differing theories about what this consistently appearing data means. Some speculate that it is because unvaccinated people are more likely to have natural immunity, which is now acknowledged to be longer lasting and more robust than vaccine immunity. Some believe that vaccinated people might be more reckless in exposure due to false beliefs that they cannot catch or spread COVID. Others have advanced theories and evidence suggesting that vaccination can blunt immunity to increase risk of infection.

308.     Whatever the reason, the data cannot support a finding that unvaccinated employees pose a "direct threat" to their colleagues such that they cannot be accommodated or have to be segregated.

309.    Even Bill Gates, arguably the world's biggest proponent of widespread mandatory vaccination, admitted recently during a panel discussion at the World Economic Forum that there is no point in checking vaccine status or mandating vaccines given the undeniable fact that vaccinated people are getting and spreading COVID at similar rates.

310.    Moreover, beyond the termination threat embodied by the Mandates, the City's pernicious treatment of employees seeking religious exemptions shows animus: for example, DOE employees are required to choose between resigning or suffering another long period of continued unpaid "leave" status, with a prohibition on outside employment. These loyal, longstanding employees are being told to "quit or starve," in essence. The policy is designed to be punitive and it is unconscionable, but consistent with ex-Mayor De Blasio's intent to impose requirements so burdensome that people would need to get vaccinated to avoid them.

311.    Many of these employees have children and spouses to feed, elderly parents to support, and eventually, a retirement to fund. To deny any employee both a salary and any option to earn money from other sources is not, by any understanding, a narrowly tailored provision. It does not meet even Title VII standards, much less strict scrutiny.

312.    These provisions, along with the skewed application procedures that appear to be engineered to deny exemptions, accomplish two purposes: to make refusal to vaccinate so onerous that religious opponents of vaccination will be forced to act against their beliefs or waive their legal rights, and to save money through the mass "separation" of religiously motivated employees.

313.    The Mayor of New York City controls the New York City school system and other agencies. These policies were always ordered from the top down.


***The Mandates do not serve the public interest***

314.     The Mandates have created a staffing crisis Citywide that is causing widespread and massive harm to the public interest.

315.     The schools and hospitals are in such bad shape, that not only have they opted to send infected staff back to work while they are still able to infect others, but critical services are being withheld from vulnerable people.

316.     Special education children are not receiving federally required services, or aid.

317.     The lack of security personnel in schools has caused an increase in school stabbings and other major safety concerns.

318.     Crime is skyrocketing in New York City, and staffing shortages at the NYPD have played a role in this.

319.     Since the Mandates were implemented, the City has been hard-pressed to provide essential services or contain serious safety threats. Prominent fires have occurred that were not able to be quickly controlled. Interruption in trash pickup has increased the rat population. Yet, critical staffing shortages continue to grow due to the Mandates.

320.     Private employers are also struggling to find enough employees, while unvaccinated employees are being denied the right to work, and starved out of house and home.

321.     Many of the unvaccinated teachers are seasoned tenured faculty, who have been teaching children for years.

322.     They are being replaced by substitute teachers who are exempted from the basic qualifications usually required for teachers, in an effort to get bodies into classrooms.

323.     The toll on the workforce of operating under such conditions is causing even fully vaccinated employees to quit or retire early to avoid the nightmare that is currently unfolding in New York City.

*Plaintiff's Injuries and Standing to Seek Declaratory and Injunctive Relief*

324.    All Plaintiffs have sincere religious objections to vaccination and are entitled to opt out of these vaccines both because they are experimental medicine and because the vaccines conflict with their deeply held religious beliefs.

325.    They bring this suit on behalf of themselves and all similarly situated employees in New York City with sincere religious objections to taking a COVID-19 vaccine.

FACTS RELATING TO INDIVIDUAL PLAINTIFFS

326.    Detailed facts concerning the individual Plaintiffs are set forth in declarations, which are filed herewith and incorporated herein.

*Gennaro Agovino*

327.    Plaintiff Gennaro Agovino  has been employed by the DOC as a civilian employee for the past 26 years.

328.    Agovino has been a Christian his entire life and has sincerely held religious beliefs that prevent him from getting any of the Covid-19 vaccinations.

329.    For example, he objects to the Pfizer and Moderna vaccines because they interfere with the function of the human immune system and give genetic code instructions to cells that do not originate from the DNA in that cell and thus interfere with God's creation. He also objects to the Johnson & Johnson vaccine because it was manufactured using aborted fetal cells, and deriving any personal benefits from an abortion, no matter when it occurred, would violate his sincerely held religious beliefs in the sanctity of human life and the biblical principle that life begins at conception, as contemplated by Psalm 139:13-16 and Jeremiah 1:5.

330.    Agovino submitted a religious exemption request on October 27, 2021, which the DOC denied

on November 17, 2021.

331.    On November 22, 2021, Agovino submitted his appeal.

332.    On March 22, 2022, Agovino received an email from the Director of Human Resources Data Analytics, Classification and Performance Management at the DOC, stating the following: "the Human Resources Division was advised that your request for an appeal to your Reasonable Accommodation decision regarding the vaccine mandate was denied. Therefore, effective Monday, March 28, 2022 you will be separated from the department, unless proof of vaccination is provided."

333.    The email did not provide any explanation for his denial whatsoever.

334.    The next day he responded, copying the individual who sent the email, and also sending it directly to the DOC's Deputy Commissioner of Human Resources, explaining that this deadline constituted coercion to force him to get the vaccine in violation of his sincerely held religious beliefs, and requesting an extension until Tuesday so that he could speak with his family on the weekend about this agonizing decision. He also asked questions, including but not limited to the following:

> Why was my reasonable accommodation for religious exemption denied?
> When was DOC Human Resources notified of this decision?
> How was DOC HR notified? Please provide a copy of the correspondence sent to DOC HR that prompted HR to notify me that my sincerely held religious beliefs have been treaded upon.
> Who made the decision to deny my sincerely held religious beliefs? Please provide the Citywide Appeal Panel contact information, including full name, title, agency, email address and phone number of the person(s) responsible.
> What weighting method was used in the decision making process that led to this decision? Please provide details on how the evaluation was made without bias.
> In total, how many DOC MOS requested reasonable accommodation for religious exemption?
> How many have been granted, how many have been denied and how many are still pending appeal?
> Is this the same blanket email correspondence being sent to all DOC MOS whose appeal for religious exemption is denied?

335.    The Deputy Commissioner replied the same day, stating,

> Please be advised that the deadline cannot be extended. If you do not provide proof

of vaccination before Monday, March 28, 2022 you will be terminated from the Department. For all matters related to the details of your Reasonable Accommodation request and appeal please contact the office of EEO.

336.    He then forwarded his questions to the Assistant Commissioner of the EEO, an attorney with the EEO, the Disability Rights Coordinator of the EEO, the Deputy Director with the EEO, and the general EEO email address.

337.    He also sent an email to the Commissioner and Chair of the NYC Commission of Human Rights, Annabel Palma, explaining the situation and asking why the City Commission on Human Rights was not fighting for his religious rights. He explained that this is a conflict of interest, as the agreement between his union and the City said that a member of the City Commission on Human Rights would sit on the Citywide Appeals Panel that considered his religious exemption request.

338.    A few days later he made the torturous choice to be vaccinated in violation of his sincerely held religious beliefs, so as not to lose his livelihood and end his 26-year career in the service of the City of New York.

339.    He later found out that all three Citywide Appeals Panelists voted to reject his application. David Rozen from CCHR commented "Employer Undue Hardship," Silvia Montalban from DCAS commented "DOC asserted undue hardship including risk to safety which can also exacerbate staff shortage." MacKenzie Fillow from the Law Department commented, "request motivated by personal preference rather than sincerely held religious belief; accom would present undue hardship."

340.    The DOC's original denial letter which discussed undue hardship did not say that COVID had caused staff shortages or provide any individualized assessment that could support a finding that it would be an undue hardship to accommodate Avogino.

341.    Furthermore, Avogino never came into contact with detainees and rarely came into contact with DOC employees who did interact with them, detainees were not required to be vaccinated, and visitors

to the jails were not required to be vaccinated.

342. The City violated the First Amendment, EEOC guidance, the New York City and State Human Rights Laws, and the policies under which they purported to be governed by both ignoring Agovino's profoundly held religious beliefs and re-casting them as "personal preference[s]," failing to consider the heightened undue hardship standard of the State and City Human Rights Laws, and allowing exceptions for secular conduct that presented the same if not more of a direct threat to detainees.

### *Brendan Fogarty*

343. Brendan Fogarty has employed by the FDNY for the past 19.5 years, and has been a captain for the past two years.

344. Fogarty possesses sincerely held religious beliefs that prevent him from receiving any of the Covid-19 vaccines.

345. On October 23, 2021, he submitted his request for a religious exemption to the FDNY, and the FDNY denied it on December 13, 2021, stating that "[t]he asserted basis for the accommodation is insufficient to grant the requested accommodation, particularly in light of the potential undue hardship to the Department."

346. He appealed the denial on December 19, 2021.

347. In May, Fogarty still had not heard back regarding whether his appeal was granted. He chose to resign to protect his pension.

348. Later, Fogarty found out that two Citywide Appeal Panelists had denied his appeal. Hanh Le from the Law Department, who voted to reject his application, commented, "concerns about fetal cell lines but only researched covid vaccine; undue hardship." David Rozen from CCHR, who voted to reject his application, commented "Employer Undue Hardship."

349. Upon information and belief, Fogarty resigned before an official from DCAS voted, so his

appeal was closed out.

350.    Neither the FDNY nor the Citywide Appeals Panel ever demonstrated why accommodating Fogarty constituted more than a "potential for undue hardship"—a standard which does not even satisfy Title VII, let alone the New York City or State Human Rights Laws.

351.    Fogerty felt he was forced to resign to avoid further retaliation. He did not voluntarily leave his employment but was forced out due to the City's religious discrimination.

*Curtis Cutler*

352.    Plaintiff Cutler has been a Sanitation Worker with the DSNY since 2014.

353.    Cutler objects to the vaccine mandate due to his longstanding sincerely held religious objections to vaccines.

354.    Cutler submitted an exemption request on August 20, 2021.

355.    On November 19, 2021, DSNY denied Cutler's request for a religious exemption.

356.    Cutler appealed on November 16, 2021, and the DSNY denied his appeal on January 6, 2022. He was placed on LWOP three days later.

357.    On January 31, 2022, Mr. Cutler received a notice from the DNSY stating his employment would be terminated if he does not show proof of vaccination by 5:00 p.m. on February 11, 2022.

358.    Cutler was also told by a union representative that he could extend his LWOP until June 30, 2022 and maintain his health insurance if he resigned from DSNY and waived his right to sue the DSNY.

359.    Cutler has a family to support and felt he had no choice but to resign.

360.    Even though he filled out a resignation form on February 11, 2022 and stated that he was resigning under duress, it was never processed because the same day he notified DSNY in writing that he changed his mind.

361.    That same day he received a notice stating that his employment with DSNY was terminated,

effective February 11, 2022.

362.    Cutler can be reinstated if he gets vaccinated in violation of his religious beliefs.

363.    Upon information and belief, other City employees whose religious exemption requests have been denied have gotten vaccinated after their termination and been reinstated.

364.    Last year, Cutler and his wife bought their first home. They are now unable to afford the mortgage and have been forced to put their house on the market and relocate. His relocation will cause significant harm to his church community, as he is the sole Deacon of Tottenville Evangelical Free Church.

