**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

NEW YORKERS FOR RELIGIOUS LIBERTY, INC., GENNARO AGOVINO, CURTIS CUTLER, LIZ DELGADO, JANINE DEMARTINI, BRENDAN FOGARTY, SABINA KOLENOVIC, KRISTA O'DEA, DEAN PAOLILLO, DENNIS PILLET, MATTHEW RIVERA, LAURA SATIRA, FRANK SCHIMENTI, JAMES SCHMITT, individually and on behalf of all other persons similarly situated,

**MEMORANDUM OF LAW**

1:22-cv-00752 (DG) (VMS)

Plaintiffs,

- against -

THE CITY OF NEW YORK; ERIC ADAMS, in his official capacity as Mayor of the City of New York, DAVE CHOKSHI, in his official capacity as Health Commissioner of the City of New York, and ROBERTA REARDON, in her capacity as New York State Commissioner of Labor,

Defendants.

------------------------------------------------------------------- x

---

**PLAINTIFFS' MEMORANDUM OF LAW CHALLENGING REPORT AND RECOMMENDATION ORDER RE PLAINTIFFS' MOTION TO AMEND**

---

Gibson Law Firm, PLLC
Sujata S. Gibson, Esq.
416 N. Tioga Street
Ithaca, NY 14850
(607) 327-4125
Email: sujata@gibsonfirm.law

# TABLE OF CONTENTS


TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

STANDARD OF REVIEW .......... 1

ARGUMENT .......... 2

I. THE R&R IMPROPERLY CONDITIONS AMENDMENT ON DELETING CLAIMS AND ALLEGATIONS ALREADY IN THE OPERATIVE COMPLAINT .......... 2

II. THE ESTABLISHMENT CLAUSE CLAIMS ARE NOT FUTILE .......... 2

A. Legal Standard .......... 3

B. The DOE Plaintiffs Plead Viable Establishment Clause Claims .......... 3

C. The Municipal Employees Plead Viable Establishment Clause Claims .......... 5

D. The Newly Disclosed Chokshi Correspondence Supplies the Missing Nexus and Supports Strict Scrutiny .......... 8

III. THE R&R SHOULD NOT BE CONSTRUED TO NARROW PLAINTIFFS' SURVIVING FREE EXERCISE CLAIMS .......... 11

IV. THE R&R IMPROPERLY REJECTS PERSONAL-CAPACITY LIABILITY AGAINST CHOKSHI AND ADAMS .......... 13

A. The SAC Plausibly Alleges Chokshi's Own Unconstitutional Conduct .......... 13

B. Plaintiffs Separately Object to the Dismissal of Adams' Personal-Capacity Claims .......... 15

V. THE R&R'S LIMITATIONS ANALYSIS SHOULD NOT BAR THE NEWLY IDENTIFIED DEFENDANTS AT THE PLEADING STAGE .......... 17

A. R&R's Chronology Does Not Account for the Court-Directed Amendment Process ....17

B. Equitable Estoppel Precludes Dismissal ....18

C. Plaintiffs Preserve Their Rule 15(c) Relation-back Objections ....19

VI. THE R&R'S RULE 8 ANALYSIS AND 15,000-WORD LIMIT ....19

CONCLUSION ....20

# TABLE OF AUTHORITIES

**Cases**

*Anderson News, L.L.C. v. American Media, Inc*,
680 F.3d 162 (2d Cir. 2012) ........................................ 15

*Bensinger v. Denbury Resources Inc.*,
31 F. Supp. 3d 503 (E.D.N.Y. 2014) ........................................18

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*,
605 U.S. 238 (2025) ........................................ 3, 6

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ........................................11

*Citizens United v. FEC*,
558 U.S. 310 (2010)........................................11

*Commack Self-Serv. Kosher Meats, Inc. v. Weiss*,
294 F.3d 415 (2d Cir. 2002)........................................3, 4, 7, 14

*Dodds v. Richardson*,
614 F.3d 1185 (10th Cir. 2010) ........................................14

*Duchesne v. Sugarman*,
566 F.2d 817 (2d Cir. 1977)........................................14

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*,
494 U.S. 872 (1990)........................................ 3, 4

*Foman v. Davis*,
371 U.S. 178 (1962)........................................ 2

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021)........................................13

*Gardner-Alfred v. Fed. Reserve Bank of N.Y.,*
143 F.4th 51 (2d Cir. 2024) ........................................14

*Jolly v. Coughlin,*
76 F.3d 468 (2d Cir. 1996) ........................................14

*Kane* v. *De Blasio*,
19 F.4th 152, (2d Cir. 2021) ........................................*passim*

*Larson v. Valente*,
456 U.S. 228 (1982) ....................................................................................3

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ....................................................................................2

*Lucente v. Int'l Bus. Machs. Corp.*,
310 F.3d 243 (2d Cir. 2002)....................................................................................2

*M.A. v. Rockland County Department of Health,*
53 F.4th 29 (2d Cir. 2022) .................................................................... 12, 16, 17

*Masterpiece Cakeshop v. Colorado C.R. Comm'n,*
584 U.S. 617 (2018)............................................................................................. 11