365.    In that role, he fields all calls to the church, collects and counts the church offerings, prepares the table for Holy Communion, provides assistance to widows in the congregation, and takes care of the church grounds and building.

366.    Earlier this month, his son had to go to the hospital for a collapsed lung, but he had no health insurance to pay for it due to his termination.

367.    His family depends on his income, and he cannot otherwise assure their health and sustenance.

368.    He therefore faces immense pressure every day to get vaccinated in violation of his sincerely held religious beliefs in order to get his job back.

369.    Cuter later learned, after discovery in this case, that the following exchange occurred between counsel for the Plaintiffs and Eric Eichenholtz:

> **Mr. Nelson:** So what was the policy of the Citywide Appeals Panel with respect to employees who had experienced a religious conversion and had been vaccinated prior to the conversion and were no longer vaccinated after the conversion?
>
> **Mr. Eichenholtz:** That is an example of what I said a moment ago, right? That an employee had been vaccinated throughout their life and in 2017, for example, they converted, they became a born again Christian, they converted to another religion, what have you. That as a result of that conversion, they took on a set of religious calls presumably they had been developing prior to

71

that, then they have a sincerely held religious belief, and if some of those values that they've explained conflict with the vaccine requirement, then they would be entitled to a reasonable accommodation. So in that case, that sort of fact would compel a grant of an accommodation notwithstanding that fact that like, standing alone the fact that they had vaccines in the past might mitigate against that knowledge.

370.    The following exchange also occurred between counsel for the Plaintiffs and Eric Eichenholtz:

**Mr. Nelson**: What was the policy of the Citywide Appeals Panel with respect to applicants who only objected to the COVID-19 vaccine based upon religious objections, but didn't object to any other vaccine?

**Mr. Eichenholtz**: So this is going to sound familiar. There is no uniform blanket policy because that is a factual determination. There can certainly be a basis for granting of reasonable accommodation. I'm sure if we put a series of facts together, you may have some ready to go, where an RA might be granted, and there are many scenarios where if someone is objecting solely to the COVID-19 vaccine, where the RA would be denied . . . so there's no rule that . . . if they just said COVID, you've got to deny, or they just said COVID, you've got to grant. There's no policy like that.

371.    Cutler's original religious exemption application materials were lengthy and comprehensive. He is a born again Christian, a deacon at his church, and his duties include watching over the building, teaching lessons, helping widows with challenging tasks, collecting and counting the offerings during/after every service, and serving food every Sunday morning.  He submitted a clergy letter and records of his tithing to the church from 2012-2021. He also submitted a statement containing at least 10 Bible verses and very specific conflicts between his religious beliefs and the vaccination requirement (i.e. aborted fetal cells/rejecting alterations to his God-made immune system/etc.).

372.    In response to his agency's question of whether he had ever been vaccinated before, he gave the following response:

Well, I must answer this question carefully. After all, people like myself who come to faith in Christ are not the same people we were before. In biblical Christianity, we by nature of being born into the world by natural means, are not religious by default. The scripture in contrast affirms we are made believers by the grace of God. This is called "being born again*". Jesus responded and said to him, "Truly, truly, I say to you, unless someone is born again he cannot see the kingdom of God." (John 3:3).* This Christian experience means a person's actions (whether passive or active) in the past may not line up with one's religious convictions through

the course of one's life. But rather, through the edification of the word of God, a person's conscience may become honed as well. This pillar of Christian truth is found many places in the scriptures, but I will briefly point to the book of Romans chapter 12. *Therefore, I urge you, brothers and sisters, by the mercies of God, to present your bodies as a living and holy sacrifice, acceptable to God, which is your spiritual service of worship. 2 And do not be conformed to this world, but be transformed by the renewing of your mind, so that you may prove what the will of God is, that which is good and acceptable and perfect. (Rom 12:1-2)* The renewing of the mind is a process within our religious belief that is non-negotiable. When the mind learns about the will of God, the conscience becomes conformed to what is our spiritual service before God. When a Christian's conscience is sincerely made up about an issue it is to be held with the highest reverence and love for God as possible. As a believer in Jesus this is imperative. The Apostle Paul tells us this in 1 Timothy 1:19 *keeping faith and a good conscience, which some have rejected and suffered shipwreck in regard to their faith.* To reject the convictions of my conscience may shipwreck my faith. <u>So to answer the question above, yes I have been given vaccines in the past but I was not a religious person and my conscience was not yet edified and firmly established in God's Most Holy Word. Therefore, my religious experience and conscience changes are consistent with Christian doctrine and born again experience</u>. As a religious leader and teacher I will say it is **consistent** in our theological doctrine and religious experience that an individual's convictions, in all areas of life (including this issue), may change but hold just as much weight as essential religious convictions.

373.    Cutler later learned, after discovery in this case, that all three Citywide Appeals Panelists voted to reject his appeal. David Rozen from CCHR commented, without support in the record, that "[n]o strongly held religious belief that would prevent vaccination." Sanford Cohen from DCAS commented, "[o]pposition is personal preference against COVID vaccine. No demonstration that employee applies fetal cell line concern to any product other than COVID vaccine." Eric Eichenholtz from the Law Department commented, "[e]mployee acknowledges receiving vaccines in the past. Appears decision not to vaccinate limited solely to COVID 19 vaccination."

374.    Eichenholtz and the other panelists violated the First Amendment, EEOC guidance, the New York State and City Human Rights Laws and policies under which they purported to be governed by both ignoring his profoundly held religious beliefs and re-casting them as "personal preference[s]," and giving absolutely no weight to his thoughtful spiritual explanation regarding the impact of his religious conversion on his vaccination behavior, and failing to consider the heightened undue hardship standard of the State and City Human Rights Laws.

*Liz Delgado*

375.    Liz Delgado has been an Administrative Assistant for the DOI since 2017. Prior to working at DOI, Delgado worked with the Department of Corrections, and also worked at the Department for the Aging for 12 years. She has been a New York City employee for over 30 years.

376.    Delgado possesses sincerely held religious beliefs that prevent her from taking any of the Covid-19 vaccines, and has not had a vaccine in over 25 years due to these religious convictions.

377.    Delgado submitted a request for a religious exemption on October 22, 2021, and the DOI denied it on November 19, 2021 because they found that her refusal of vaccination was "not based on a sincerely held religious, moral, or ethical belief."

378.    Delgado appealed to the Citywide Appeals Panel on November 24, 2021.

379.    On December 20, 2021, the DOI denied her appeal.

380.    Delgado was placed on LWOP and received a termination notice from her employer. Pursuant to that notice, Delgado was forced to choose by February 22, 2022 whether to extend her LWOP through June 30, 2022, involuntarily resign, or retire. All options presented to Ms. Delgado included waiving her right to sue DOI.

381.    She chose not to sign any of the waivers.

382.    On March 1, 2022, she received her termination notice from the DOI.

383.    On March 11, 2022, she applied for unemployment, but was deeply concerned that she would not obtain it, because she knows of other City employees terminated because of their religious objections to the vaccination who were denied unemployment by the Department of Labor for "misconduct."

384.    On March 29, 2022, the Department of Labor denied her application, stating,

You were discharged for misconduct in connection with your employment with [your] employer. Because of this determination, you will not be able to use your wages from this employer before 12/30/2021 to collect unemployment insurance benefits in the future.

You were discharged because on 12/30/2021 you refused to get the Covid 19 vaccination as required by your employer. Your employer informed you on 10/28/2021 that receiving the Covid 19 vaccination was required to continue your employment, and mandatory Covid 19 vaccinations are permissible under NYS law. You knew or should have known that your actions would jeopardize your job.

385.    Delgado did not appeal the denial because she assumed it would be futile. This is because the DOL website states the following in response to the question "[i]f a worker refuses to get vaccinated, will they be eligible for UI Benefits?":

Like all UI claims, eligibility will depend on the circumstances as each claim is unique and reviewed on a case-by-case basis. Workers in a healthcare facility, nursing home, or school who voluntarily quit or are terminated for refusing an employer-mandated vaccination will be ineligible for UI absent a valid request for accommodation because these are workplaces where an employer has a compelling interest in such a mandate, especially if they already require other immunizations. Similarly, a public employee who works in a public setting and is subject to a local government mandate to submit proof of vaccination or negative testing may be disqualified from the receipt of UI if they refuse to get vaccinated or tested.

*Unemployment Insurance Top Frequently Asked Questions*, N.Y. State Dep't of Labor, https://dol.ny.gov/unemployment-insurance-top-frequently-asked-questions (last visited May 16, 2022).

386.    Upon information and belief, numerous other New York City workers who were terminated because they refused to be vaccinated in violation of their religious beliefs were denied unemployment for either "misconduct" or for "quitting without good cause." Many have gone through the appeals process and were found to have sincerely held religious beliefs but nonetheless denied unemployment compmensation on the ground that the DOL has a policy of assuming that there is a "compelling reason" that they cannot accommodate employees given the pandemic. No inquiry or facts were assessed in

upholding this assumption even though good cause determinations are supposed to be individualized.

387.    This situation has depleted Delgado emotionally. Each day she wakes up, she feels empty, lost, and not good enough. Some days all she can do is cry. She has withdrawn from her friends and her family so she can grieve and pray. She never had trouble sleeping before, but she does now. She now gets chest pain. She used to be a calm person, but she is riddled with anxiety. The City took away her decades-long livelihood, leaving her devastated.

388.    Upon information and belief, she could be reinstated if she gets vaccinated in violation of her sincerely held religious beliefs. She knows of another City employee who has done so.

389.    Delgado later learned, pursuant to discovery in this case, that all three Citywide Appeal Panelists voted to deny her application. David Rozen from CCHR commented, without support in the record, "[n]o strongly held religious belief articulated that would prevent vaccination." Michael Reyes from DCAS commented, arbitrarily, "[r]eligious objection to vaccine is vague. Employee refers to the power of healing and faith, but has relied on doctors for treatments, which is an expression of personal preference rather than religious belief." Eric Eichenholtz from the Law Department commented, "[a]rticulated belief does not preclude vaccination. Employee describes belief as choosing regarding individual medical treatments, which is an expression of personal preference."

390.    Nevertheless, Delgado's personal statement explained that her faith has impacted her medical decisions for decades, including her decision not to be vaccinated for the past 25-30 years. For example, she stated, she was diagnosed with breast cancer at 34 years old, and it was her faith and the leading of God that helped her get diagnosed. She saw multiple doctors who dismissed her fears, but because she knew God was telling her that something was wrong, she sought second and third opinions until she received a diagnosis. She prayed at every chemotherapy session, radiation appointment, and surgery that God would heal her, and He did.

391.    After recovering from cancer, Delgado turned to holistic medicine, because she realized that the best way to honor her body as God's temple is to treat herself as that temple. She now avoids anything that God leads her to believe would defile her body and thereby her soul. She has rejected other medical treatments, such as a treatment for osteoporosis, because of this same belief.

392.    The EEOC's guidance states that when an employee observes certain practices for religious reasons and another employee adheres to the very same practices but for secular (e.g., health or environmental) reasons, the employee in the first case may be subject to reasonable accommodation under Title VII because the employee engages in the practice for religious reasons, and the employee in the second case may not be subject to reasonable accommodation because the practice is engaged in for secular reasons.

393.    The EEOC gives the following example:

> "A Seventh-day Adventist employee follows a vegetarian diet because she believes it is religiously prescribed by scripture.  Her vegetarianism is a religious practice, even though not all Seventh-day Adventists share this belief or follow this practice, and even though many individuals adhere to a vegetarian diet for purely secular reasons."