*New Yorkers for Religious Liberty, Inc. v. City of New York,*
125 F.4th 319 (2d Cir. 2024) ....................................................................*passim*

*NRA v. Vullo,*
602 U.S. 175 (2024)............................................................................................. 15

*Pearl v. City of Long Beach,*
296 F.3d 76 (2d Cir. 2002) .................................................................................. 18

*Quaratino v. Tiffany & Co.,*
71 F.3d 58 (2d Cir. 1995) ......................................................................................2

*Rothman v. Gregor,*
220 F.3d 81 (2d Cir. 2000) .................................................................................. 18

*Spivack v. City of Philadelphia*,
109 F.4th 158 (3d Cir. 2024) ............................................................................... 16

*Tangreti v. Bachmann,*
983 F.3d 609 (2d Cir. 2020)...................................................................... 13, 14, 19

**Statutes or Rules**

28 U.S.C. § 636(b)(1) ....................................................................................1

Federal Rule of Civil Procedure 12(b)(6) ....................................................................................2

Federal Rule of Civil Procedure 15(a)(2) ....................................................................................1

Federal Rule of Civil Procedure 15(c) ........................................................................... 18, 19

Federal Rule of Civil Procedure 15(d) ....................2

Federal Rule of Civil Procedure 72(b)(3) ....................1

New York City Human Rights Law ....................1

New York State Human Rights Law ....................1

Title VII of the Civil Rights Act of 1964 ....................1

U.S. Const. amend. I, cl. 1 ....................1, 11, 13, 20

U.S. Const. amend. I, §1 ....................*passim*

U.S. Const. amend XIV, §1, cl. 1 ....................1, 20

## PRELIMINARY STATEMENT

Pursuant to 28 U.S.C. § 636(b)(1), Plaintiffs respectfully object to the July 31, 2026 Report and Recommendation ("R&R"), ECF No. 154. Plaintiffs do not object to the recommendations permitting the addition of Title VII claims and Plaintiffs Kouame, Smith, and Jurado; or the maintenance of the as-applied Free Exercise, Equal Protection, NYSHRL, and NYCHRL claims; or municipal liability. They object to the adverse recommendations conditioning amendment on withdrawal of existing claims and deletion of more than two-thirds of the operative complaint's allegations, and to the conclusions concerning the Establishment Clause, the scope and governing scrutiny of the surviving Free Exercise claims, individual liability, and relation back.

This case comes before the Court on a motion to amend—not a motion to dismiss. The R&R nevertheless makes dispositive determinations concerning claims already pending in the FAC, draws inferences against Plaintiffs in assessing futility, and finds proposed claims untimely without accounting for the Court-directed premotion and bundling procedures.

Amendment is necessary and causes no prejudice. The 2022 FAC predates many Plaintiffs' accommodation denials and terminations, intervening appellate guidance, and substantial factual development concerning the City's accommodation policies. More than four years after filing, Defendants have not answered and discovery has not begun. Plaintiffs therefore respectfully request leave to file the proposed substitute SAC at ECF No. 152-1 and permit any challenges to the resulting operative pleading to proceed through ordinary Rule 12 motion practice.

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(3), the Court reviews the objected-to portions of the R&R de novo. Rule 15(a)(2) directs courts to "freely give leave [to amend] when justice so requires," reflecting the Second Circuit's "strong preference for resolving

disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). Leave generally should be denied only for undue delay, bad faith, prejudice, or futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Rule 15(d) likewise permits supplementation based on post-pleading events and is governed by the same liberal standard. Fed. R. Civ. P. 15(d); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995). Futility is governed by Rule 12(b)(6), requiring the Court to accept well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

## ARGUMENT

### I. THE R&R IMPROPERLY CONDITIONS AMENDMENT ON DELETING CLAIMS AND ALLEGATIONS ALREADY IN THE OPERATIVE COMPLAINT

The R&R does not merely reject proposed amendments. It conditions filing an SAC on deleting or limiting claims already pending in the FAC and removing more than two-thirds of its allegations, without identifying which allegations must be removed. Adopted literally, it would require Plaintiffs to surrender pending claims as the price of making amendments the R&R permits.

Denial of leave to amend does not dismiss claims in the operative complaint. Defendants have neither answered the FAC nor moved to dismiss it, but instead effectively obtained adjudication of "a motion to dismiss they have never filed." ECF No. 150 at 4–5. That circumvents the procedure established by this Court, which sequenced amendment before any motion to dismiss. Gibson Decl. Ex. A (12/2/24 Tr. 11–12).

### II. THE ESTABLISHMENT CLAUSE CLAIMS ARE NOT FUTILE

Plaintiff objects to the effective dismissal of Establishment Clause claims. The R&R reasons that *New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th 319 (2d Cir. 2025)

("*NYFRL*"), rejected the Establishment Clause challenge brought by separate plaintiffs in the *Kane/Keil* matter and that the proposed SAC does not alter that result. R&R 38–40. That conclusion reads *NYFRL* too broadly and fails to credit the SAC's materially expanded allegations.