394.    Nevertheless, the panelists characterized Delgado's prayerful and religiously influenced consideration of medical treatments and practices as personal preferences, stating that her use of doctors and case-by-case decision-making based on guidance from prayer regarding health decisions somehow transformed them into a non-spiritual exercise for her.

395.    The Citys violated the First Amendment, EEOC guidance, and the policies under which they purported to be governed by both ignoring Delgado's profoundly held religious beliefs and re-casting them as "personal preference[s]," finding inconsistencies in her beliefs where they were none, and substituting their own judgment of what constitutes a violation of Delgado's sincerely held religious beliefs for her own.

396.    On June 17, 2022, Delgado received a notice from the City stating the following:

The City of New York would like to offer you the opportunity to return to employment if you become fully vaccinated, provided that you share a copy of your vaccination record to DOICOVIDINFO@DOI.NYC.GOV indicating that you have received or will receive at least the first dose by close of business on Thursday, June 30th, and that you intend to receive the second dose by August 15th. Compliance with this requirement is a condition of your return to employment with the City. Once you provide proof of full vaccination (both doses), you will be reinstated to your civil service title at your most recent salary within two weeks of submission of proof of full vaccination, with no change to benefits or break in service.

If you wish to resume employment with the City of New York, you must provide proof of receipt of at least one dose of the vaccine by close of business on June 30th, 2022.

397.    Delgado now feels unbearable coercion to betray her faith so she can get her job back.

### Janine DeMartini

398.    DeMartini is employed by The Child Study Center of New York, which is partially funded by the New York City Department of Education.

399.    She holds a strong and sincere religious objection to the vaccine.

400.    She submitted a request for a religious exemption on September 9, 2021, which was denied.

401.    The Child Study Center denied the application because they thought that they had to do so by order of the Mandates, not because DeMartini's religious objection was found to be insincere or because she was found to be a direct threat.

402.    DeMartini was not given the opportunity to appeal the decision and was terminated from her job as of September 27, 2021.

### Sabina Kolenovic

403.    Kolenovic is employed as a teacher by DOE. She has strong and sincere religious objections to vaccines.

404.    Kolenovic was forced to apply for exemption through the unconstitutional SAMS criteria. There was no other option available to DOE employees.

405.    Kolenovic stimely submitted a request for religious exemption to the DOE, which was denied

through an autogenerated email as were all other requests submitted by DOE employees

406.    Kolenovic participated in a Zoom hearing on her appeal to a SAMS Appeal arbitrator. During that hearing, the DOE attorney argued, "If religious leaders are publicly in support of the vaccine, this must be denied." The SAMS Appeal was denied without explanation and Kolenovic was put on LWOP.

407.    In November, Kolenovic was given an opportunity to file a new appeal before the Citywide Panel, as a result of a decision by the Second Circuit Court of Appeals in the case of *Kane v De Blasio*.

408.    In January, 2022, the DOE sent Kolenovic a series of questions concerning her religious beliefs, which she promptly answered.

409.    On February 15, 2022, the Citywide Appeals Panel denied her appeal of the DOE's denial of her religious exemption request, stating that "DOE has demonstrated that it would be an undue hardship to grant this accommodation to appellant given the need for a safe environment for in-person learning." It did not explain how DOE had made this demonstration. It also stated this was the final decision with respect to her request and that she had seven business days to submit proof of vaccination or be placed on LWOP.

410.    On March 17, 2022, the DOE terminated Kolenovic.

411.    Kolenovic can no longer pay for her son's room and board at college, and she fears that she will not be able to pay for her daughter to attend college next year.

412.    She has been unable to obtain much-needed dental work due to the loss of health benefits.

413.    The stress of this experience has left her physically, mentally, and emotionally depleted and has caused her to lose significant amounts of hair.

414.    On May 13, 2022, Kolenovic applied for unemployment compensation from the DOL.

415.    She did not apply sooner because she knows of other NYC workers in her situation who have been denied unemployment for "misconduct" for merely abiding by their sincerely held religious

beliefs, and she was concerned it would be futile.

416.    Later, after discovery in this case, Kolenovic found out that all three Citywide Appeals Panelists voted to deny her appeal. David Rozen commented, "Employer Undue Hardship." Silvan Montalban from DCAS commented "[a]ffirming undue hardship as safety risk of unvaccinated employees interacting with others, even outside classroom, and cost-prohibitive diversion of resources for employee not to perform essential functions." Eric Eichenholtz from the Law Department commented, "undue hardship."

417.    Kolenovic feels daily pressure to renounce her religious opposition to COVID-19 vaccines and accept vaccination, in order to save her career and stop going without any income.

418.    Other DOE teachers have been accommodated.

419.    At least one other DOE teacher was allowed to remain in the classroom despite remaining unvaccinated with the consent and knowledge of the DOE.

420.    Many more have been accommodated at remote worksites, which sit mostly empty and can accommodate many more teachers.

421.    Thousands of students are still studying remotely and could benefit from additional dedicated remote teachers.

422.    Eichenholtz admitted in sworn testimony that many teachers were granted religious accommodation by the DOE under the SAMS criteria.

423.    Eichenholtz further admitted that they are treating religious objectors who did not qualify under the facially discriminatory SAMS criteria, such as Kolenovic, less favorably, and imposing a stricter standard for "undue hardship" on them.

424.    Eichenholtz also admitted that arbitrarily, the Citywide Panel has still allowed at least some teachers to be accommodated and that no specific information was used to decide which ones to

accommodate and which ones to reject under "undue hardship."

425. Eichenholtz also admitted that the DOE did not provide specific information to determine whether Kolenovic might pose a direct threat to others or whether she could be reasonably accommodated without hardship.

426. Kolenovic can be reasonably accommodated without undue hardship and there is no rational reason, leave aside compelling need, to deny her accommodation.

*Krista O'Dea*

427. O'Dea is employed by FDNY. She holds a strong and sincere religious objection to the COVID-19 vaccine.

428. She made an administrative request for a religious accommodation to the FDNY which was refused because "[t]he asserted basis for the accommodation is insufficient to grant the requested accommodation, particularly in light of the potential for undue hardship to the Department."

429. She submitted an appeal to the Citywide Appeals Panel, which the Citywide Appeals Panel denied on February 20, 2022

430. O'Dea worked during the height of the pandemic, as well as from the time that she submitted her original request in October 2021 until she was placed on leave without pay in February 2022.

431. On March 7, 2022, O'Dea received a letter from the FDNY stating that if she did not get vaccinated, her termination would be effective on March 15, 2022.

432. On March 18, 2022, she received her termination notice (dated March 14, 2022) from the FDNY in the mail, confirming her 3/15/22 termination.

433. On March 28, 2022, she applied for unemployment compensation from the New York State Department of Labor.

434. On April 28, 2022 and April 29, 2022 she received phone calls from the DOL requesting

additional information regarding her termination, as the FDNY gave the DOL incorrect information.

435. Upon information and belief, the FDNY told the DOL she was placed on LWOP on March 13, 2022 and that she was terminated for misconduct on March 15, 2022. In reality, she was placed on LWOP on February 23, 2022 and terminated on March 18, 2022.

436. She corrected the FDNY's mistakes on the phone call. She also provided them with the religious exemption request she submitted to the FDNY.

437. She did not engage in misconduct while employed by FDNY. She merely declined to get vaccinated, as it would violate my sincerely held religious beliefs.

438. On May 5, 2022, the DOL denied her application because "you were discharged for misconduct in connection with your employment[.]"

439. She appealed the denial on the same day.

440. On May 13, 2022, she received an "alternative determination" from the DOL, dated May 9, 2022, which stated that

> Your employment ended on 3/15/22 because you refused to get the Covid 19 vaccination as required by your employer per the December 2021 NYC vaccine mandate. Your employer informed you on 10/20/21 that receiving this vaccination was required to continue your employment, and mandatory vaccinations are permissible under NYS law. Your failure to receive the vaccination is considered to be a quit without good cause. Hearing processed.

441. Upon information and belief, numerous other New York City workers who were terminated because they refused to be vaccinated in violation of their religious beliefs were denied unemployment for either "misconduct" or for "quitting without good cause."

442. On June 16, 2022, O'Dea had a hearing on her unemployment insurance denial. No determination has been made and O'Dea still has not received any unemployment insurance.

443. O'Dea did not quit voluntarily. She was terminated because she could not take a COVID

vaccine, which was a new requirement of employment and thus cannot form the basis for a determination that she quit without good cause.

444.    Commissioner Reardon has adopted and is nonetheless implementing a policy at the behest of Governor Hochul to unconstitutionally deny religious objectors unemployment compensation on the unfounded and unsupported blanket policy that failure to get vaccinated in violation of one's religious beliefs is "quitting without good cause."


*Dean Paolillo*

445.    Paolillo is employed as a police officer by NYPD.

446.    Paolillo has strongly held religious objections against the use of COVID-19 vaccines.

447.    Paolillo expressed his objections to COVID-19 vaccines in an administrative application for a religious accommodation which he submitted to NYPD.

448.    The NYPD never initiated a cooperative dialogue with him regarding his religious accommodation.

449.    Paolillo's application was administratively denied.

450.    On February 8, 2022 Paolillo received a revised statement of denial for his application and was given a short time to make an appeal from it.

451.    The reasons were that his "[o]bjection was personal, political, or philosophical," that the "statement [did] not appear to be written by the applicant/generic statement that does not support candidate's request," and that he had "[n]o demonstrated history of vaccination/medicine refusal."

452.    On February 15, 2022, he submitted a supplemental document to the Citywide Appeals Panel. In it, he addressed each of the stated reasons for the denial of his religious exemption. He explained that that it was incorrect to characterize his beliefs as "personal, political, or philosophical"

because his objection was based on his religious beliefs which were outlined and supported by Biblical scripture in his appeal letter. He also stated that none of his documents contained any personal, political, or philosophical objections. In response to the charge that the statement did not appear to be written by him, he explained that he wrote his appeal letter in which he dove firsthand into his devotion to his faith multiple times. In response to the charge that he had no demonstrated history of vaccination/medicine refusal, he stated that he had also addressed that in his appeal letter, in which he asserted that since he became an adult, he has not received any vaccinations nor has he ever taken over the counter medications for his past illnesses or injuries as a result of his sincerely held religious beliefs. He stated that in any event, the Department has no records of his immunization history and/or medicine refusal so the decision to mark this box could not have been logically concluded either. On March 14, 2022, he received an email from the Department of Citywide Administrative Services stating merely that the Citywide Appeals Panel denied his appeal and that the decision classification was "Does Not Meet Criteria." It stated that he had seven calendar days to submit proof of vaccination or be placed on LWOP.

453.    On March 15, 2022, he received a notice in his email stating that since his appeal was denied, he would be placed on LWOP effective March 21, 2022 and that if he did not receive the vaccine by Friday, March 25, 2022, the City of New York would terminate his employment.

454.    On March 25, 2022, he was terminated from the NYPD.

455.    He later found out from an NYPD sergeant that she believed he could be reinstated if he got vaccinated in violation of his sincerely held religious beliefs and told him that the first step for reinstatement for individuals who took a leave of absence would be to send a letter to the Police Commissioner requesting reinstatement, which he did. He also found out from this sergeant that other members of the NYPD whose religious exemptions were denied had their terminations halted so that the Police Commissioner could review their cases individually.