*NYFRL* did not categorically foreclose Establishment Clause challenges here. It held that the Consolidated Amended Complaint in the separate *Kane/Keil* action—which involved only the DOE Mandate—did not plead the "multiple tracks" theory plaintiffs' counsel later advanced at oral argument and failed to provide a "tangible connection" between Mayor de Blasio's statements and the DOE accommodation process at issue. 125 F.4th at 330–31. Those pleading deficiencies are not law of the case as to the operative or proposed pleadings here, and the SAC supplies the missing allegations and more.

**A. Legal Standard**

The Establishment Clause prohibits government from officially preferring one denomination over another or "lend[ing] its power to one or the other side in controversies over religious authority or dogma." *Larson v. Valente*, 456 U.S. 228, 244 (1982); *Employment Division v. Smith*, 494 U.S. 872, 877 (1990). Even subtle governmental distinctions "between religions along theological lines" trigger strict scrutiny. *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238, 247–50 (2025); see also *Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 425–30 (2d Cir. 2002).

**B. The DOE Plaintiffs Plead Viable Establishment Clause Claims**

DOE Plaintiffs were first subjected to the Stricken Standards, which expressed denominational preferences on their face. In the preliminary-injunction appeal in *Kane*, the Second Circuit found the process likely unconstitutional because the standards favored "recognized and established religious organizations," permitted denial where a religious leader supported vaccination, and

disfavored objections deemed "personal." 19 F.4th at 167–69. Following that ruling, all *Kane* plaintiffs were offered "remedial review" purportedly governed by neutral statutory standards, including those who had not originally applied.

The *Kane/Keil* litigation later returned to the Second Circuit in the consolidated *NYFRL* appeal after dismissal of the plaintiffs' amended complaint. In assessing whether that subsequent review had cured the original constitutional injury, *NYFRL* reinstated Solon's as-applied First Amendment claim because never received a fresh review and remained injured by a denial issued under the standards found "very likely unconstitutional." 125 F.4th at 334. The SAC alleges that Kouame's claim follows the same path. SAC ¶¶ 513–21. Like Solon, Kouame never received fresh review before the threatened harm forced her compliance. Her claim should proceed for the same reason.

Kolenovic alleges a different failure of remediation: she alleges that the remedial review did not remediate the harm. There is no doubt that Kolenovic was discriminated against in her original denial. At her SAMS hearing, DOE invoked a City-supplied article concerning a vaccinated Muslim leader and argued: "If religious leaders are publicly in support of the vaccine, this must be denied." SAC ¶ 480. Kolenovic explained that the person identified by the City was not her religious leader, but DOE rejected that distinction. *Id.* ¶ 481. The SAC alleges that this was not isolated; the City supplied DOE representatives and arbitrators with denomination-specific materials used against applicants whose beliefs differed from positions attributed to selected religious authorities. *Id.* ¶¶ 149–53. This violates the Establishment Clause. Government may not select who speaks for an adherent's faith and use that selection to determine the adherent's religious obligations. See *Smith*, 494 U.S. at 877; *Commack*, 294 F.3d at 425–30.

The SAC also shows that Kolenovic's later Citywide Panel review did not cure the injury. She pleads the "multiple tracks" theory absent from the prior complaint: 165 DOE employees who

qualified under the Stricken Standards remained accommodated throughout the Mandate, while employees rejected under those religious criteria faced a later Panel process imposing an additional blanket undue-hardship barrier. SAC ¶¶ 163–67, 192–95. The Panel affirmed "undue hardship" as to Kolenovic without explaining why she could not be accommodated like those 165 employees who'd been preferenced under the old standard. *Id.* ¶¶ 491–506. Had she satisfied the preferred religious criteria, the SAC alleges, she would have remained employed. Those facts show special disability imposed on disfavored beliefs, a square Establishment Clause violation.

**C. The Municipal Employees Plead Viable Establishment Clause Claims**

The Municipal Employee also assert viable Establishment Clause claims in multiple different ways. For example, the SAC asserts that after *Kane* found the DOE Stricken Standards "very likely unconstitutional," the City did not repudiate those standards or vacate or remediate decisions made under them. Instead, it expanded their use beyond DOE, offering a SAMS appeal expressly governed by the Stricken Standards as an alternative to the Citywide Panel in nearly every City agency. SAC ¶¶ 215, 252–55, 325–26, 734. Thus, the SAC alleges not merely a failure to disavow the discriminatory criteria identified in *Kane*, but their affirmative continuation and expansion into a new Citywide two-track system.

The distinction between those tracks was substantive. The SAMS process was narrow and discriminatory regarding which religions qualified. SAC ¶ 253. However, employees who satisfied those religious criteria could not then be denied on undue-hardship grounds and "shall" remain on payroll. *Id.* ¶ 254. The alternative Citywide Panel route was available to more religions but imposed an additional undue-hardship inquiry not imposed on Christian Scientists and those who qualified under the narrower policy. *Id.* ¶¶ 255–68. Thus, the SAC plausibly alleges a system in which access to the more favorable route depended upon theological criteria expressly

privileging institutional and established religion. That is precisely the type of governmental differentiation "between religions along theological lines" that is subject to strict scrutiny. *Catholic Charities Bureau, Inc*, 605 U.S. at 248–50.