456.    He later found out, after discovery in this cae, that two out of the three Citywide Appeals Panelists voted to deny his application. David Rozen from CCHR, who voted to grant his appeal, commented, "[s]trongly held religious belief; Vaccines developed using fetal cells; supportive materials; cooerpative dialogue does not provide contrary materials."

457.    Sana Hassan from DCAS, who voted to reject the application, commented, "[e]mployee states 'the COVID-19 vaccines I oppose are all researched, produced, and manufactured with aborted fetal cell lines…' The employee's objection is based on inaccurate scientific information and not a sincerely held religious belief."

458.    The rejection based on this reasoning unequivocally violated the First Amendment, as government actors are not permitted to assess the veracity of a sincerely held religious belief, or to state that a belief is not a sincerely held religious belief because it is based on inaccurate information. *Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) (plaintiff's religious objections to a tuberculosis test on the basis that it contained artificial substances were entitled to First Amendment protection regardless of their factual accuracy, even when defendants submitted objective, scientific evidence that test was derived from natural substances).

459.    In any event, each of the Covid-19 vaccines were either researched or manufactured with aborted fetal cells.

460.    Lorenzo Di Silvio from the Law Department, who voted to reject the application, commented, "[r]equest not based on sincerely held religious beliefs, and grant in any event would impose undue hardship on agency."

461.    The NYPD never claimed that accommodating Paolillo would impose an undue hardship on the agency.

462.    On June 17, 2022, Paolillo received an email from the NYPD which stated the following:

The New York City Police Department would like to offer you the opportunity to return to employment if you become fully vaccinated, provided that you email a copy of your vaccination record to the New York City Police Department at meoleave@nypd.org indicating that you have received or will receive at least the first dose by close of business on **Thursday, June 30, 2022**, and that you intend to receive the second dose by **Monday, August 15, 2022**. Compliance with this requirement is a condition of your return to employment with the City. Once you provide proof of full vaccination (both doses), you will be reinstated to your civil service title at your most recent salary within two weeks of submission of proof of full vaccination, with no change to benefits or break in service.

If you wish to resume employment with the City of New York, you must provide proof of receipt of at least one dose of the vaccine by close of business on **Thursday, June 30, 2022**.

*Dennis Pillet*

463.    Pillet is a long-time FDNY employee. He holds sincere religious beliefs that it would be ungodly to accept vaccination with a COVID-19 vaccine.

464.    Pillet applied for a religious accommodation to the vaccination requirement, which was denied because of the "potential for undue hardship," which does not satisfy the undue hardship standard under Title VII or the New York State and City Human Rights Laws.

465.    Pillet submitted an appeal of the denial to the Citywide Appeals Panel.

466.    In his appeal, he stated that the FDNY provided testing at the workplace and that was the initial policy of the FDNY prior to the mandate. He also said that FDNY demonstrated in the past that monitoring through daily temperature checks, provision of appropriate personal protective equipment (such as masks and hand sanitizer), and logs of an individual's health status were all costs the FDNY was willing to bear.

467.    He also included in his appeal that as of November 2021, FDNY EMS members had achieved a 90% vaccination rate, the size of the 2022 FDNY budget was $2.17 billion, and the NYC Test and Trace Corps. offers free testing which eliminates all cost to the FDNY.

468.    He suggested several accommodations. He stated that there were other members in his EMS

station who also had religious beliefs that preclude them from getting the vaccination, including his partner for the past year. He asked to be allowed to continue working with his partner. He also asked that he be allowed to continue testing weekly at his EMS station, since the logistics were already in place and the number of EMS personnel that have not been vaccinated were less than 10 percent. He also suggested that he be transferred to a non-response unit, such as a dispatch to limit his interaction with the public if this was a concern for the Department.

469.    The FDNY never considered any of these alternatives or had a cooperative dialogue with him about them.

470.    On May 9, 2022, the Citywide Appeals Panel denied his reasonable accommodation with no explanation.

471.    Pillet worked throughout the whole pandemic, up until he was placed on LWOP three days later.

472.    Pillet later found out that all three Citywide Appeals Panelists voted to deny his appeal. Sanford Cohen from DCAS commented, "[e]mployee does not articulate any sincerely held religious belief that precludes COVID vaccination. Employer undue hardship." David Rozen from CCHR commented, "Employer Undue Hardship," and Seth Kramer from the Law Department commented, "[p]roperly denied as undue hardship. It does not appear employee responded to cooperative dialogue questions."

473.    There is no merit to the claim that Pillet never responded to cooperative dialogue questions.

474.    Further, the FDNY and Citywide Appeals Panel violated the City and State Human Rights Laws by not demonstrating how continuing to accommodate Pillet, as they had done throughout the height of the pandemic, satisfied the heightened undue hardship standard of those statutes.

475.    The FDNY required that Pillet submit a letter from his clergy in his original religious exemption request. Nevertheless, this letter is not included in the files that the Citywide Appeals Panel reviewed on appeal, according to the documents Defendants produced in this case. Upon information and belief,

the Citywide Appeals Panel never saw it.

476.    On May 13, 2022, Pillet chose to extend his LWOP until June 30, 2022, and signed a waiver "under protest, under duress, and without prejudice to [his] claim that the FDNY and Citywide panel's religious exemption process violates the constitution and other applicable laws."

477.    He is currently under immense pressure to betray his faith and accept vaccination by the June 30, 2022 deadline, after which he will be terminated if he does not comply with the Mandate.

*Matthew Rivera*

478.     Rivera works for Consolidated Edison in New York City. He is not vaccinated against COVID-19.

479.    Rivera holds strong religious objections to the Covid-19 vaccines.

480.     Rivera was informed on multiple occasions by his employer is subject to a vaccine mandate and that it requires him to get vaccinated.

481.    Rivera submitted a request for exemption from the vaccination requirement with his employer.

482.    A representative of the employer contacted Rivera asking for more information. Rivera asked for more time to do so.

483.    On February 28, 2022, Rivera received an email stating that the Accommodation Review Committee granted his religious exemption request. It stated, however, that "[s]hould the circumstances surrounding the accommodation change, the exemption may be revised or revoked."

484.    He knows of another ConEd employee whose religious exemption was revoked.

485.    He fears that his religious exemption could be arbitrarily revoked at any time, especially given the constantly changing guidelines and guidance that ConEd has issued since the start of the pandemic.

*Laura Satira*

486.   Satira was formerly employed by St. Bernard's Catholic Academy.

487.   When her employer became subject to the City's vaccine mandates, Satira was informed that she needed to get vaccinated.

488.   Satira has strong and sincere religious beliefs that preclude her from taking the COVID-19 vaccines.

489.   Satira submitted a request for religious accommodation to her employer, who informed her that no religious exemption or accommodation was available, and terminated Satira's employment.

*Frank Schimenti*

490.   Plaintiff Frank Schimenti has been employed by the NYC DOB for the past 25 years, and currently serves as the Assistant Chief Plan Examiner and Project Advocate for the Borough of Staten Island.

491.   He possesses deeply held religious beliefs that prevent him from receiving any of the Covid-19 vaccines.

492.   On or about October 27, 2021, Schimenti submitted his request for a religious exemption to the DOB, which was denied on November 4, 2021.

493.   Schimenti appealed this decision on November 9, 2021, and the Citywide Appeals Panel denied his appeal on December 6, 2021, with no explanation.

494.   On December 10, 2021, he was placed on leave without pay.

495.   On January 31, 2022, Schimenti received an email from the DOB stating that he had until 5 p.m. on February 11, 2022 to submit proof of vaccination in order to maintain his employment. It stated that if he did not submit such proof, his termination would be processed.

496.   He also learned that his termination for this reason would disallow him from filing for

unemployment, so he never applied as he thought it would be futile.

497.    On February 9, 2022, the President, Vice President, Treasurer, Secretary, and Immediate

Past President of the American Institute of Architects sent a letter to the Department imploring it not to

go through with Schimenti's termination, and explaining, among other things,

> Frank's absence has already had an extreme negative impact on the
> Staten Island DOB, on the design professionals filing applications,
> the constituents of Staten Island waiting for approvals, building
> permits and Certificate of Occupancy's. Additionally, it can be said
> that the health, safety and welfare of the public is being put in danger
> in his absence where his roll has not been replaced with someone
> that has the same pedigree and local experience.

498.    The Department did not heed the letter.

499.    When Schimenti had originally applied to the DOB for a religious exemption, he submitted

an eight-page personal statement describing his religious background including his spiritual mentors,

his reliance on prayer, and his understanding of more than 25 different Bible verses. He explained that

the use of aborted fetal cell lines in the testing or manufacturing of the vaccine clearly contradicted his

sincerely held religious beliefs and Catholic faith regarding abortion.

500.    He also filled out a required form from the DOB stating that he had taken various over-the-

counter medications in his lifetime including Tylenol and Pepto-Bismol.

501.    However, in the same form, he explained to the DOB that "[n]ow that it has come to my attention

that more products than I ever realized are possibly derived from the same methods I disagree with, I

am currently in search of alternatives that better reflect the beliefs that I sincerely and faithfully hold."

502.    The DOB denied his religious exemption because "the sincerely held religious beliefs that you

identified do not prohibit you from taking the COVID vaccine" and the Citywide Appeals Panel

affirmed that decision with no explanation.

503.    Schimenti later learned, after discovery in this case, that all three Citywide Appeals Panelists

voted to reject his appeal. David Rozen from the City Commission on Human Rights ("CCHR") commented simply "employee contradictions." Sanford Cohen from the Department of Citywide Administrative Services ("DCAS") commented, "[e]mployee's use of other products that used fetal cell lines for testing demonstrates that his opposition to COVID vaccination is a personal [sic] preference, not a sincerely held religious belief. His recital of religious beliefs is from internet template." Eric Eichenholtz from the Law Department commented, "[r]equest based on personal preference against vaccination rather than the religious belief. Articulated religious belief does not prohibit vaccination."

504.    Nevertheless, when describing a scenario in which an employee would be entitled to an exemption, Eric Eichenholtz stated under oath,

> Obviously if the employee says I'm Catholic and in my Catholic upbringing and the teachings of the church I believe that life begins at conception, life begins at fertilization, that's a religious belief, and I've practiced making sure I was never remotely connected to abortion, including I will not take any vaccines that were tested on cell lines derived from fetal cell lines, then yes, that would be a scenario.

505.    Eichenholtz also stated under oath that he did not believe there was any member of the panel who had denied an appeal on the ground that an employee has taken Pepto Bismol, that panel members did not draw adverse inferences regarding applicants' uses of over-the-counter products like Tylenol and Pepto Bismol, that in situations where an applicant had said he or she used Tylenol would not result in "a guaranteed rejection of their reasonable accommodation by any stretch of the imagination," and that no factor was ever dispositive.

506.    Eichenholtz and the other panelists violated the First Amendment, EEOC guidance, and policies under which they purported to be governed by re-casting Schimenti's profoundly religious beliefs as "personal preference[s]," giving absolutely no weight to his explanation that he was previously ignorant of over-the-counter medications' connections' to abortion and is now committed to finding alternatives that better represent his sincerely held religious beliefs, and automatically denying his application

because of his use of such medications.

507. Due to his termination, Schimenti was forced to apply for Medicaid. In order to avoid losing his house, he had to obtain a forbearance on his mortgage. He had to cash savings bonds to pay for his daughter's bridal shower, and he had no choice but to put the van that he used to transport his late son to doctor's appointments and family outings up for sale.