The municipal claims also present a much more direct nexus between City policymakers and the challenged accommodation process than the *Kane/Keil* pleading considered in *NYFRL*. The SAC alleges that religious-accommodation determinations were centrally coordinated rather than independently developed by individual agencies. City agencies made initial determinations pursuant to guidance from DCAS and the Law Department; DCAS conducted meetings and issued instructions and written materials concerning the standards to be applied; and agency EEO personnel sought direction from DCAS concerning individual requests. SAC ¶¶ 214–26.

The SAC also identifies the substantive religious judgments embedded in that centralized guidance. Plaintiffs allege that DCAS and the Law Department instructed agencies and the Citywide Panel to treat beliefs personally derived through prayer, guidance from God, or an individual understanding of faith as merely "personal" when they did not conform to institutional religious authority. *Id.* ¶¶ 227–32. Applicants whose understanding of their faith differed from the position attributed by the City to their denomination were rejected because the City regarded their beliefs as idiosyncratic, insufficiently orthodox, or mistaken about what their religion actually required. *Id.*

Nor are those allegations abstract. The SAC identifies a DCAS memorandum containing statements from selected leaders of Judaism, Protestant Christianity, Catholicism, Islam, Evangelical Christianity, Hinduism, Orthodox Christianity, and the Church of Jesus Christ of Latter-day Saints endorsing vaccination, and alleges that the City treated those authorities as

evidence against employees whose own religious beliefs required otherwise. SAC ¶¶ 233–35.[1] By treating the Pope's and other religious leaders' positions as authoritative against Catholics whose own religious conscience required otherwise, for example, the City allegedly "effectively aligned itself with one side of an internal debate" within the faith. *Commack*, 294 F.3d at 426.

The SAC then connects those standards directly to the Citywide Panel. It alleges that the Panel was created and supervised by City officials and attorneys; that its voting members came from the Law Department, DCAS, and CCHR; and that Eichenholtz and DCAS guided and trained reviewers concerning the standards applicable to religious appeals. SAC ¶¶ 252–68. The pleaded guidance specifically reached beliefs concerning abortion and beliefs deemed "personal," and the SAC alleges that the Panel continued many of the same theological distinctions embedded in the Stricken Standards. *Id.* ¶¶ 264–88.

The Panel's contemporaneous decision records confirm the plausibility of these allegations. O'Dea's Catholic fetal-cell objection was deemed a "personal preference based on inaccurate facts" even though the Law Department acknowledged that she asserted a sincere religious objection (SAC ¶¶ 540–546); Cutler's extensively documented born again unorthodox Christian beliefs (including that he is a deacon at his church and a supportive clergy letter) were characterized as a "personal preference" and rejected because there was allegedly "no demonstration that employee applies fetal cell line concern to any product other than COVID vaccine" (¶¶ 429–441); Delgado's longstanding practice of seeking guidance from God through prayer was deemed "personal" rather than religious (¶¶ 442–460); Paolillo's biblically-supported

[1] The SAC identifies specific materials assembled and distributed, including a memorandum containing a table of quotations from the City's selected religious leaders, as well as a specifically identified New York Times article authored by a former pastor which was sent to reviewers as evidence that religious objections to vaccination were invalid or inconsistent with recognized religious doctrine. It also cites evidence that multiple employees were told that they could not qualify based on an article about their "faith leader" supplied by the City.

aborted-fetal-cell-line objection was rejected by the Panel because "[t]he employee's objection is based on inaccurate scientific information" (¶¶ 556–572); Schimenti's Catholic aborted fetal-cell objection was rejected as a "personal preference," in part based upon his prior use of medications such as Tylenol and Pepto-Bismol (¶¶ 594–612); Schmitt was found by one Panel member to hold a "strongly held religious belief," while DCAS nevertheless rejected that same belief as a "personal preference" (¶¶ 624–631); Smith's Christian pro-life aborted fetal-cell objection was rejected by the Panel as not "qualify[ing] as a religious belief." Eichenholtz asserted that the Panel rejected his application because "to qualify as a religious belief, the cited belief should be part of a comprehensive religious belief system" (¶ 645–653). Smith asserted that his beliefs were part of such a comprehensive system. He believes that abortion is murder and a grave sin against God (*Id.*) Such sentiments are a core tenet of many Christian's belief systems.

These allegations address the precise deficiency identified in *NYFRL*. The *Kane/Keil* complaint alleged no "tangible connection" between the earlier evidence of denominational preference and the later Panel process. 125 F.4th at 330–31. The proposed SAC now alleges the intervening links: centralized City policymaking and guidance, transmission of substantive religious criteria to agencies and Panel reviewers, supervision and training of those reviewers, and contemporaneous decisions applying the same types of theological judgments to municipal employees. Those allegations must be credited on a motion to amend.