508. He now has high blood pressure and cardiac issues which are health problems he never before had experienced.

509. In addition to Schimenti's career at the DOB, he has moonlighted as a professional entertainer since 2007.

510. Under Eric Adams' Executive Order 62 of March 24, 2022, Schimenti can now perform in Yankee stadium as an entertainer, but he cannot work for the DOB as an employee because of his sincerely held religious beliefs.

511. Schimenti continuously struggles with the compulsion to get vaccinated against his religious beliefs so that he can get his job back. Furthermore, on June 16, 2022, Schimenti received a letter from DOB stating, among other things,

> The Department of Buildings would like to offer you the opportunity to return to employment if you become fully vaccinated, provided that you share a copy of your vaccination record to payrolltimekeeping@buildings.nyc.gov indicating that you have received or will receive at least the first dose by close of business on Thursday, June 30, 2022, and that you intend to receive the second dose by August 15, 2022. Compliance with this requirement is a condition of your return to employment with the City. Once you provide proof of full vaccination (both doses), you will be reinstated to your civic service title at your most recent salary within two weeks of submission of proof of full vaccination, with no change to benefits or break in service.

> If you wish to resume employment with the City if New York, you must provide proof of receipt of at least one dose of the vaccine by close of business on June 30, 2022.

*James Schmitt*

512.    Plaintiff James Schmitt has been employed by Parks as a plumber for the past 13 years.

513.    Schmitt is a Christian and has sincerely held religious beliefs that prevent him from getting the Covid-19 vaccination.

514.    Schmitt submitted a request for a religious exemption on October 27, 2021 and Parks denied his request on November 17, 2021.

515.    He submitted his appeal on November 22, 2021, which Parks also denied on December 28, 2021. Schmitt was then placed on leave without pay.

516.    Because Schmitt felt he had no choice but to extend his leave without pay and keep his health insurance until June 30, 2022—which is an option Parks gave him— he signed a waiver which was a condition of this option.

517.    The waiver, which he signed under protest and without prejudice to the claim that the religious accommodation process was unconstitutional, violated the Older Workers Protection Act because he did not have three weeks to review it.

518.    Because he cannot afford to lose his job and felt that he had no other choice, Schmitt has since begun the process of being vaccinated by the June 30 deadline. He is greatly distressed that Parks coerced him into this crisis of conscience.

519.    Schmitt recently learned, after discovery in this case, that two of the three Citywide Appeals Panelists voted to reject his application, while one voted to grant it. David Rozen from CCHR commented "[s]trongly held religious belief; vaccines developed using fetal cells; supportive materials; cooperative dialogue did not provide contrary materials," and voted to approve Schmitt's application. Sanford Cohen from DCAS voted to reject it and commented, "[o]pposition is personal preference against COVID vaccines. No demonstration that employee applies fetal cell line concern to any product other than COVID vax. Description of beliefs is from internet template and not credibly sincerely held."

Eric Eichenholtz from the Law Department voted to reject it without any comments.

520. Despite Mr. Cohen's comments, Eric Eichenholtz testified under oath that no implications were ever assumed by the applicants' silence.

521. On May 13, 2022, Schmitt applied for unemployment compensation from the DOL.

522. He did not apply sooner because he knew that other NYC workers in his situation were denied unemployment for "misconduct" or "quitting without good cause" for merely abiding by their sincerely held religious beliefs, and he was concerned it would be futile.

***Mass Terminations of Other Class Members***

523. Pursuant to a decision recently announced by Mayor Adams, the Defendants have sent mass notices of termination to members of the plaintiff Class. Mayor Adams has defended these firings, characterizing them not as "firing," but as "quitting" by the City's employees.

524. Many of these employees face a termination date of February 11, 2022.

525. Many of the other employees faced a February 14 termination date.

526. The mass termination of City employees who have refused to obey the various vaccine mandates because of their firmly held religious beliefs is a tremendous injustice that urgently needs to be addressed – and immediately.

***DOE Class Members***

527. One class member who was terminated from the DOE after refusing to obtain a vaccine in violation of her sincerely held religious beliefs also applied for unemployment insurance. She received two different denials from the DOL. The first one, dated January 10, 2022, stated that she was denied unemployment because she was terminated for quitting without good cause.

528. In her denial, a DOL Administrative Law Judge ("ALJ") stated, "I find that the COVID-19 vaccination policy is justified by a compelling governmental interest. Given the severity of the ongoing

COVID-19 health crisis and the need to protect the employees and children placed in the care of the employer, I find there was a compelling governmental interest justifying the vaccine mandate. As a result, I find the employer's directive was reasonable and the claimant's refusal to comply with the vaccine mandate was tantamount to quitting her job without good cause under the Labor Law . . . ."

529.    This is a consistent reason stated in the ALJ appeals, at the direction of Commissioner Reardon or with her knowledge and consent.

530.    In this case, like the others that mirror it, nothing in the hearing or evidence was submitted to support this finding of "compelling interest."

531.    Under the First Amendment, the DOL would have to justify burdening a religious adherent's exercise of religion by demonstrating not only a compelling government interest, but also that the challenged conduct was the least restrictive means of doing so.

532.    The second denial, dated February 2, 2022 stated that she was denied unemployment because she had been discharged for misconduct.

533.    The class member appealed these denials and wrote a letter to the ALJ explaining that the statements that she had "quit" and that she had been "discharged" for "misconduct" were both false, as she had been on involuntary unpaid leave since October 4, 2021, and the Citywide Appeals Panel denied her religious exemption request because of undue hardship, not because of misconduct.

534.    On March 3, 2022, the class member attended a hearing for the appeal of the denial of unemployment compensation with the ALJ who had originally denied her. She told the ALJ that she wanted to read Scriptures supporting her religious beliefs. Before the ALJ allowed her to do that, the ALJ asked the class member, "what religion is this?" to which the class member replied, "Christian, non-denominational."

535.    The ALJ then asked if the class member had ever been vaccinated, and the class member

explained that her parents had the class member vaccinated when she was a child. The ALJ replied, "[y]our parents. Are they the same religion as you?" The class member responded that they were not, and that she had become a Christian on July 18, 2021.

536.     They then had the following exchange:

Class Member: Your Honor, in Genesis 1:27, it says that God created mankind in His own

image. In Peter 2: 1, 3 ...

ALJ: Wait a minute, God ... I'm sorry, God.

Class Member: Created mankind in His own image.

ALJ: And how does that relate to not getting vaccinated?

Class Member: It means that God already created us in all His divinity. He created us with an immune system. He created us with faith, so that we have just the pure faith in Him, and that He can protect us. It means that our bodies don't belong to us. They belong to God.

ALJ: Wait, does it say that? Or does it say God created mankind in His own image?


Class Member: Genesis 1:27, God created mankind in His own image.

ALJ: Okay. And what other verses are you citing?

Class Member: 1 Corinthians 6: 19-20.

ALJ: And what does that one say?

Class Member: Don' t you realize your body is a temple of the Holy Spirit, who lives in you, and who has given you strength by God? You do not belong to yourself for God bought you with a high price, so you must honor God with your body.

ALJ: How come you didn't send me these Scriptures?

Class Member: I honestly did not know that this was going to question my faith.

ALJ: Well this is why you didn't get the vaccine, right?

Class Member: Yes .... I can send you the two 10-page letters that I wrote for my appeal.

ALJ: I don't need the letters that you wrote for your appeal. Are the Scriptures in there?

Class Member: Yes.

ALJ: Where are they?

Class Member: That I didn't send you. Those are the letters that I gave to the City of New York for the Citywide Appeal. That I did not send.

ALJ: You didn' t send it to me?

Class Member: No Your Honor. I didn't send it to anybody. I didn' t think that ... this [would] be another appeal for a religious exemption.

ALJ: Well I'm deciding if you get your unemployment benefits, so . . ..

They also had the following exchange:

ALJ: Do you take any medication?

Class Member: No. No medication.

ALJ: For anything?

Class Member: For anything, no.

ALJ: Not an Aspirin? You've never taken anything? Never taken an antibiotic for sickness?

Class Member: Honestly, I haven't gotten sick since July .... A long time ago when I was a child my mother took me to the doctor. Now I haven't gotten to the doctor.

ALJ: You haven't taken any medications at all?

Class Member: No, Your Honor. God is good; I've been healthy.

ALJ: When is the last time you took a medication, anything? An Aspirin?

Class Member: I can't remember Your Honor.

ALJ: An antibiotic?

Class Member: No.

537.    Throughout the hearing, the ALJ sounded irritated with the class member, and kept heaving exasperated sighs while she was reading her Scriptures. The class member felt like she was being bullied.

538.    Despite the widespread policies and pressure to deny religious objectors adopted by the DOL, the class member knows of other DOE teachers who were terminated for failing to be vaccinated in violation of their sincerely held religious beliefs who were granted unemployment from other administrative law judges.

539.    Another class member who applied for unemployment also received two denial letters, one for "misconduct," the other for "quitting without good cause." The ALJ on her appeal overruled both determinations:

> The credible evidence establishes that the claimant stopped working for the employer on October 1, 2021 because she did not comply with the employer's vaccine mandate, which caused her to be placed on leave without pay, which on October 6, 2021 became leave without pay when she failed to provide proof of her vaccination status by the deadline. In this case, the employer provided credible testimony to establish that these requirements were imposed upon the employer of the City of New York. Moreover, it is clear from the testimony of both the claimant and the employer that the claimant was made aware of this requirement prior to her last day of work, and understand she could lose her job if she failed to provide proof of vaccination for COVID-19. An involuntary separation from employment, is considered to be a voluntary separation from employment without good cause for the purposes of employment insurance when a claimant voluntarily engages in conduct, transgressing a legitimate known obligation, which leaves the employer no choice but to discharge the claimant.

> However, in this case, the record establishes that subsequent to the imposition of the mandate the employer permitted employees to be exempted from this mandate for religious or medical reasons based on its agreement with the claimant's union. By so doing, the employer is no longer

able to establish it had no choice but to discharge a claimant, when a claimant has submitted such a request, since it was now within the employer's control to approve or deny the request for an exemption, and thus retain the claimant as an employee. It is therefore incumbent upon the employer to clearly offer a reason for why it denied an exemption request in order to make a finding that it still had no choice but to end the claimant's employment.

The record in this case establishes that the claimant submitted a religious exemption request as specified in the arbitration agreement and provided a note from a clergyperson which was the only requirement mentioned in the agreement. The employer denied the request for the exemption. However, the employer failed at this hearing to provide any testimony from a witness with any direct knowledge about the standards or criteria used for accepting or denying such an exemption request, or the reasons why the claimant's request in particular was denied in this case. The generic denials issued by the employer to the claimant for her religious exemption also provide no clarification on this matter.

Accordingly, the employer has failed to establish that it had no choice but to end the claimant's employment which would have constituted a voluntary separation from employment without good cause for the purposes of unemployment insurance. The claimant testified that her failure to provide proof of vaccination arose out of her religious beliefs. This reason for failing to comply with the vaccine mandate in itself does not constitute misconduct for the purposes of unemployment insurance particularly  since the employer permitted exemptions for religious reasons. The employer is free to characterize the claimant's separation in any way it so chooses, or end her employment for any lawful reason, however, under these circumstances, her job ended for non-qualifying reasons for the purposes of unemployment insurance, and the determination should be overruled.

## FIRST CLAIM FOR RELIEF
### (Liability under the Free Exercise Clause By All Plaintiffs Against All Defendants)

540.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

541.    The Mandates are unconstitutional, both facially, including as applied through widespread policies and practices, and as applied to the plaintiffs and others, because they violate their right to religious freedom under the First Amendment.