### D. The Newly Disclosed Chokshi Correspondence Supplies the Missing Nexus and Supports Strict Scrutiny

The newly disclosed emails underlying the Chokshi letter provide direct factual support for the pleaded connection between City policymakers and the challenged religious criteria. The R&R rejects Defendants' characterization of the communications as "a complete red herring" and acknowledges that Banks expressed, "at the very least," "skepticism and arguably hostility" toward

abortion-based religious objections. R&R 34. It nevertheless discounts the communications because they preceded the Citywide Panel and, viewed in isolation, supposedly lack a sufficient connection to the challenged policies and harms. *Id.* at 34–35. But the SAC does not plead the communications in isolation. It alleges their role in developing religious criteria, incorporating those criteria into official City guidance provided to adjudicators reviewing DOE and City employees, disseminating them through the accommodation system, and applying them in individual adjudications by the Citywide Panel.

The communications began with pending DOE religious-accommodation requests, supplying the nexus between the City and DOE found lacking in *Kane*. After learning that roughly two-thirds of incoming DOE requests were religious—many involving abortion or animal products—Banks sought a document signed by a City doctor that "essentially makes the argument as to why this is BS" and stated that its purpose was "for the arbitrators to reference" in denials. SAC ¶¶ 125–27. Bray gathered employee applications and recurring language, assembled materials directed specifically to those objections, proposed using medications such as Tylenol to test religious consistency even though there was no connection, and described the objective as producing the City's "best product" for upcoming hearings and anticipated litigation. *Id.* ¶¶ 128–35. Banks responded that a North Dakota publication Bray found was "a little bit more neutral than I was thinking" because it acknowledged both the use of fetal cells and the possibility of a Catholic conscience-based objection. He urged the group to "go further" and proposed stating that "even if someone is concerned about fetal cells it should not prevent them from being vaccinated." *Id.* ¶ 136.

Commissioner Chokshi and other senior officials then reviewed and approved the resulting Letter, which misleadingly suggested that the vaccines had no relevant connection to aborted fetal-

cell lines (though burying the opposite admission later in the same paragraph), interpreted the positions of an "array of religious groups," and represented that "the Catholic Church" permitted vaccination for all Roman Catholics while omitting the competing conscience-based position acknowledged in the North Dakota publication. *Id.* ¶¶ 141–46. The Letter also asserted that Tylenol and other medications used aborted fetal cells in the same manner, supplying the proposed religious-consistency test even though officials knew the City could not verify that those medications had any such connection. *Id.* ¶¶ 139–47. Credited as true, these allegations plausibly support an inference that senior City officials were not merely providing neutral medical information. They were developing governmental criteria for judging the validity and consistency of particular religious objections and misrepresenting unverified scientific assertions as scientific fact to undermine them.

The SAC asserts that DCAS then issued centralized guidance addressing the same abortion-based objections, relied expressly on the Chokshi Letter, characterized those objections as resting on a "false premise," and instructed agency reviewers to question applicants about Tylenol and similar medications. SAC ¶¶ 237–50. The Citywide Panel employed the same concepts: reviewers rejected fetal-cell objections as scientifically inaccurate, used medication history to test religious consistency, characterized individually derived beliefs as "personal," and measured applicants' beliefs against institutional religious authority. *Id.* ¶¶ 266–97. The individual allegations show those criteria applied to O'Dea, Paolillo, Schimenti, Schmitt, and others.

That chronology supplies the connection the R&R finds missing. The September 2021 communications concern the development of the challenged criteria; the Chokshi Letter and subsequent DCAS materials concern their adoption and dissemination; and the Panel records and individual denials concern their application. The Panel's later creation does not sever that chain

because the SAC alleges that the resulting guidance was incorporated into the municipal accommodation process. At the Rule 15 stage, those allegations and the reasonable inferences they support must be credited.

## III. THE R&R SHOULD NOT BE CONSTRUED TO NARROW PLAINTIFFS' SURVIVING FREE EXERCISE CLAIMS

Plaintiffs do not object to the recommendation permitting them to plead as-applied Free Exercise claims. R&R 38. They do object to any limitation predetermining the governing scrutiny, restricting relevant evidence, or constraining available relief.

The distinction between facial and as-applied challenges principally concerns the breadth of the claim and remedy, not the governing substantive standard. *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). Plaintiffs do not seek to invalidate every conceivable application of every Mandate, but their as-applied claims may establish that systemic features of the City's policies and decisionmaking were non-neutral or not generally applicable as applied to religious objectors, warranting correspondingly broad relief.

The R&R appears to conflate these questions by suggesting that non-neutrality triggers strict scrutiny "on [a law's] face," while lack of general applicability does so only "as applied." R&R 30. Either defect may trigger strict scrutiny in either posture. *Lukumi* holds that "[f]acial neutrality is not determinative" and requires consideration of subtle departures from neutrality, the sequence of events, administrative history, and decisionmakers' statements. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 540 (1993). Applying that principle in an as-applied challenge, *Masterpiece Cakeshop* reversed a state-court judgment affirming an administrative determination because hostility displayed at an earlier stage was never repudiated by the remaining commissioners or the State. 584 U.S. 617, 634–40 (2018).