542.    The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that Congress (and by extension, State and City governments) shall make no law prohibiting the free exercise of religion.

543.    Laws that burden religion are subject to strict scrutiny under the Free Exercise Clause particularly when they are not neutral or generally applicable.

544.    Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature. Indicia of animus need not appear in the text of the regulation, but must be examined in context through scrutiny of legislative history, related regulations and policies, implementing policies and commentary by decision-makers, among other sources.

545.    Mayor de Blasio, who was the architect of these Mandates, openly expressed animus towards unorthodox religions, admitting to the press that he is convinced by the Pope that scripture does not support a religious objection to vaccination, and stating that religious objections that do not comport with orthodoxy, as the mayor interprets it, will be denied an exemption from the Mandates. Official policies subsequently adopted by the various City departments and agencies mirrored the mayor's admission that the City intended to impose a special disability on employees with unorthodox religious viewpoints.

546.    A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions.

547.    All of the Mandates governing City employees (which constitute most of the Mandates) provide for highly individualized determinations by government officials about whether the employees' religious beliefs are valid and whether they seem sincere. Particularly given the City's adoption of brazenly discriminatory standards to judge these applications, and the widespread pattern of hostility and abuse, such unbridled discretion render the Mandates invalid as a facial matter.

548.    Moreover, a policy is not generally applicable if there are carve outs for secular exemptions when religious exemptions are denied, as occurs in these Mandates.

549.    A government policy can survive strict scrutiny under the Free Exercise Clause only if it

advances interests of the highest order and is narrowly tailored to achieve those interests. Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so.

550.    Here, there is no compelling reason to mandate vaccines, as the COVID-19 vaccines cannot stop the spread of disease.

551.    Moreover, to the extent that stopping the spread of COVID-19 is the interest, far more effective and less intrusive measures exist that could be adopted instead.

WHEREFORE, Plaintiffs ask the Court to declare that the Mandates are invalid on their face and as applied as a facial matter generally to all employees subject to them, and individually to the Plaintiffs and the Class because they violate the Free Exercise Clause of the First Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order that all employees who have been adversely affected by the Mandates be reinstated with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

## SECOND CLAIM FOR RELIEF
### (Liability under the Establishment Clause By All Plaintiffs Against All Defendants)

552.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

553.    The Mandates violate the Establishment Clause because the City declared, in implementing them, that they intended to preference orthodox religious beliefs over unorthodox or personally held beliefs, and the City specifically noted that they would preference Christian Scientists. Under the Larson test, this requires strict scrutiny, which the City cannot withstand.

554. The Mandates also violate the Establishment Clause because they fail the coercion test, and are enforced by the City to coerce everyone with minority religious views on vaccines to violate their faith and get vaccinated, or lose the ability to earn income anywhere in New York City for the foreseeable future.

WHEREFORE, Plaintiffs ask the Court to declare that the Mandates are unconstitutional as applied facially through general policy and practice, and as applied to the Plaintiffs and the Class because they violate the Establishment Clause of the First Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order reinstatement to all who have been adversely affected by the Mandates with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

## THIRD CLAIM FOR RELIEF
### (Hybrid Rights Claim: Violation of Substantive Due Process Rights Guaranteed by The Fourteenth Amendment to the United States Constitution And First Amendment Rights Claims)

555. The Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

556. Plaintiffs have a protected substantive due process right to be free from the forced or coerced administration of medical products, especially medical products that are experimental or could cause them harm.

557. This right is also a fundamental human right, so widely recognized as to be defined by the world courts, the laws of nations, and by the Second Circuit Court of Appeals and the Supreme Court of the

United States as a *Jus Cogens* norm.

558.     As well, or in the alternative, this right to refuse medicine is secured by the Due Process Clause of the United States Constitution and corresponding provisions in the New York State Constitution, international protocols and treaties adopted by and entered into by the United States, and by the laws and regulations of the United States and New York, to be free from burdens on rights deemed "fundamental" in nature.

559.     All of the available COVID-19 vaccines are still experimental in nature.

560.     They were rushed to market in a matter of months, skipping or glossing over most steps and avoiding years of the normally required testing process.

561.     The only available vaccines in this country are available under Emergency Use Authorization, which forbids compulsory mandates.

562.     The FDA has approved two vaccines – Pfizer's "Comernaty" vaccine and Moderna's Spikevax - but neither is available in available in the United States yet, rendering this fact meaningless for all operative purposes.

563.     Even if Comernaty and Spikevax were available, or other vaccines were licensed, these vaccines are all still undergoing clinical trials and are still blatantly experimental in nature.

564.     Under international law, national law, state law and local law, experimental medical products cannot be mandated.

565.     All vaccines, including these ones, can cause harm to some people. People with natural immunity face a greater risk of harm from COVID-19 vaccines as do certain demographic groups represented in this class – including men under twenty-five and people with certain pre-existing conditions.

566.     Under the United States Constitution, people also have a fundamental right to refuse any

medicine, whether it is experimental or not, even lifesaving medication. The Supreme Court has also recognized that making medical decisions free from state interference is a fundamental right, and that the right to bodily autonomy is one of the most sacred and well-protected rights.

567.    Considering the serious rights at stake, and the dearth of evidence to show this policy is necessary or effective in light of the fact that the vaccinated can transmit disease and have inferior immunity to those who have caught the disease, there is no rational reason to mandate vaccines for school employees, City employees or private sector workers. Given that the vaccines are still experimental, this mandate shocks the conscience.

568.    Moreover, the City lacks the police power to intervene in medical decisions that cannot meaningfully stop the spread of disease. The police power is for protection of the greater community, not for protection of the individual against himself. Making medical decisions such as this are the individual's sole and sacred right.

569.    The Mandates are not narrowly tailored to impose the least restrictive burdens on fundamental rights. Rather, they are intentionally tailored to create an outsized burden in order to coerce participation in experimental medicine for no apparent reason.

570.    Plaintiffs have no adequate remedy at law available against defendants for the injuries and the irreparable harm they imminently suffer as a direct result of the Mandates.

WHEREFORE, Plaintiffs ask the Court to declare that the Mandates are invalid facially and as applied because they violate the substantive due process rights of all covered employees, as well as hybrid rights under the First and Fourteenth Amendment, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order reinstatement of all employees who have been adversely affected by the Mandates with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs

and Class Members, and to award attorney's fees and costs to Plaintiffs.

## FOURTH CLAIM FOR RELIEF
### (Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the New York State Constitution)

571.        On behalf of themselves and the Class, the Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

572.        By their actions, as described herein, Defendants, acting under color of statute, ordinance, regulation, custom, or usage, subjected Plaintiffs to the deprivation of the rights, privileges, or immunities secured by the United States Constitution and New York Constitution.

573.        The Mandates violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (and the corresponding provisions of the New York State Constitution and New York City Charter) because they discriminate against unvaccinated people who need to exercise their fundamental rights to refuse experimental vaccines that conflict with their sincerely held religious beliefs.

574.        There is no rational basis for this discrimination. Plaintiffs pose no more danger to others than a person who is vaccinated. Both groups are equally able to spread COVID-19.

575.        The policy of discriminating based on an individual's willingness or ability to subject themselves to medical experimentation or to give up their deeply held religious beliefs shocks the conscience and cannot be justified as relating to any rational, permissible goal. It is not grounded in science, but rather in the effort to coerce people into waiving their protected rights.

576.        Plaintiffs face the loss of their employment, ability to practice their vocation, contractual rights and violation of civil rights and liberties as a result of the discriminatory regulation.

577.        Moreover, the policies adopted by the City facially discriminate against Plaintiffs

and their similarly situated class members on the basis of religion by refusing to afford accommodations to people who hold minority or unorthodox religious viewpoints.

578.    The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

579.    While performing those duties, Defendants intentionally deprived Plaintiffs of securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and the State of New York by arbitrarily discriminating against them based on medical status, religious beliefs, and creed.

WHEREFORE, Plaintiffs ask the Court to find that the Mandates are invalid facially and as applied because they violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order reinstatement to all employees who have been adversely affected by the Mandates with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

## FIFTH CLAIM FOR RELIEF
### (Violation of the Supremacy Clause of the United States Constitution and Violations of Federal Statutory Provisions Governing EUA products and Consent to Participation in Clinical Investigations)

580.    On behalf of themselves and the Class, the Plaintiffs reallege and incorporate by reference the allegations recited in all prior paragraphs of this Complaint as if fully set forth herein.

581.    Federal laws and regulations governing the approval and administration of medical products preempt all contrary or inconsistent laws of the states and/or local governments.

582.    The Mandates are patently contrary to United States law, and thus preemptedand

invalid.

583.          Title 21 of the United States Code, Section 360bbb-3(e)(1)(A)(ii), and regulations and internal protocols of the United States Food and Drug Administration promulgated thereunder, provide in relevant part that all individuals to whom an investigational product is to be administered under an Emergency Use Authorization be informed "of the option to accept or refuse administration of the product."

584.          Because all available vaccines in New York are each investigational products, with some vaccines, under some circumstances, only permitted for use under an Emergency Use Authorization, the laws and regulations of the United States prohibit state and local governments from requiring them for any person who does not consent to their administration, including Plaintiffs.

585.          Plaintiffs do not consent to being vaccinated with an experimental vaccine, especially one which violates their sincerely held religious beliefs.

586.          Title 21, Part 50 of the Code of Federal Regulations governs the protection of human subjects in the conduct of all clinical investigations regulated by the U.S. Food and Drug Administration.

587.          21 C.F.R. § 50.20 provides that, "[e]xcept as provided in §§ 50.23 and 50.24, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative."

588.          EUA vaccines and the licensed Comirnaty vaccine and Spikevax vaccine are all still being subjected to clinical trials. Population-wide surveillance and data are still being gathered for all of them, whether the "test subjects" consent or not. Whether licensed or not, all available COVID-19 vaccines are classified as experimental medicine.

107

589.	None of the exemptions provided in sections 50.23 and 50.24 apply to Plaintiffs.

590.	Plaintiffs are competent to make a decision concerning medical treatment and experimentation and will not consent.

591.	Accordingly, the Mandates also violate federal law and regulations governing the administration of experimental medicine and is thus preempted.

592.	Plaintiffs have no adequate remedy at law available against Defendants for the injuries and the irreparable harms they are suffering as a direct result of the Mandates.

WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that the Mandates violate and are preempted by the laws and regulations of the United States governing the administration of investigational medical products, for an injunction prohibiting enforcement of the Mandates, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## SIXTH CLAIM FOR RELIEF

### (Declaratory Judgment, Against Roberta Reardon in her capacity as Commissioner of the Department of Labor)

593.	Plaintiffs reallege and incorporate by reference the allegations recited in all prior paragraphs of this Complaint as if fully set forth herein.

594.	On information and belief, on or after September 26, 2021,, Commissioner Reardon, or someone under her direction and authority, decided that persons who were terminated from their jobs, or who were placed on involuntary leave without pay, for refusal to comply with the Mandate, had been terminated for "misconduct," and that subsequently, they were not entitled to

unemployment insurance.

595.    Some of the Plaintiffs have been placed on leave without pay for their principled refusal to comply with Mandate, and some of them have been terminated, or have received termination notices, for that reason. Such plaintiffs have already been refused unemployment insurance, or on information and belief, they will be refused.

596.    The cause for the denial is, or will be, Commissioner Reardon's decision that their loss of employment is due to "misconduct."

597.    None of the Plaintiffs has committed misconduct.

598.    The change in the policy of the Department of Labor was effected without compliance with the laws that govern the Department of Labor.