Nor does *Kane* prohibit a systemic challenge. In that emergency preliminary-injunction appeal, the Court held only that the plaintiffs had "not established, **at this stage,**" a likelihood of showing the Mandate facially non-neutral or not generally applicable. 19 F.4th 152, 166 (2d Cir. 2021) (emphasis added). Indeed, notwithstanding that facial ruling, *Kane* applied strict scrutiny to the plaintiffs' as-applied challenges—even those who had not applied for accommodation—because the DOE procedures were independently non-neutral and not generally applicable. *Id.* at 167–69.

*M.A. v. Rockland County Department of Health* confirms that neutrality remains fact-intensive. Although the vaccination restriction there was facially neutral, the Second Circuit reversed summary judgment because neutrality and general applicability still turned on policymakers' statements and participation, the policy's operation and affected population, its underinclusiveness, and possible pretext in its asserted public-health purpose. 53 F.4th 29, 38–42 (2d Cir. 2022). Official statements are "context specific," and close questions of discriminatory purpose belong to the factfinder. *Id.* at 39–40.

The SAC pleads precisely that additional evidence: underinclusiveness; senior policymakers' participation and statements; the City's failure to repudiate—and subsequent expansion of—the Stricken Standards; and its development and continued use of discriminatory religious criteria. This includes Varma's alleged admission that the Mandates were unnecessary from a public-health perspective and intended to "harass" those who would not vaccinate, and his approval of the Chokshi guidance developed for use in accommodation hearings to defeat religious-accommodation claims. SAC ¶¶ 135–45, 709. These allegations plausibly support the inference that the City used the Mandates as a vehicle to defeat religious-accommodation requests and preclude treating the Citywide Panel as necessarily curing the earlier non-neutral decisionmaking.

R&R 33 n.8 also overlooks that an individualized-exemption mechanism defeats general applicability independently of any secular-comparator showing, "regardless whether any exceptions have been given." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–37 (2021). *Kane* applied that rule to DOE's discretionary process, and the SAC alleges comparable discretion in the later City processes. 19 F.4th at 168; SAC ¶¶ 252–95, 726.

Plaintiffs therefore object to R&R 30, 33 n.8, and 42–43 to the extent that they limit their ability to fully litigate Free Exercise claims.

## IV. THE R&R IMPROPERLY REJECTS PERSONAL-CAPACITY LIABILITY AGAINST CHOKSHI AND ADAMS

### A. The SAC Plausibly Alleges Chokshi's Own Unconstitutional Conduct

Plaintiffs object to the recommended exclusion of personal-capacity claims against Commissioner Chokshi. Under *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020), an official may be liable under § 1983 when his own actions violate the Constitution.

The R&R itself recognizes that "[h]ad Chokshi written a letter instructing City officials to discriminate in this way, he would have committed a direct violation of the Constitution that would allow him to be sued in his personal capacity." R&R 22. The SAC plausibly alleges precisely that.

As detailed above, the Chokshi Emails arose from an overt effort to develop guidance enabling adjudicators to reject pending religious objections as "BS," particularly abortion- and fetal-cell-based objections. The R&R acknowledges Banks's "skepticism and arguably hostility." R&R 34. That evidence of non-neutrality cannot be isolated from the guidance developed through those communications and transmitted into the accommodation process.

Copied on the emails where Banks admitted the purpose and lack of neutrality underlying his request, Chokshi not only failed to repudiate it but agreed to help with this effort, personally reviewed the resulting Letter, approved its contents and issuance under his name, requested

restoration of religion-specific content, and approved the final product. R&R 23–26. Defendants themselves concede that the Letter was the "direct result" of those discussions. R&R 25.

The R&R's own characterization of Chokshi's conduct sufficiently pleads personal involvement. It concludes that the Letter "lays out Chokshi's official position" that fetal-cell objections are "misunderstandings" or can be resolved by selecting another vaccine. R&R 23–24. That describes, rather than defeats, the alleged violation. Government may assess sincerity, but not whether an adherent's religious understanding is objectively "accurate or logical." *Jolly*, 76 F.3d at 476. *Gardner-Alfred* specifically held in the COVID-vaccine context that an individual Catholic's disagreement with institutional dogma is immaterial and that government may not assess the objective validity of a fetal-cell belief. 143 F.4th at 65–68. Nor may government resolve an internal doctrinal dispute by aligning itself with one religious position. *Commack*, 294 F.3d at 426.

Nor does personal involvement require an express *instruction* to deny a particular application. Personal responsibility exists where an official "affirmatively promoted a policy which sanctioned the type of action which caused the violations." *Duchesne v. Sugarman*, 566 F.2d 817, 831 (2d Cir. 1977). That principle accords with *Tangreti*, which relied on authority recognizing liability where an official creates, promulgates, or maintains an unconstitutional policy. 983 F.3d at 618; *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

That is what Plaintiffs allege. Chokshi personally reviewed, revised, approved, and authorized under his own name official guidance concerning the validity of religious objections for the stated purpose of suppressing those beliefs. That is his own policymaking conduct, not passive supervision. His personal involvement does not disappear because other officials later applied

those unconstitutional criteria to particular Plaintiffs; downstream application does not erase his upstream conduct. R&R 24.