599.    The Department of Labor's policy to deny unemployment insurance to persons who are unemployed because they possessed religious objections to the Mandates violates the Free Expression and Establishment Clauses of the United States Constitution and similar provisions in the New York State Constitution and the New York City Charter.

WHEREFORE, Plaintiffs ask this Court to issue declaratory and injunctive relief including a declaration that the refusal to subject oneself to vaccination for reasons of religious objection cannot constitute "misconduct" and is not ground for refusing unemployment insurance; and retroactively to award unemployment insurance proceeds to cover Plaintiffs' periods of unemployment or loss of income caused by their refusal to comply with the vaccination Mandates; and to enter a permanent injunction commanding the Defendant Roberta Reardon to reverse the policy that treats religious objection to vaccination as a basis for denial of unemployment insurance benefits and forbidding the Department of Labor under her command and control from enforcing

the Mandates against Plaintiffs, awarding nominal and compensatory damages and awarding attorney's fees, costs and expenses to the Plaintiffs.

## SEVENTH CLAIM FOR RELIEF

**(Liability Under 42 U.S.C. Sec. 1983, alleged by all Plaintiffs against all Defendants)**

600.    Plaintiffs reallege and incorporate by reference the allegations recited in all prior paragraphs of this Complaint as if fully set forth herein.

601.    Defendants NYC and DOE acted under the color of state law, and at the direction of the individual Defendants, when they imposed the Mandates, cooperated in the creation of the Exemption Standards and acceded thereto, enforced and applied the terms of the Mandates and the Exemption Standards and denied Plaintiffs' requests for religious exemption and appeals from such denials and denied Plaintiffs' requests for unemployment insurance.

602.    The Plaintiffs have been, and are being, deprived by the activities of the Defendants of their right effectively to apply for and receive religious exemptions from the vaccination requirements of the Mandates.  Their right to religious freedom is being substantially and unfairly burdened.

603.    Defendants' Mandates created a system of unconstitutional and unfair exemption application procedures that are designed to deny the religious exemption applications of as many people as possible, including Plaintiffs.  Through the creation, application and enforcement of the standards and procedures set forth in the Exemption Standards, Defendants have ensured that the Plaintiffs, and many others, have been denied a fair adjudication and accommodation of their religious freedom rights.

604.    The Plaintiffs did not at any point or in any way effectively consent to the unconstitutional

110

actions of the Defendants, nor have they ever effectively waived their civil right to demand in court that the Defendants respect their First Amendment freedoms.

605.    On information and belief, Defendants former Mayor de Blasio, former Commissioner Chokshi and former NYC Schools Chancellor Meisha Porter, or subordinates directly subject to their control, formulated the Mandates that NYC and the DOE have enforced against the Plaintiffs, and conspired in the establishment of unconstitutional standards for the consideration of Plaintiffs' religious exemption requests. The successors of such officials continue unlawfully to enforce said restrictions and policies in violation of Plaintiffs' constitutional rights.

606.    Plaintiffs have suffered damages, including without limitation lost salaries, lost potential earnings, loss of health insurance coverage, loss of seniority, loss of employment and deprivation of their right to religious freedom.

WHEREFORE, Plaintiffs request judgment declaring that the Mandates, as implemented by the Exemption Standards and the Citywide Appeals Panel process, are void and unenforceable as against them and all other persons similarly situated, an award of damages as further described above in an amount to be determined by the Court, or nominal damages, and an award requiring Defendants to pay Plaintiffs' legal fees and expenses in this matter pursuant to 42 U.S.C. Sec. 1983.

## EIGHTH CLAIM FOR RELIEF

**Violation of the New York City Human Rights Law, alleged by all Plaintiffs against All Defendants**

607.    Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

608.     In 2005, the City Council amended the administrative code to emphasize the New York City Human Rights Law's (NYCHRL) uniquely broad and remedial purposes, and again in 2016 to clarify its intent to foster jurisprudence that maximally protects civil rights in all circumstances. Therefore, although Title VII's analytical framework is applicable to the NYCHRL, claims under the City law must be reviewed "independently from and more liberally than their federal and state counterparts." *Loeffler v. Staten Island Univ. Hosp*., 582 F.3d 268, 278 (2d Cir. 2009) (internal quotation marks omitted); *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78, 947 N.E.2d 135, 922 N.Y.S.2d 244 (2011) (requiring the NYCHRL to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible"); *Makinen v. City of NY*, 857 F3d 491, 495 (2d Cir. 2017).

609.     Defendants have adopted an unlawful discriminatory practice by imposing vaccine mandates upon Plaintiffs and Class Members as a condition of retaining their employment, while denying their religious exemption requests, because complying with the mandates would require Plaintiffs and Class Members to violate their sincerely held religious beliefs and practices.

610.     Plaintiffs and all similarly situated Class Members have sincere religious beliefs against vaccination. They alerted the Defendants that they are unable to be vaccinated because of these beliefs, but were nonetheless suspended or segregated or otherwise adversely impacted because Defendants refused to accommodate their sincerely held religious beliefs.

611.     Plaintiffs and Class Members were furthermore then harassed, retaliated against and further discriminated against as a result of their sincerely held religious beliefs and creed.

612.     The New York City Human Rights Law applies to the proceedings of the individual agencies as well as the Citywide Appeals Panel.

613.   "Importantly, in contrast to Title VII which does not define 'undue hardship' in the context of religious accommodation, the NYCHRL adopts a rigorous definition of an employer's 'undue hardship' as 'an accommodation requiring significant expense or difficulty,' and mandating that '[t]he employer shall have the burden of proof to show such hardship.'" *Litzman v. New York City Police Dep't*, 2013 U.S. Dist. LEXIS 162968, *20 (S.D.N.Y. 2013) (quoting N.Y.C. Admin. Code § 8-107(3)(b)).

614.   Defendants engaged in no bona fide effort to demonstrate that an undue hardship under the NYCHRL exists.

615.   Despite the fact that Plaintiff Kolenovic's initial denial stated that her application was reviewed under "applicable law," her initial denial and and other Class Members' initial denials stated that accommodating them would be an "undue hardship (i.e. more than a minimal burden) on the DOE and its operations." This failed to take into account the heightened undue hardship standard of the New York City Human Rights Law.

616.   Defendants' adjudications also violate the New York State Human Rights Law, which states that an undue hardship exists when the accommodation would cause significant expense or difficulty, not "more than a minimal burden" (which is the standard under Title VII). The DOE's claim that accommodating Plaintiffs would be more than a minimal burden on the DOE incorrectly states the standard for undue hardship and cannot constitute a valid reason for denying Plaintiffs' requests.

617.   The DOE's claim that accommodating Plaintiff Kolenovic and other proposed Class Members would be more than a minimal burden on the DOE incorrectly states the standard for

undue hardship and cannot constitute a valid reason for denying Plaintiff Kolenovic and other proposed Class Members' requests.

618.    The denial of the appeals filed by Plaintiff Kolenovic and Class Members after the so-called "fresh consideration" of the Citywide Appeals Panel stated that accommodation would impose undue hardship on the employer, but made no attempt to distinguish why it was an undue hardship under Title VII, why it was an undue hardship under the New York State Human Rights Law, and why it was an undue hardship under the New York City Human Rights Law—which is what the law requires.

619.    Plaintiff Agovino was denied his religious exemption at the agency level on the basis of undue hardship to the DOC, even though he did not come into contact with detainees and rarely came into contact with those who did come into contact with them, detainees were not required to be vaccinated, and visitors to the jails were not required to be vaccinated. The Citywide Appeals Panel later affirmed his denial on the basis of undue hardship – which was not explained.

620.    Plaintiff O'Dea was denied her religious exemption at the agency level because of the "potential undue hardship" to the FDNY. The Citywide Appeals Panel later affirmed this denial partially on this basis.

621.    Plaintiff Fogarty was denied his religious exemption at the agency level because of the "potential undue hardship" to the FDNY. Two members of the Citywide Panel later affirmed this denial partially on this basis.

622.    Plaintiff Pillet was denied his religious exemption at the agency level because of the "potential undue hardship" to the FDNY. The Citywide Appeals Panel later affirmed this denial partially on this basis.

623. Plaintiff Paolillo was denied his religious exemption at the Citywide Appeals Panel level partially on this basis, even though his agency never cited it as a reason for his denial.

624. Neither the city agencies nor the Citywide Appeals Panel carried their burdens to demonstrate why the requested accommodations would constitute an undue hardship under Title VII, an undue hardship under the New York State Human Rights Law, and an undue hardship under the New York City Human Rights Law—which is what the law requires.

625. In fact, neither the FDNY nor the Citywide Appeals Panel even explained why accommodating Plaintiff O'Dea would be more than a "potential for undue hardship"—which does not even satisfy Title VII and the EEOC guidance.

626. Furthermore, Eric Eichenholtz—an attorney in the City's Law Department who played a critical role in the formation of the Citywide Appeals Panel, provided consultation regarding the standards to be applied by the Citywide Appeals Panel, and served on the Citywide Appeals Panel himself—appeared to not even know that there is a heightened "undue hardship" standard in the New York City Human Rights Law and stated that the Citywide Appeals Panel followed only the EEOC guidance and the "more than a de minimus burden" standard when assessing undue hardship.

627. Mr. Eichenholtz himself denied Plaintiff Kolenovic on this basis.

628. DOE Plaintiff Kolenovic taught her students remotely during the height of the pandemic.

629. FDNY Plaintiff O'Dea worked throughout the pandemic and until February 2022, and Plaintiff Pillet worked throughout the pandemic and up until May 2022, all while engaging in periodic testing, daily temperature checks, and daily masking and not imposing an undue hardship on the FDNY's operations.

630.    During this time, Plaintiff O'Dea received a second Prehospital Save Commendation for assisting with a patient who was in cardiac arrest and who, due to her efforts, regained a heargbeat and was discharged. Yet her continued employment was later considered a "potential for undue hardship" to the FDNY.

631.    Plaintiff O'Dea has since gotten a job as a paramedic in New Jersey, fulfilling the very same role that she fulfilled while working for the FDNY, yet her employer has not concluded that she poses an undue hardship on its operations.

632.    The Citywide Panel made no independent inquiry of whether accommodating applicants would pose an undue hardship to the various agencies' operations, instead relying on whatever agency description of undue hardship already existed in the record. Such descriptions were either nonexistent or threadbare, failing in each instance to incorporate the factors that EEOC guidance and the state and city human rights laws set forth for assessing whether an employer has demonstrated an undue hardship.

633.    The Citywide Panel also did not seek information regarding whether employees posed a direct threat to others, the number of employees agencies could afford to accommodate, agencies' ability to make payroll, any additional costs of accommodating employees, the degree to which the geographic separateness or administrative or fiscal relationship of the facilities would make accommodations more difficult or expensive, agencies' capacities to work with remote workers, agencies' number of available remote sites, agencies' remote site capacities, as well as whether other alternatives were explored—all factors that the state and city human rights laws set forth for assessing whether an employer has demonstrated an undue hardship.

634.    Eric Eichenholtz testified under oath that, "I know of no legal requirement that requires at

116

the appellate phase of a review that that sort of assessment be provided at that level of detail."

635.     Additionally, Defendants have not stated a cost of accommodating Plaintiffs, including the costs of loss of productivity and of retaining or hiring employees. In fact, Defendants' cost of not accommodating Plaintiffs itself constitutes a significant expense or difficulty on the DOE, as the DOE is currently facing a teaching shortage and has invited teachers who have tested positive for Covid-19 back into the classrooms, when Plaintiff Kolenovic and Proposed Class Members are ready and willing to resume their teaching positions.