At minimum, the context permits the inference that Chokshi issued the Letter to shape adjudication of the religious objections it addressed. It was developed in response to pending requests, addressed to the arbitrator deciding them, approved by Chokshi with knowledge of that purpose, and later cited by accommodation decisionmakers and used in the Citywide Panel process. SAC ¶¶ 109–17, 121–53. The R&R instead infers that Chokshi did not intend the guidance to affect adjudications because it prescribed no particular outcome. But "[t]he choice between two plausible inferences" belongs to the factfinder. *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 184–85 (2d Cir. 2012); see also *NRA v. Vullo*, 602 U.S. 175, 194–95 (2024). That competing inference cannot be resolved against Plaintiffs on futility review.

These same allegations also satisfy the R&R's cited state and city standards: Chokshi plainly possessed authority beyond merely carrying out others' personnel decisions, and Plaintiffs allege his actual participation in developing and promulgating the discriminatory guidance.

**B. Plaintiffs Separately Object to the Dismissal of Adam's Personal-Capacity Claims**

Plaintiffs similarly object to the recommended exclusion of personal-capacity claims against former Mayor Adams. The R&R characterizes the allegations as impermissible supervisory liability and concludes that his public statements are insufficiently connected to religious discrimination. R&R 20–22. But the SAC alleges affirmative exercises of governmental authority by Adams himself.

Continued operation of the Mandates depended on the Mayor's repeated renewal of emergency authority, and Adams possessed and exercised discretion to repeal, amend, pause, or create exceptions to them. SAC ¶¶ 51–58. He lifted other COVID restrictions while retaining the employee Mandates, issued Executive Order 62 creating categorical exemptions for selected

groups based on economic considerations, and knowingly permitted thousands of unvaccinated employees to work for secular reasons, including staffing shortages, administrative backlog, and mutual-aid arrangements. *Id.* ¶¶ 53–59. Yet he maintained the Mandates against religious objectors despite materially changed public-health conditions and CDC guidance counseling against differentiating between vaccinated and unvaccinated workers. *Id.* ¶¶ 62–65. Those Mandates remained in force until February 2023. These allegations concern Adams's own policy choices, not a failure to supervise subordinates.

The R&R also concludes that Adams's statements "do not reference religious beliefs at all." R&R 21. But Adams was specifically asked whether he would repeal the employee Mandates and reinstate employees "who were denied religious accommodation and lost their jobs." SAC ¶ 56. He responded that employees who complied "did the right thing," that reversing course would "send[] the wrong message," and that "[p]eople have to follow the rules." *Id.* This was not an abstract observation about vaccination, but Adams's stated justification for continuing the Mandates' consequences for religious objectors. A factfinder could understand his statement that compliant employees "did the right thing" as conveying that employees who adhered to their religious beliefs had done the wrong thing. See *Spivack v. City of Philadelphia*, 109 F.4th 158, 169–70 (3d Cir. 2024).

*M.A. v. Rockland County Department of Health* confirms that "[a]ssessing the relevance of statements by public officials to the question of religious animus is often context specific" and that competing interpretations present "the sort of close factual question that should be left to the jury." 53 F.4th at 37–38. *M.A.* also considered whether the speaker exercised authority over the challenged action. *Id.* at 38. Adams did: he repeatedly exercised authority over the City's COVID restrictions, personally continued the employee Mandates, and made the challenged remarks while

explaining why he would not lift them or reinstate employees denied religious accommodation. SAC ¶¶ 51–65. His statements therefore bear on the purpose underlying his own policy decision.

At minimum, a factfinder could construe Adams's statements and policy decisions as evidence that continued enforcement against religious objectors served a compliance or punitive purpose rather than the asserted public-health justification. *M.A.* precludes resolving that inference against Plaintiffs as a matter of law. The SAC therefore alleges Adams's own policymaking conduct and a plausible discriminatory purpose sufficient for the personal-capacity claims to proceed.

## V. THE R&R'S LIMITATIONS ANALYSIS SHOULD NOT BAR THE NEWLY IDENTIFIED DEFENDANTS AT THE PLEADING STAGE

Plaintiffs also object to the categorical exclusion of Banks, Bray, Afshar, Varma, and Eichenholtz as untimely. R&R 17–19.

### A. R&R's Chronology Does Not Account for the Court-Directed Amendment Process

The R&R deems the claims against Banks, Bray, Afshar, Varma, and Eichenholtz untimely based on the premise that Plaintiffs first "attempt[ed] to add new parties in an April 2026 motion" concerning events in 2021 and 2022. R&R 17. That chronology is incomplete.

At the December 2, 2024 conference, Plaintiffs expressly requested amendment and discussed the Chokshi Letter, the Pope/religious-authority problem, newly learned evidence, and the need for additional factual detail. 12/2/24 Tr. 10–13. The Court directed Plaintiffs not to file a full motion then, but to proceed through a joint-letter process. Plaintiffs' February 2025 submission accordingly identified proposed amendments concerning Chokshi, the Letter, abortion- and fetal-cell-based objections, and the City's religious-authority criteria. The Court then scheduled proceedings to address the amendments "outlined in" ECF No. 138 and established a briefing schedule. Plaintiffs served their motion on June 25, 2025 pursuant to that schedule; after Defendants obtained additional time to oppose, the papers were filed under the Court's bundling procedure.