636.     Had the Citywide Appeals Panel sought additional information regarding undue hardship, it might have learned that, for example, contrary to the DOE's representations to the contrary, remote instruction is still being provided through a DOE program called Home Instruction Schools during the 2021-2022 school year. *See, e.g.*, *Per Session Vacancy Notice #0610: Guidance Counselor – ASPDP Stipulation Instructor (Office of Teacher Development)*, NYC Department of Education, posted Jan. 20, 2022, https://www.schools.nyc.gov/careers/job-opportunities/contentdetails/per-session-vacancy-notice-0610 (last visited June 16, 2022) (option to offer "Virtual, Synchronous Instruction using Zoom technology").

637.     They might also have found out that one of the DOE's remote workspaces—located at 1087 Ocean Avenue, Brooklyn, NY 11230 (the "Brooklyn Worksite")—currently accommodates only about 30 DOE employees when it has a capacity of more than 312.

638.     Specifically, no remote workers are using the basement cafeteria of the Brooklyn Worksite, which itself has a maximum capacity of 312 people.

639.     Upon information and belief, there are at least five classrooms on the second floor of the

Brooklyn Worksite, all of which could accommodate at least four to six teachers (if not more), which are currently only being used to accommodate only one or two people or are not being used to accommodate anyone at all.

Upon information and belief, there are at least two to three classrooms on the third floor of the Brooklyn Worksite, all of which could accommodate at least four to six teachers (if not more), which are currently being used to accommodate only one or two people. There are other open classrooms on the third floor that are not being used to accommodate anyone at all.

640.    There are also locked classrooms on both the second and third floors of the Brooklyn Worksite that are not being used to accommodate anyone at all.Accommodating Plaintiffs and Class members will not result in their inability to perform the essential functions of their positions, as most are willing to engage in masking, social distancing, and periodic testing.


WHEREFORE, Plaintiffs ask the Court to declare that the Defendants have violated their rights and the rights of Class Members under the New York City Human Rights Law, to permanently enjoin the enforcement of the mandates against employees asserting sincere religious objection to vaccination, and to order the Defendants to restore all employees who have been adversely affected by the Mandates to employment with their respective agencies with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

## **NINTH CLAIM FOR RELIEF**

**Violation of the New York State Human Rights Law, alleged by all Plaintiffs against All Defendants**

641.    Plaintiffs reallege and incorporate by reference the allegations recited in all prior paragraphs of this Complaint as if fully set forth herein.

642.    Defendants have adopted an unlawful discriminatory practice by imposing vaccine mandates upon Plaintiffs and Class Members as a condition of retaining their employment, while denying their religious exemption requests, because complying with the Mandates would require Plaintiffs and Class Members to violate their sincerely held religious beliefs and practices.

643.    Plaintiffs and all similarly situated Class Members have sincere religious beliefs against vaccination. They alerted the Defendants that they are unable to be vaccinated because of these beliefs, but were nonetheless suspended or segregated or otherwise adversely impacted because Defendants refused to accommodate their sincerely held religious beliefs.

644.    Plaintiffs and Class Members were furthermore then harassed, retaliated against and further discriminated against as a result of their sincerely held religious beliefs and creed.

645.    Defendants engaged in no bona fide effort to demonstrate that an undue hardship exists.

646.    Despite the fact that Plaintiff Kolenovic's initial denial stated that her application was reviewed under "applicable law," her initial denial and and other Class Members' initial denials stated that accommodating them would be an "undue hardship (i.e. more than a minimal burden) on the DOE and its operations." This failed to take into account the heightened undue hardship standard of the New York City State Rights Law.

647.    The DOE's claim that accommodating Plaintiff Kolenovic and other proposed Class Members would be more than a minimal burden on the DOE incorrectly states the standard for undue hardship and cannot constitute a valid reason for denying Plaintiff Kolenovic and other proposed Class Members' requests.

648.     Plaintiff Kolenovc and Class Members' denials after the so-called "fresh consideration" of the Citywide Appeals Panel stated undue hardship, but made no attempt to distinguish why it was an undue hardship under Title VII, why it was an undue hardship under the New York State Human Rights Law, and why it was an undue hardship under the New York City Human Rights Law— which is what the law requires.

649.     Plaintiff Agovino was denied his religious exemption at the agency level on the basis of undue hardship to the DOC, even though he did not come into contact with detainees and rarely came into contact with those who did come into contact with them, detainees were not required to be vaccinated, and visitors to the jails were not required to be vaccinated. The Citywide Appeals Panel later affirmed his denial on this basis.

650.     Plaintiff O'Dea was denied her religious exemption at the agency level because of the "potential undue hardship" to the FDNY. The Citywide Appeals Panel later affirmed this denial partially on this basis.

651.     Plaintiff Fogarty was denied his religious exemption at the agency level because of the "potential undue hardship" to the FDNY. Two members of the Citywide Panel later affirmed this denial partially on this basis.

652.     Plaintiff Pillet was denied his religious exemption at the agency level because of the "potential undue hardship" to the FDNY. The Citywide Appeals Panel later affirmed this denial partially on this basis.

653.     Plaintiff Paolillo was denied his religious exemption at the Citywide Appeals Panel level partially on this basis, even though his agency never cited it as a reason for his denial.

654.     Neither the city agencies nor the Citywide Appeals Panel carried their burdens to

demonstrate why the requested accommodations would constitute an undue hardship under Title VII, an undue hardship under the New York State Human Rights Law, and an undue hardship under the New York City Human Rights Law—which is what the law requires.

655. In fact, neither the FDNY nor the Citywide Appeals Panel even explained why accommodating Plaintiff O'Dea would be more than a "potential for undue hardship"—which does not even satisfy Title VII and the EEOC guidance.

656. Furthermore, Eric Eichenholtz—an attorney in the City's Law Department who played a critical role in the formation of the Citywide Appeals Panel, provided consultation regarding the standards the Citywide Appeals Panel applied, and served on the Citywide Appeals Panel himself—appeared to not even know that there is a heightened "undue hardship" standard in the New York State Human Rights Law and stated that the Citywide Appeals Panel followed only the EEOC guidance and the "more than a de minimus burden" standard when assessing undue hardship.

657. Mr. Eichenholtz himself denied Plaintiff Kolenovic on this basis.

658. DOE Plaintiff Kolenovic taught her students remotely during the height of the pandemic.

659. FDNY Plaintiff O'Dea worked throughout the pandemic and until February 2022, and Plaintiff Pillet worked throughout the pandemic and up until May 2022, all while engaging in periodic testing, daily temperature checks, and daily masking and not imposing an undue hardship on the FDNY's operations.

660. During this time, Plaintiff O'Dea received a second Prehospital Save Commendation for assisting with a patient who was in cardiac arrest and who, due to her efforts, regained a heargbeat and was discharged. Yet her continued employment was later considered a "potential for undue

hardship" to the FDNY.

661.    Plaintiff O'Dea has since gotten a job as a paramedic in New Jersey, fulfilling the very same role that she fulfilled while working for the FDNY, yet her employer has not concluded that she poses an undue hardship on its operations.

662.    The Citywide Panel made no independent inquiry of whether accommodating applicants would pose an undue hardship to the various agencies' operations, instead relying on whatever agency description of undue hardship already existed in the record. Such descriptions were either nonexistent or threadbare, failing in almost all respects to incorporate the factors that EEOC guidance and the state and city human rights laws set forth for assessing whether an employer has demonstrated an undue hardship.

663.    The Citywide Panel also did not seek information regarding whether employees posed a direct threat to others, the number of employees agencies could afford to accommodate, agencies' ability to make payroll, any additional costs of accommodating employees, the degree to which the geographic separateness or administrative or fiscal relationship of the facilities would make accommodations more difficult or expensive, agencies' capacities to work with remote workers, agencies' number of available remote sites, agencies' remote site capacities, as well as whether other alternatives were explored—all factors that the state and city human rights laws set forth for assessing whether an employer has demonstrated an undue hardship.

664.    Eric Eichenholtz testified under oath that, "I know of no legal requirement that requires at the appellate phase of a review that that sort of assessment be provided at that level of detail."

665.    Additionally, Defendants have not stated a cost of accommodating Plaintiffs, including the costs of loss of productivity and of retaining or hiring employees. In fact, Defendants' cost of not

accommodating Plaintiffs itself constitutes a significant expense or difficulty on the DOE, as the DOE is currently facing a teaching shortage and has invited teachers who have tested positive for Covid-19 back into the classrooms, when Plaintiff Kolenovic and Proposed Class Members are ready and willing to resume their teaching positions.

WHEREFORE, Plaintiffs ask the Court to declare that the Defendants have violated their rights and the rights of Class Members under the New York State Human Rights Law, to permanently enjoin the enforcement of the mandates against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

**REQUEST FOR RELIEF**

Plaintiffs respectfully ask this Court for the following relief:

1. Certifying the proposed Class pursuant to Rule 23;

2. Declaring the Mandates unconstitutional on their face and as applied to the Plaintiffs and the Class they represent;

3. Enjoining enforcement of the Mandates generally and against the Plaintiffs and the

Class they represent;

4. Declaring the Department of Labor policy denying unemployment benefits to persons who refused vaccination on the basis of religious conviction to be unlawful, compelling the Labor Commissioner to reverse said policy and forbidding said Department from enforcing it against Plaintiffs and the Class they represent, and awarding unemployment insurance to said persons;

5. Reinstating any employees who were suspended or disciplined for failure to follow the mandate against religious convictions, and restoring their benefits, status and accrued rights as set forth above; and

6. Damages as set forth above, Attorney's fees and costs to Plaintiffs.

7. On all Claims for Relief: awarding relief to the Class equivalent to the relief requested for the individual named Plaintiffs identified herein.

8. On all Claims for Relief: awarding costs of suit; investigation costs; payment of reasonable attorneys' fees; declaratory relief, injunctive relief, and such other and further relief as the Court may deem just and proper.

<u>CONCLUSION</u>

Plaintiffs respectfully ask that the Court act immediately to enjoin the Defendants from terminating thousands of their religiously-observant employees, who have thus far received intolerant and unconstitutional mistreatment of their religious accommodation requests at the hands of City employees, to reverse the termination of such employees who have already been terminated, and to make whole each person who has been harmed by Defendants' aversion to religious freedom.

<u>DEMAND FOR</u>
<u>JURY TRIAL</u>

Plaintiffs and the Class respectfully demand a trial by jury for all issues so triable in this action.

Dated:  New York, New York
        June 17, 2022

                            Respectfully submitted,

                            NELSON MADDEN BLACK LLP
                            *Attorneys for Plaintiffs and the Class*

                            */s/ Jonathan R. Nelson*
                            **By: Jonathan Robert Nelson (JN8796)**
                            Barry Black
                            Sarah E. Child
                            475 Park Avenue South, Suite 2800
                            New York, NY 10016
                            (212) 382-4300
                            jnelson@nelsonmaddenblack.com

                            GIBSON LAW FIRM, PLLC

                            */s/ Sujata S. Gibson*
                            **Sujata S. Gibson**
                            *Attorney for Plaintiffs and the Class*
                            Gibson Law Firm, PLLC
                            408 W Martin Luther King, Jr. Street
                            Ithaca, NY 14850
                            (607) 327-4125
                            sujata@gibsonfirm.law

                            Mary Holland, Esq., *Of Counsel*
                            Michael Howard Sussman, Esq., *Of Counsel*