These dates matter because, "[w]hen a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000). A premotion request may serve the same function where it gives sufficient notice of the proposed amendment. *Bensinger v. Denbury Resources Inc.*, 31 F. Supp. 3d 503, 509 (E.D.N.Y. 2014). Here, the premotion did just that. ECF 138. The analysis therefore cannot simply assume that either September 2025, when the bundled motion appeared on ECF, or April 2026, when Plaintiffs supplemented with the Chokshi emails, controls every claim and defendant.

That point is especially clear as to Chokshi, an existing defendant whose Letter and conduct were identified long before the emails surfaced; the emails corroborated his personal participation rather than creating the underlying claim. More broadly, Plaintiffs should not lose claims because they complied with Court-directed procedures that postponed filing.

**B. Equitable Estoppel Precludes Dismissal**

The new individual defendants present a distinct issue. The records revealing Banks's, Bray's, Afshar's, and Varma's participation were sought from the City beginning in 2021, withheld through years of FOIL litigation, and ordered produced in February 2026. SAC ¶¶ 30–31, 118–21. The Second Department held that DOHMH had "no reasonable basis for denying access." *Matter of Wagner v. New York City Department of Health & Mental Hygiene*, 246 A.D.3d 751, 755 (2d Dep't 2026). Plaintiffs moved promptly after obtaining the evidence.

The R&R addresses concealment only under Rule 15(c)(1)(C), finding it insufficient to establish that each proposed defendant knew he or she would have been named but for a "mistake." R&R 18–19. Equitable estoppel is distinct. Section 1983 limitations may be equitably tolled where concealment prevents discovery of the cause of action. *Pearl v. City of Long Beach*, 296 F.3d 76, 82–83 (2d Cir. 2002).

Critically, the Chokshi Emails did not merely strengthen claims Plaintiffs already possessed against these individuals; they revealed for the first time the facts necessary to plead any personal-capacity claim against them at all. Because *Tangreti* requires allegations of each official's own unconstitutional conduct, Plaintiffs could not have asserted viable § 1983 claims against Banks, Bray, Afshar, or Varma without knowing of their personal participation—facts the City had concealed. *See Blaskiewicz v. County of Suffolk*, 29 F. Supp. 2d 134, 140–41 (E.D.N.Y. 1998) (equitably tolling limitations where plaintiff had already commenced suit, diligently attempted to identify the individual actors responsible, sought the necessary information through FOIL, and the municipality withheld it, reasoning that the municipality "should not benefit from its refusal to provide the plaintiff with relevant information").

On those allegations, tolling presents, at minimum, a factual issue that cannot be resolved against Plaintiffs on a Rule 12 futility determination.

### C. Plaintiffs Preserve Their Rule 15(c) Relation-Back Objections

Plaintiffs preserve their objections concerning notice, mistake, constructive notice, identity of interest, and shared representation. They recognize that ordinary lack of knowledge of a John Doe defendant's identity generally is not a Rule 15(c)(1)(C) "mistake" but the SAC alleges more: constructive notice, centralized Corporation Counsel involvement, senior officials' participation in policies challenged since 2022, and concealment of their identities and roles. Plaintiffs preserve their argument that those facts may satisfy federal or state relation-back principles on a developed record.

## VI. THE R&R'S RULE 8 ANALYSIS AND 15,000-WORD LIMIT

Plaintiffs object to the recommended 15,000-word cap and the contradictory pleading demands accompanying it. The R&R finds that the SAC's substance is discernible, recognizes that its length reflects the number of Plaintiffs and claims and the "convoluted circumstances" of the litigation,

and declines to deny amendment under Rule 8. R&R 15–16. Yet it then imposes a substantial word limit while elsewhere demanding still greater factual specificity.

For example, the SAC identifies religion-specific materials the City allegedly supplied to adjudicators, their use against members of several faiths, and particular adjudications in which they were invoked. SAC ¶¶ 149–53. The R&R nevertheless requires further detail about each article, its contents, and its recipients. R&R 35. Similar demands recur concerning each Plaintiff, defendant, comparator, policymaker connection, and accommodation process. Rule 8 requires plausibility and fair notice, not an evidentiary record; in any event, the particularized pleading the R&R demands cannot reasonably be reconciled with its word cap.

The cap also creates uncertainty about which allegations may remain. The Chokshi communications, policymaker conduct, City-supplied religious materials, Panel practices, secular comparators, and failure to repudiate are relevant not only to theories the R&R rejects, but also to the surviving Free Exercise, Equal Protection, statutory-discrimination, and municipal-liability claims. Deleting those facts risks leaving the surviving claims insufficiently supported; retaining them risks an accusation that Plaintiffs repleaded a rejected theory. That ambiguity invites avoidable motion practice. Plaintiffs therefore object to the 15,000-word limit.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court conduct de novo review and decline to adopt the adverse portions of the R&R, instead granting leave to file the substitute SAC [ECF 152-1] and allowing Defendants to answer or otherwise respond within twenty days.

Dated: August 21, 2026

Respectfully Submitted,
/s/ Sujata S. Gibson
Sujata S. Gibson, Esq.